Frank Morreale, Esq.
Matthew R. DiBlasi, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466
Facsimile: (904) 358-1872

*Attorneys for Defendant Lupin Atlantis Holdings SA*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INSPIRX, INC.,

Plaintiff,

- against -

LUPIN ATLANTIS HOLDINGS SA,

Defendant.

Case No. 1:20-cv-03214 (JPC)

**DEFENDANT'S STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

Defendant Lupin Atlantis Holdings SA ("Defendant" or "Lupin"), by and through its attorneys, Holland & Knight LLP, submits this statement of material undisputed facts pursuant to Local Rule 56.1 in support of its motion for summary judgment.

**Venue, Jurisdiction and Choice of Law**

1. Venue is proper in this Court, and this Court may assert jurisdiction over the parties and the subject matter. [*See* First Amended Complaint (D.E. 14 at ¶¶ 3-6); Answer (D.E. 15 at ¶¶ 3-6).]

2. New York law applies to the parties' claims and defenses. [*See* the Exclusive Distribution, License and Supply Agreement (the "Agreement"), attached as Exhibit 1 to the accompanying Declaration of Matthew R. DiBlasi in Support of Defendant's Motion for Summary Judgment (the "Def. Decl.") at § 13.10(b) (LUP0000197).]

**The Parties**

3. Plaintiff InspiRx, Inc. ("Plaintiff" or "InspiRx") is a pharmaceutical and device company that researches and produces medical devices, including valved holding chambers ("VHCs"), to improve delivery of medicines for diseases such as idiopathic pulmonary fibrosis, with a focus on infants and toddlers. [*See* excerpts from deposition transcript of Dr. Michael Newhouse, dated August 31, 2020 ("Newhouse Tr."), at 7:25-8:15; 9:18-21, attached to the Def. Decl., as Exhibit 2.]

4. InspiRx has a sophisticated management team with decades of experience inventing and marketing VHCs. [*See* Newhouse Tr. at 7:10-20 (naming the members of InspiRx's management team).]

5. InspiRx's Chief Medical Officer, Dr. Michael Newhouse, invented AeroChamber in the 1980s and co-invented InspiraChamber. [*See* Newhouse Tr. at 26:10-27:20; 49:11-15.]

6. InspiRx's Marketing Director, Michael Amato, III, was a member of Lupin's pediatric sales forces from 2013 to 2016. [*See* excerpts from deposition transcript of Michael Amato, III, dated August 20, 2020 ("Amato, III Tr."), at 16:8-17; 43:8-44:17, attached to the Def. Decl., as Exhibit 3.]

7. InspiRx's CEO, Michael Amato, built AeroChamber into a global market leader between 1984 and 2011 and is considered an expert on VHCs. [*See* excerpts from deposition transcript of Tonya Winders, dated August 27, 2020 ("Winders Tr."), at 23:6-13, attached to the Def. Decl., as Exhibit 4 ("Q. In your opinion, would it be fair to say Mr. Amato has a significant amount of experience in the VHC industry? A. Yes. Q. Would you categorize him as an expert on VHCs? A. Yes.") (objection omitted); *see also* excerpts from deposition transcript of Michael Amato, dated August 13, 2020 ("Amato Tr."), at 20:23-21:7, attached to the Def. Decl., as Exhibit 5.]

8. Mr. Amato was hired as InspiRx's CEO because he had done a "brilliant job marketing AeroChamber." [*See* Newhouse Tr. at 14:20-25 ("Q. How did it come to be that Mr. Amato began working for InspiRx? A. I called him and suggested that – that since he had done such a brilliant job marketing AeroChamber, he might want to come to – he might want to do the same sort of thing for InspiraChamber . . . ."); *see also id.* at 48:7-49:15.]

9. Defendant Lupin is a pharmaceutical company with commercial divisions for generics and branded pharmaceuticals. [*See* Lupin, About Us, https://www.lupin.com/US/about-us/ (last visited Sept. 30, 2020).]

10. Mr. Jay Liska was Lupin's project leader for InspiraChamber. [*See* excerpts from deposition transcript of Jay Liska, dated August 11, 2020 ("Liska Tr."), at 76:25-77:4, attached to the Def. Decl., as Exhibit 6.]

11. Between 1982 and 2020, Mr. Liska worked for DuPont, Bristol Myers Squibb and Lupin. [*See* Liska Tr. at 20:12-23:13.]

12. Prior to entering the Agreement with Plaintiff, Lupin's experience with VHCs was limited to supporting Forest Labs, the company primarily responsible for promoting AeroChamber, by making sales calls for the five-year period between 2008 and 2013. [*See* excerpts from deposition transcript of Mickey Proctor, dated August 18, 2020 ("Proctor Tr."), at 16:1-19:22, attached to the Def. Decl., as Exhibit 7 ("Q. And you mentioned that it was on a per sales call basis. Can you explain what that means? A. That means they paid us $100 a call. So if we made a call on the qualified doctors and we gave them a list of the doctors we called on, then they would give us $100 per call. So all the sales still went through Forest.").]

**<u>The Valved Holding Chamber ("VHC") Market</u>**

13. VHCs were developed in the early 1980s. [*See* Amato Tr. at 90:20-91:2 ("I started at Monaghan in 1984. AeroChamber was already on the market for at least one year. So, 1983.").]

14. A VHC "is a device that is used with asthma medications—most often inhalers—to hold or suspend the medications so that a child or someone elderly, anyone that has breath coordination efforts or issues can get the medication deeper into their lungs." [*See* Winders Tr. at 22:5-11; *see also* Newhouse Tr. at 26:11-27-20.]

15. As of 2015-2019, the VHC market was a mature consumer market. [*See* Newhouse Tr. at 28:11-29:7.]

16. The VHC market consisted of only 2 million units of annual sales. [*See* Liska Tr. at 39:25-40:8.]

17. VHCs are not as popular in the United States as substitute products such as small volume nebulizers. [*See* Liska Tr. at 154:9-21 ("Nebulizers are used vastly more than valved

holding chamber for kids with asthma . . . ."); *see also* Amato Tr. at 71:16-21 ("[N]ebulizers have been used historically for the last 70 years."); Amato, III Tr. at 42:3-43:7.]

**<u>The December 2013 Agreement</u>**

18. In December 2013, Plaintiff and Lupin executed the Agreement. [Def. Decl., Ex. 1.]

19. Pursuant to Section 2.1(b) ("Appointment; Acceptance"): "Lupin hereby accepts the appointment as InspiRx's independent distributor with the sole and exclusive right to Distribute the Products . . ." [*Id.* at § 2.1(b) (LUP0000173).]

20. Pursuant to the Agreement: "'Commercially Reasonable Efforts' means, with respect to the efforts to be expended by a Party with respect to any task of or objective under this Agreement, reasonable, diligent, good-faith efforts to accomplish such task or objective as soon as practicable, which efforts shall not be less than the efforts that other similarly situated companies would normally use to accomplish a similar task or objective under similar circumstances exercising reasonable business judgment, with respect to a product owned by it or to which it has similar rights as the Products, which product is at a similar stage in its product life and is of similar market, commercial and profitability potential as the Product, taking into account efficacy, safety, approved labeling, the competitiveness of alternative products in the marketplace, the patent and other proprietary position of the product, and other relevant factors commonly considered in similar circumstances. It is understood that the level of efforts required to meet the above standard may change over time if there are changes in the status of the Products or of the above criteria applicable to the Products." [*Id.* at § 1.1 (LUP0000170).]

21. Pursuant to Section 2.1(b) ("Appointment; Acceptance"): "Lupin shall use commercially reasonable efforts to distribute the products . . . using its current distribution capabilities and resources." [*Id.* at § 2.1(b) (LUP0000173) (emphasis added).]

22. According to Section 2.5 ("Payments"): "As full consideration for the grant by InspiRx of the exclusive Distribution rights and exclusive licenses hereunder, Lupin agrees to pay during the Term and subject to the terms and conditions hereof . . . the following amounts to InspiRx by wire transfer to the account designated by InspiRx to Lupin in writing" totaling $977,000.00. [*Id.* at § 2.5 (LUP0000176); *see also* Proctor Tr. at 27:22-28:11.]

23. According to Section 3.11(d) ("Minimum Purchase Obligations"): "InspiRx's sole right and remedy with respect to such failure shall be to terminate this Agreement on sixty (60) days prior written notice . . . and Lupin shall bear no other liability therefor . . . . In the event that InspiRx fails to deliver such written notice within such period, InspiRx shall be deemed to have irrevocably and unconditionally waived for all purposes Lupin's failure to meet the Annual Purchase Obligation for such Contract Year, and this Agreement shall remain in full force and effect for the remainder of the Term . . . ." [Def. Decl., Ex. 1 at § 3.11(d) (LUP0000180).]

24. Pursuant to Section 7.1(a) of the Agreement ("Lupin Marketing Authority"): "Lupin shall have, in its sole discretion, the authority to market and otherwise Distribute the Products . . . to the extent and in such manner as it deems appropriate." [*Id.* at § 7.1(a) (LUP0000184).]

25. Pursuant to Section 7.1(b) of the Agreement ("Lupin Marketing Authority"): "Notwithstanding Section 7.1(a), Lupin or its Affiliates shall use Commercially Reasonable efforts to exhibit the Products at one or more major physician group meetings in the Territory during each Contract Year . . . . Lupin shall confer with InspiRx on which physician group meeting(s) Lupin

plans to exhibit the Products. After consultation with Lupin, InspiRx may exhibit the Products for the Hospital Market, at its expense . . . ." [*Id.* at § 7.1(b) (LUP0000184).] The Agreement does not mandate that the sales force consist of any specific number of salespersons or mandate a minimum number of sales calls. [*See generally id.*]

26. The Agreement does not mandate any payment from InspiRx to Lupin for Lupin's efforts to market and sell InspiraChambers. [*See generally id.*]

27. The Agreement required Lupin to pay InspiRx $977,000 over four payments during 2014. [*See id.* at § 2.5(a) (LUP0000176); *see also* Plaintiff's Objections and Responses to Defendant's First Set of Requests for Admissions at Nos. 1-5, attached to the Def. Decl., as Exhibit 8.)

28. No company other than Lupin was interested in promoting InspiraChamber before Plaintiff reached an agreement with Lupin. [*See* Amato Tr. at 31:3-32:24.]

**<u>Pre-Launch (mid-2014 through January 2015)</u>**

29. InspiRx and Lupin positioned the InspiraChamber to compete with the market leader, AeroChamber, as opposed to the inferior OptiChamber. [*See* Newhouse Tr. at 32:7-13 ("Q. And do you consider the OptiChamber to be an inferior device to AeroChamber and InspiraChamber? A. Yes. Q. What is the most comparable competitor's product to InspiraChamber? A. AeroChamber."); *see also* Liska Tr. at 104:16-106:2.]

30. AeroChamber had a substantial competitive advantage in the VHC market. [*See* Amato Tr. 74:21-75:5 ("[T]he leader simply, when we negotiated, was AeroChamber."); Amato, III Tr. at 102:24-103:23 ("And because of their long-standing reputation in the market, the pharmacists who dispense and the physicians who write take that – they look at the headlines or a big pretty picture in front, and take that to heart, and that's what causes the challenges.").]

31. AeroChamber's "first to market" status was significant for brand recognition with doctors who prescribe VHCs. [*See* Newhouse Tr. at 32:14-33:8 ("Q. And AeroChamber was first to the market. Right? A. Absolutely, by – by quite a bit. Q. And AeroChamber has historically enjoyed a premium pricing advantage over OptiChamber and any generics. Right? A. . . . . AeroChamber is a bit like Kleenex. I think a lot of doctors have that reflex, so they write AeroChamber, and – because it was so far ahead of everybody else . . . . But I believe it's – you know, it's very well known and is used probably most."); *see also* Winders Tr. at 58:11-14 ("It's the most well known brand.").]

32. Lupin hired and paid an external advertising agency Brand Equity Rx to develop the InspiraChamber campaign. [*See* Liska Tr. at 86:5-20.]

33. InspiRx had no sales before Lupin launched InspiraChamber. [*See* Amato Tr. at 59:24-60:4.]

**<u>The Launch (February 2015)</u>**

34. The launch event for InspiraChamber in February 2015 was "perfect" and "an extremely well-done introduction." [*See* Amato Tr. at 107:24-25 ("I believe the launch was perfect."); *id.* at 46:1-7 ("We were extremely positive after leaving the Lupin launch meeting."); Newhouse Tr. at 22:21-23:9 ("I recall that it was very well done . . . . I thought it was an extremely well-done introduction."); *id.* at 62:6-21 (praising the launch as "excellent"); *id.* at 64:11-13 ("I've never seen any program done any better than that for introducing a device."); *see also* excerpts from deposition transcript of Rohinton Toddywala, dated September 11, 2020 ("Toddywala Tr."), at 29:2-4, attached to the Def. Decl., as Exhibit 9 ("Q. Would you characterize the launch as successful? A. Yes.").]

35. According to Plaintiff's expert Christianna Vance, "Lupin's efforts to distribute the Products at the time of the launch, i.e., in or around February 2015, were commercially reasonable and demonstrated reasonable, diligent and good-faith efforts to position the business to increase market share over the course of several years." [*See* excerpts from Expert Report of Christianna Vance, dated September 9, 2020 ("Vance Report") at p. 4, attached to the Def. Decl., as Exhibit 10.]

**<u>Post-Launch (February 2015 - January 2016)</u>**

36. Lupin's sales force was tasked with selling its entire brand portfolio, not just InspiraChamber, including Lupin's historic anchor brand, Suprax. [*See* Liska Tr. at 261:22-25 ("Q. Okay. And do you recall what other products the primary care sales force was marketing at that point in time? A. Antara and Suprax."); *id.* at 64:17-20 ("Lupin started its brand business, I believe in 2004 in the United States, you know, with Suprax, and very early on targeting physicians.").]

37. Between February 2015 and the end of 2016, Lupin's pediatric sales force promoted InspiraChamber in the first or second priority position. [*See* Liska Tr. 170:11-171:9.]

38. Lupin attended many conferences for the purposes of marketing and selling the Products in 2015 and 2016. [*See* Defendant's Answers and Objections to Plaintiff InspiRx, Inc.'s Second Set of Interrogatories ("Lupin Interrogatory Answers"), at Answer to Interrogatory No. 4, attached to the Def. Decl. at Exhibit 11; *see also* excerpts from deposition transcript of Nancy Schladen, dated August 25, 2020 ("Schladen Tr.") at 77:19-80:12, attached to the Def. Decl., as Exhibit 12; *id.* at 81:6-21; Liska Tr. at 235:24-236:24; Amato Tr. at 178:9-180:3; *see also* excerpts from deposition transcript of Kevin Turner, dated September 15, 2020 ("Turner Tr."), at 133:3-21, attached to the Def. Decl., as Exhibit 13.]

39. Plaintiff's Dr. Newhouse attended conferences with Lupin in 2015 and 2016, which were all "well done." [*See* Newhouse Tr. at 54:12-15; 67:5-15 ("I think the whole booth was well done."); *id.* at 92:17-93:7; *id.* at 95:18-96:2; 97:10-16.]

40. Exhibiting at physician group meetings was costly and required a substantial amount of preparation. [*See* Newhouse Tr. at 53:3-10.]

41. Lupin engaged in journal advertising for the Products. [*See* Liska Tr. at 115:23-116:9.]

42. Journal advertising is typically most effective at launch and for six months. [*See* Liska Tr. at 116:20-117:6 ("Q. Okay. Do you know what happened after that six-month period, in terms of digital and print journal advertising? A. I know over time, we pared back on the advertising. Typically, you know, once you've created your awareness, you know, and usually that's a six-month blitz, you know, there's a place for reminder advertising, but, you know, advertising is expensive, particularly print advertising. So we typically tapered off after six months.").]

43. Plaintiff's CEO conceded that he has no complaints about Lupin's efforts in 2015 and 2016. [*See* Amato Tr. at 162:16-19 ("Q. And so do you have any complaints about the effort Lupin was making in 2015 and 2016 when they had the pediatric sales force? A. No, I don't.").]

44. Sales of InspiraChamber flat-lined by summer 2015. [*See* Schladen Tr. at 43:14-23; *id.* at 51:5-52:8; Liska Tr. at 143:23-147:3; 156:5-14 (Q. Okay. Is it your understanding that InspiraChamber had totally flat-lined in the month of May in 2015? A. . . . . So, you know, yes, I guess the sales were flat month over month, you know, as soon as May, after the launch in February.").]

45. Plaintiff's damages expert conceded that Lupin met its first year obligation to purchase InspiraChambers from Plaintiff. [*See* excerpts from Expert Report of Graham D. Rogers, dated September 9, 2020 ("Rogers Report") at ¶ 56, attached to Def. Decl. at Exhibit 14 ("Based on my analysis, Lupin met the minimum purchase requirements in 2015[.]"); *see also* Defendant's Responses to Plaintiff's First Request For Admissions, at Responses to Requests Nos. 7-10, attached to Def. Decl. at Exhibit 15.]

**<u>Sales Were Disappointing With Each Of Plaintiff's Distributors In 2015 and 2016</u>**

46. Between 2015 and 2018, InspiraChamber sales were flat or non-existent in every market that InspiraChamber was sold. [*See* Amato Tr. at 102:10-13 ("Q. [redacted] *id.* at 105:14-17 [redacted] *id.* at 161:18-162:6 (same); Liska Tr. at 143:23-147:3; 156:5-14; *id.* at 160:22-162:13.]

47. Plaintiff's European distributor had a troubled launch followed by disappointing sales. [*See* Amato, III Tr. at 102:4-103:23.]

48. Plaintiff's attempts to sell in Asia were unsuccessful. [*See* Amato, III Tr. at 141:20-142:6 ("Q. Was InspiRx also looking to expand into the Hong Kong and Macau markets, around this time? A. Around October of 2018? Q. Yes, in that general time frame. A. Approximately around then . . . . Q. And whatever happened with that, please? A. Ultimately, we didn't end up doing business with them.").]

49. As of October 26, 2016, InspiRx's distributor for the United States hospital market, Salter Labs, was not ordering InspiraChambers pursuant to its agreement with InspiRx. [*See* Toddywala Tr. at 57:20-58:6.]

50. Salter Labs did not buy any new product in 2016 and returned a significant amount of product. [*See* Toddywala Tr. at 33:15-34:25; 51:2-19; 52:8-55:17.]

51. Plaintiff terminated its hospital distributor, Salter Labs, in part due to disappointing sales. [*See* Amato, III Tr. at 100:4-11; Toddywala Tr. at 75:19-76:2.]

52. InspiRx was kept fully informed of Lupin's sales numbers through regular meetings and reporting. [*See* Toddywala Tr. at 49:1-18; Amato Tr. at 50:2-51:3; 51:11-52:8; Schladen Tr. at 59:12-61:3; Liska Tr. at 239:4-18.]

53. By the end of 2016, the costs associated with employing a pediatric sales force was not justified due to the lack of revenue created by the Suprax and InspiraChamber brands. [*See* Liska Tr. at 247:15-25 ("The decision to disband the pediatric sales force was a function of the fact that InspiraChamber sales were flat to declining; Suprax was getting generic competition, and we were not able to get any other business development deals to support the sales force.").]

54. By late 2016, Lupin had lost millions of dollars despite substantial efforts to market and sell InspiraChamber. [*See* Liska Tr. at 231:2-232:14.]

55. According to Lupin's Profit & Loss statement, Lupin lost $17.112 million on InspiraChamber between April 2014 and March 2017. [*See* Liska Tr. at 182:14-183:5; *see also* Lupin Interrogatory Answers at Nos. 7, 9, and Exhibit 1 thereto at "P&L with 2015-2020" tab.]

56. [redacted] [*See* Amato Tr. at 45:22-47:10; 188:17-25.]

57. Lupin's project leader testified that, "typically in the first 12 to 18 months of any brand launch, you get the prescribers you're going to get[.]" [*See* Liska Tr. at 161:22-162:13.]

**The Alternate Strategy (February 2017)**

58. Lupin made the decision to change strategy and restructured its pediatric sales force. [*See* Liska Tr. at 247:15-25; *id.* at 249:18-250:10; Schladen at 37:9-15.]

59. Lupin developed alternate plan to market and sell the Products. [*See* Liska Tr. at 251:12-255:3, Amato Tr. 143:24-144:17; *see also* excerpts from deposition transcript of Janett DeTore, as Rule 30(b)(6) witness, dated September 3, 2020 ("Lupin Tr.") at 111:22-113:24, attached to the Def. Decl. at Exhibit 16.]

60. The amount budgeted to promote InspiraChamber was reduced to reflect historical sales trends. [*See* Liska Tr. at 192:12-193:9; 219:22-220:13.]

61. A small sales force remained to promote InspiraChamber. [*See* Liska Tr. at 227:11-21; 261:5-263:19.]

62. InspiRx supported the alternate strategy during and after a February 16, 2017 meeting. [*See* Amato Tr. 137:22-138:18; Depo. Ex. 53 at Inspirx00004587, attached to the Def. Decl., as Exhibit 17 ("I came away [from the February 16, 2017 meeting] with a renewed feeling that 2017 would be a vast difference than the last 2 years in terms of InspiraChamber product sales and market penetration."); Amato, III Tr. at 70:18-23 ("Q. So you personally were on board with the new strategy? A. Yes."); Amato, III Tr. at 70:8-72:7; Depo. Ex. 68 at Inspirx00006422, attached to the Def. Decl., as Exhibit 18 ("I believe the new strategy is not only going to be effective in moving units, but is also going to make a huge impact, and make real changes on the standard of treatment in the United States . . . . Thank you all for the time, passion and continued effort.").]

**Lupin's Execution Of The Alternate Strategy (February 2017 through August 2019)**

63. Lupin attempted to contract with many large retailers, including HEB, CVS, Publix, Albertsons, Walmart. [*See* Lupin Tr. at 83:11-85:9; *see also* excerpts from deposition transcript of David Shirkey, dated September , 2020 ("Shirkey Tr."), at 17:13-18:7; 27:22-28:8; 34:18-37:25; 28:23-25; 38:1-16, attached to the Def. Decl., as Exhibit 19; Amato Tr. 144:23-145:7; Turner Tr. at 34:23-35:3; 117:15-118:7; 120:6-10 ("Q. Did Lupin ever make the proposed deal with Walmart for InspiraChamber? A. We attempted to make deals with most large, if not all box stores respective to InspiraChamber from a pricing standpoint."); *id.* at 130:17-22; 131:21-23; *id.* at 141:8-11; *see* excerpts from the deposition transcript of Janett DeTore, dated September 24, 2020 ("DeTore Tr.") at 13:10-20, attached to the Def. Decl. as Exhibit 20 ("Q. Okay. Do you recall setting up meetings with any other retailers with regard to InspiraChamber? A. Yes. Not necessarily myself, but whether it was David Shirkey or Kevin Turner, setting up meetings, once again with Walgreens, CVS, Walmart, continued conversations with Albertsons, Safeway and HEB.").]

64. Dr. Newhouse participated in a meeting with HEB that "went very well." [*See* Newhouse Tr. at 80:4-81:17.]

65. Lupin achieved preferred status with Albertsons in 2017 and improved the contract one year later. [*See* Turner Tr. at 35:8-16 ("Q. Did you make any deals other than the Albertsons account for the InspiraChamber on the retail side? A. No. I actually made the Albertsons deal better for InspiraChamber. Q. How so? A. Working with Albertsons to ensure InspiraChamber was preferred within its system from an edit standpoint, which increased sales."); *id.* at 64:4-16; 66:2-14; *id.* at 80:14-22; Amato, III Tr. at 87:3-12; Shirkey Tr. at 22:24-23:10.]

66. Sales at Albertsons increased substantially wholly independent of the use of a sales force. [*See* Amato, III Tr. at 135:23-136:15; Turner Tr. at 96:20-97:10 ("Q. . . . You see in the middle line, you say, 'We continue to see lift with the changes we have locked in place? A. Yes. Q. What does that refer to? A. Exactly what I've been talking to you about in the prior discussion around Albertsons' step edits within their system, communications out to their pharmacy network. Q. Were the education samples part of that? A. Sure. Q. The next line you say 'We're up 12.3 percent YOY for Q1.' What is 'YOY'? A. Year over year.").]

67. Lupin was not able to contract with large retailers by dropping the price. [*See* Turner Tr. at 118:8-120:16.]

68. Lupin attempted to implement the managed care initiative. [*See* Shirkey Tr. at 54:15-55:1.]

69. Lupin, not InspiRx, paid for the data necessary to start the managed care initiative. [*See* Newhouse Tr. at 83:17-19; Amato, III Tr. at 146:1-10.]

70. Plaintiff's Chief Medical Officer participated in the attempt to engage managed care companies. [*See* Newhouse Tr. at 55:10-57:4; 81:23-.83:5 ("I thought it was a great idea . . . ."); *see also* Shirkey Tr. 84:15-87:5.]

71. This part of strategy was a long-term project with significant upside. [*See* Newhouse Tr. at 84:14-21.]

72. In the spring of 2017, Lupin sponsored a non-profit organization recommended by Plaintiff, the Allergy & Asthma Network, to assist with large allergy group initiative. [*See* Winders Tr. at 61:16-62:8.]

73. The large allergy group initiative was unsuccessful. [*See* Winders Tr. at 110:4-8 ("Q. So did the LAG initiative ever work to increase sales to the level of doing to product justice? A. The LAG initiative never increased sales to the degree that I had hoped.").]

74. InspiRx was kept informed of Lupin's efforts throughout the 2017-2018 timeframe. [*See* Amato, III Tr. at 81:15-24.]

75. The Lupin employees tasked with implementing the new strategy had the resources they needed to make the strategy work. [*See* Liska at 258:9-20; Turner Tr. at 23:3-24:1; Shirkey Tr. 83:2-10.]

76. There were challenges to expanding the VHC market in 2017-2018, including a lack of patient awareness as to the importance of VHCs, lack of physician awareness as to the importance of VHCs and prescribing practices, lack of pharmacy availability because prescriptions are filled based on the VHCs that are currently stocked on the shelf, and a lack of payor coverage. [*See* Winders Tr. at 68:11-70:8; 72:6-12.]

77. By 2019, the market continued to favor nebulizers over VHCs. [*See* Toddywala Tr. at 105:23-106:21.]

78. The new strategy achieved substantially similar results as the original strategy that relied heavily on personal promotion using the pediatric sales force, at a much more reasonable cost. [*See* Lupin Interrogatory Answers at Answer to Nos. 7, 9, and Exhibit 1 thereto at "P&L with 2015-2020" tab; Liska Tr. 176:5-178:4.]

79. A Lupin affiliate acquired Symbiomix in October 2017 and Lupin did not create a sales force to promote the Symbiomix product, Solosec, until March 2018. [*See* Lupin Tr. at 90:25-93:19; 94:21-95:22; Liska Tr. at 246:4-247:7; 257:4-258:20; Turner Tr. at 23:3-8.]

**The Termination (August 2019)**

80. InspiraChamber had a history of disappointing sales. [*See* Lupin Interrogatory Answers at Answer to Nos. 7, 9, and Exhibit 1 thereto at "P&L with 2015-2020" tab; Lupin Tr. at 19:9-21:3.]

81. Lupin was in possession of InspiraChamber product that could not be sold after September 2019 as a result of a new FDA regulation requiring a "unique device identifier." [*See* Toddywala Tr. at 36:10-38:21; 39:15-40:6; 45:12-17; Lupin Tr. at 30:18-21; *See* Lupin Interrogatory Answers at Answer to Nos. 7, 9, and Exhibit 1 thereto at "Inventory" tab.]

82. Lupin exercised its right to terminate the Agreement. [*See* Lupin Tr. at 20:6-20:18 ("Q. Okay. So the reasons you are aware for Lupin deciding to terminate the agreement, I think you had said – I don't mean to paraphrase, but lack of sales, inventory. If you could just say that again. A. Yeah. I mean, we had the product for a number of years, close to six years and, you know, it was – it did not meet a budget number, broke even in probably the last one or two years, and then we had this inventory that was a sizeable amount that needed to be relabeled or destroyed as we were getting closer to – to having to serialize that – serialize that product.").]

83. Plaintiff never sent notice for any breach of the Agreement before Lupin terminated the Agreement. [*See* Amato Tr. 96:12-96:15 ("Q. [redacted]

84. InspiRx has not replaced Lupin for marketing and selling InspiraChambers in the United States retail market. [*See* Toddywala Tr. at 95:14-96:24; 89:9-90:7; *see also* Amato Tr. at 36:16-37:14 ("Q. Who is handling retail distribution for the InspiraChamber for InspiRx today? A. We are – we are pending to handle the retail market ourself. Q. When did InspiRx start handling

the retail market itself? A. We started preparing after the termination of the agreement from Lupin. Q. And that hasn't started yet, though? A. It has not . . . .").]

85. Plaintiff decided not to hire its own sales force because it would "be very expensive and take a lot of resources on our end." [*See* Amato, III Tr. at 146:20-148:13.]

86. Plaintiff sought, but could not find, a replacement for Lupin before Lupin terminated the Agreement. [*See* Amato, III Tr. 94:12-96:9 (Q. What was the end result of your efforts to work with the other pharma companies that you're referring to here? A. I mean, the same outcome. I don't remember specific reasons why it didn't work out . . . . Q. Well, what were the other pharma companies you're referring to, do you recall? A. In the email, I believe she spoke of Teva and GSK. AstraZeneca, I believe was also on a proposed list to look into. Q. But ultimately, InspiRx didn't end up doing business with any of those companies. Is that correct? A. That's correct."); Toddywala Tr. at 85:17-86:24.]

Dated: New York, New York
October 5, 2020

**HOLLAND & KNIGHT LLP**

By: /s/ Matthew R. DiBlasi
Frank Morreale
Matthew R. DiBlasi

31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466
Facsimile: (904) 358-1872
frank.morreale@hklaw.com
matthew.diblasi@hklaw.com

*Attorneys for Defendant Lupin Atlantis Holdings SA*