Frank Morreale, Esq.
Matthew R. DiBlasi, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466
Facsimile: (904) 358-1872
E-mail: frank.morreale@hklaw.com
matthew.diblasi@hklaw.com

*Attorneys for Defendant Lupin Atlantis Holdings SA*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INSPIRX, INC.,<br><br>Plaintiff,<br><br>- against -<br><br>LUPIN ATLANTIS HOLDINGS SA,<br><br>Defendant. | Case No. 1:20-cv-03214 (JPC)<br><br>*Oral Argument Requested* |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents


**Page**

Preliminary Statement .......... 1
Summary of Material Undisputed Facts .......... 6
I. The Parties .......... 6
II. The InspiraChamber and the VHC Market .......... 7
III. The December 2013 Agreement .......... 7
IV. The Launch (2014 through February 2015) .......... 9
V. Sales Were Disappointing in 2015 and 2016 .......... 9
VI. The Alternate Strategy – February 2017 .......... 10
VII. The Termination – August 2019 .......... 11
Argument .......... 12
I. THE IMPLIED COVENANT CLAIM (COUNT 3) IS DUPLICATIVE OF THE BREACH OF CONTRACT CLAIM (COUNT 1), AND THERE IS NO EVIDENCE OF BAD FAITH OR OTHER MISCONDUCT. .......... 12
A. Plaintiff's Implied Covenant Claim (Count 3) Is Redundant Of Its Breach Of Contract Claim (Count 1). .......... 12
B. There Is No Evidence Of "Bad Faith" Conduct Or Intentional Wrongdoing By Lupin... 14
II. INSPIRX'S CLAIM REGARDING THE ANNUAL PURCHASE OBLIGATION (COUNT 2) REQUIRES THIS COURT TO REWRITE THE AGREEMENT .......... 15
III. PLAINTIFF HAS NOT AND CANNOT COME FORWARD WITH EVIDENCE THAT DEFENDANT BREACHED THE AGREEMENT OR THAT PLAINTIFF HAS INCURRED DAMAGES. .......... 17
A. Plaintiff Cannot Identify A Material Breach By Lupin .......... 18
1. Lupin Did Not Breach The Agreement Prior to February 2017. .......... 19
2. Lupin Did Not Breach The Agreement After February 2017. .......... 20
B. Plaintiff Is Relying Solely On Speculation And Conjecture To Identify Alleged Damages Arising From A Material Breach. .......... 22
Conclusion .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aventine Inv. Mgt. Inc. v. Canadian Imperial Bank of Commerce*,
697 N.Y.S.2d 128 (2d Dep't 1999)....................14

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*,
No. 03-cv-8259 (CSH), 2007 WL 1988150 (S.D.N.Y. July 10, 2007) ....................18, 24

*Colina v. One East River Place Realty Co.*,
No. 99-CV-5173(DC), 2000 WL 1171126 (S.D.N.Y. Aug. 17, 2000)....................18

*Constellation Power Source, Inc. v. Select Energy, Inc.*,
467 F. Supp. 2d 187 (D. Conn. 2006)....................16

*Cramer v. Spada*,
610 N.Y.S.2d 662 (3d Dep't 1994)....................22

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013)....................12

*Grace v. Nappa*,
46 N.Y.2d 560 (N.Y. 1979) ....................16

*Holland Loader Company, LLC v. FLSmidth A/S*,
313 F.Supp.3d 447 (S.D.N.Y. 2018), aff'd, 769 Fed. Appx. 40 (2d Cir. 2019) ....................18

*Jane St. Holding, LLC v. Aspen Am. Ins. Co.*
(S.D.N.Y. 2014), *aff'd*, 581 Fed.Appx. 49 (2d Cir. 2014)....................13

*JoLyssa Educ. Dev., LLC v. Banco Popular N. Am., Inc.*,
No. 11-cv-1503-WWE, 2013 WL 2047572 (D. Conn. May 14, 2013) ....................15

*Kobrand Corp. v. Abadia Retuerta, S.A.*,
No. 12-cv-154 (KBF), 2012 WL 5851139 (S.D.N.Y. Nov. 19, 2012) ....................22

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
950 F.Supp. 2d 568 (S.D.N.Y. 2013)....................18

*Nat'l Grid Corp. Servs., LLC v. Brand Energy Servs., LLC*,
No. 13-cv-1275(DRH)(ARL), 2017 WL 1194499 (E.D.N.Y. Mar. 30, 2017)....................16

*Planète Bleue Télévision, Inc. v. A&E Television Networks, LLC*,
No. 16-cv-9317 (PGG), 2018 WL 10579873 (S.D. N.Y. Sept. 19, 2018)....................18

*Roberts v. Weight Watchers Int'l, Inc.*,
217 F.Supp.3d 742 (S.D.N.Y. 2016)....................14, 15

*Schmidt v. Magnetic Head Corp.*,
468 N.Y.S. 2d 649 (2d Dep't 1983)....................16

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000)....................18, 23

*Scotto v. Almenas*,
143 F.3d 105 (2d Cir. 1998)....................22

*Siegel v. Lewis*,
40 N.Y.2d 687 (N.Y. 1976) ....................16, 17

*Symquest Group, Inc. v. Canon USA, Inc.*,
186 F. Supp. 3d 257 (E.D.N.Y. 2016) ....................13

*Upper Deck Co. LLC v. BreaKey Int'l, BV*,
390 F. Supp.2d 355 (S.D.N.Y. 2005)....................24

*Washington v. Kellwood Co.*,
714 Fed. Appx. 35 (2d Cir. 2017)....................23

*Wells Fargo Bank Northwest v. TACA Int'l Airlines*,
247 F. Supp. 2d 352 (S.D.N.Y. 2003)....................21

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
946 F.2d 1003 (2d Cir. 1991)....................23

*Zarour v. Pacific Indem. Co.*,
113 F. Supp. 3d 711 (S.D.N.Y. 2015)....................12, 15

Defendant Lupin Atlantis Holdings SA ("Lupin") submits this memorandum of law in support of its motion for summary judgment dismissing all three claims of the First Amended Complaint filed by Plaintiff InspiRx, Inc. ("Plaintiff" or "InspiRx").

**Preliminary Statement**

Lupin is entitled to summary judgment on Plaintiff's remaining claims, which amount to nothing more than an attempt to rewrite the December 2013 Exclusive Distribution, License and Supply Agreement (the "Agreement") entered into between sophisticated parties. The Agreement does not allow Plaintiff to second guess marketing strategies that the parties collaboratively pursued between 2015 and 2019 merely because Plaintiff has decided that it is disappointed with sales results. Plaintiff never exercised its annual contractual right to terminate the Agreement or its contractual right to notify Lupin, at any time, of a supposed material breach. Instead, Plaintiff waited until eight months after Lupin terminated the Agreement to file this action. Both the Agreement and New York law foreclose Plaintiff's claims.

Plaintiff invented and manufactures medical devices known as InspiraChambers, a type of valved holding chamber ("VHC") used to deliver aerosolized asthma and allergy medicine, often to young children. In 2013, Plaintiff, unwilling to risk the investment required to launch a new product into a mature market, entered into the Agreement with Lupin to market InspiraChamber into the United States retail (*i.e.*, non-hospital) market. (Plaintiff entered into separate agreements to launch the products in other countries and market segments.) The Agreement was not a profit-sharing arrangement through which Plaintiff would receive royalties based on future sales. Rather, Plaintiff agreed it would make money via (1) Lupin's upfront payment to Plaintiff of $977,000 and (2) Lupin's future purchases of product from Plaintiff. Plaintiff freely transferred to Lupin the

risk the products would prove unsuccessful, while Lupin fully appreciated that profit could only be generated through its own efforts.

After more than a year of intensive preparation and collaboration, the parties launched InspiraChamber in February 2015. The parties sought to take significant market share from the longstanding market leader, AeroChamber, and therefore priced InspiraChamber to compete against AeroChamber at the premium end of the pediatric segment of the VHC market. Lupin spent millions promoting InspiraChamber. Throughout the Agreement, Plaintiff was fully informed of, and participated in implementing, all marketing strategies. When Lupin's pediatric salesforce proved unable to achieve more than nominal market share, causing Lupin to lose more than $10 million in two years, Lupin proposed a new strategy in February 2017. Plaintiff, in stark contrast with its claims today, contemporaneously lauded the marketing strategies for InspiraChamber as "going to be effective" and destined to "make a huge impact."

To the parties' shared disappointment, InspiraChamber never achieved a significant market share in the United States retail market. The VHC market was mature, fairly small, and crowded with competition. Further, pediatricians proved generally unreceptive to a new product after decades of prescribing AeroChamber. The United States retail market was not alone in its indifference to InspiraChamber; indeed, sales fell short of Plaintiff's goals in every segment in every market in the world where InspiraChambers were sold, regardless of who marketed them or how they did so. Despite the disappointing sales, Plaintiff never exercised its contractual right at the end of each contract year to terminate the Agreement and enlist a new marketing partner.

Plaintiff, with a heavy dose of hindsight, now claims the very marketing efforts it encouraged and joined were, in fact, commercially unreasonable all along. The specific issues in this case are whether Lupin materially breached the Agreement and, if so, whether Plaintiff

suffered any damages. Summary judgment is appropriate, as both the undisputed material facts and New York law (which governs the Agreement) foreclose Plaintiff's three remaining claims.

First, Plaintiff's implied covenant claim (Count 3) is essentially identical to its breach of contract claim (Count 1). Under New York law, a redundant implied covenant claim should be dismissed. Moreover, there is no evidence of bad faith or intentional wrongdoing by Lupin. There is no evidence that Lupin sought to prevent performance of the Agreement or withhold its benefits from Plaintiff. Rather, the record is full of evidence that Lupin made commercially reasonable efforts, with Plaintiff's full support, but Lupin still suffered significant financial losses attempting to launch and sell a new product into a mature market.

Second, Plaintiff cannot recover alleged damages arising from annual sales below the "Annual Purchase Obligation" (Count 2) for the simple reason that the Agreement does not allow it. Section 3.11(a) of the Agreement provides a minimum purchase obligation for each of the first three years of the Agreement (*i.e.*, 2015-2017). Section 3.11(a) further provides that "there shall be no Annual Purchase Obligation after the third Contract Year." Section 3.11(d), however, does not allow Plaintiff to wait until April 2020 to demand damages for 2015, 2016, or 2017. Rather, section 3.11(d) provides:

> InspiRx's sole right and remedy with respect to such failure shall be to terminate the Agreement on sixty (60) days prior written notice delivered within sixty (60) days after the end of such Contract Year, and Lupin shall bear no other liability therefore …. In the event InspiRx fails to deliver such written notice within such period, InspiRx shall be deemed to have irrevocably and unconditionally waived for all purposes Lupin's failure to meet the Annual Purchase Obligation for such Contract Year ….

(Emphasis added.)

It is undisputed that Plaintiff never sent the required written notice exercising its sole right and remedy. Thus, as the parties agreed in December 2013, Plaintiff has "irrevocably and

unconditionally waived for all purposes" all claims arising from Lupin not purchasing the Annual Purchase Obligation for 2015, 2016, and 2017. In addition, Plaintiff's damages expert has already conceded that Lupin "met the minimum purchase requirement in 2015." The parties' agreed remedies in Section 3.11 of the Agreement represent their allocation of the risk of economic loss when they decided to sell InspiraChambers together. Plaintiff may now regret that allocation, but courts applying New York law do not allow sophisticated parties to rewrite contracts years later.

Third, Plaintiff cannot come forward with evidence, as it must, supporting all four elements of its main breach of contract claim (Count 1) under New York law. The first element (*i.e.*, the existence of a contract) is undisputed and the second element (*i.e.*, adequate performance by Plaintiff) is not grounds for this motion. Plaintiff cannot, however, come forward with evidence to support the third element (*i.e.*, a material breach by Lupin), or the fourth element (*i.e.*, damages).

With respect to the third element, Plaintiff has failed to produce evidence of a material breach. Lupin's efforts were indisputably commercially reasonable. Plaintiff cannot contest the commercial reasonableness of the initial marketing strategy from early 2015 to early 2017, which principally involved personal promotion to physicians by Lupin's pediatric salesforce. Plaintiff concedes that the Lupin's product launch was "perfect" and that it has no complaint with Lupin's efforts in 2015 and 2016. During these years, Lupin spent (and, as discussed below, lost) millions of dollars marketing InspiraChamber through the salesforce as well as journal advertising and attendance at physician conferences. By the admission of Plaintiff's CEO, who previously spent decades building AeroChamber into the leading VHC, [redacted] Lupin's project leader agreed that "typically in the first 12 to 18 months of any brand launch, you get the prescribers you're going to get."

Lupin ultimately spent 22 months promoting InspiraChamber with a salesforce, 4 months longer than Plaintiff admits should have been needed to see positive results. But despite Lupin's efforts, described by Plaintiff as "first class," InspiraChamber's market share never exceeded 3%. In InspiraChamber's best year by sales, the salesforce alone cost Lupin $3 million and generated only $2 million in sales. Additional expenses drove Lupin deeper into the red. Over the Agreement's first two years, Lupin lost more than $10 million. The salesforce simply had not worked. By any reasonable commercial standard, something had to change.

That is why Lupin in early 2017 developed the new, three-pronged marketing strategy to drive InspiraChamber sales at a less punishing cost. This new approach aimed to generate sales strategically through large retail pharmacy chains, selected large allergy group practices, and managed-care companies. One sale could generate massive volume, as opposed to personal promotion to pediatricians who typically prescribed few VHCs. Plaintiff enthusiastically embraced the new approach after Lupin presented it to Plaintiff in February 2017, writing to Lupin, "I believe the new strategy is not only going to be effective in moving units but is also going to make a huge impact and make real changes on the standard of treatment in the United States …."

The alternate strategy did not increase sales, but that does not establish a breach. Plaintiff's effort to identify a material breach now relies on hindsight based almost exclusively on the disappointing sales results. New York law, however, is clear that commercial reasonableness under a contract cannot be judged in hindsight by observing that the defendant could have done something differently that may have produced a better result.

No one forced Plaintiff to accept the alternative strategy. Section 3.11 of the Agreement gave Plaintiff the right to terminate the Agreement within 60 days of the end of each contract year if Lupin did not meet agreed annual purchase obligations. Lupin's presentation to Plaintiff about

the new approach occurred during that window. At that time, Plaintiff knew Lupin had disbanded its pediatric sales force. It is also indisputable that InspiraChamber's tepid sales history, along with Lupin's large inventory, meant that Lupin did not purchase the minimum amount of InspiraChambers in 2016 and that it was unlikely that Lupin was going to purchase the minimum amount in 2017, the third and final year of the initial term of the Agreement. Plaintiff chose not to terminate the Agreement. Plaintiff also could have sought to terminate at any time if it truly believed ceasing use of a salesforce amounted to a material breach of the Agreement, but Plaintiff never notified Lupin of any such alleged breach. Quite the opposite; Plaintiff participated in and encouraged Lupin's efforts until the very end, when Lupin, not Plaintiff, terminated the Agreement effective in November 2019.

With respect to the fourth element, Plaintiff cannot demonstrate damages. It is simply not enough for Plaintiff to point to early forecasts for a new product being launched into a mature consumer market and demand that sales meet or exceed those forecasts. Forecasts are not guarantees, and Lupin certainly did not guarantee a certain amount of sales in the Agreement. Under New York law, damages must be proved with reasonable certainty. Lost profit models for new products, such as InspiraChamber, are subject to heightened scrutiny. Plaintiff is unable to meet this standard.

## **Summary of Material Undisputed Facts[1]**

### I. The Parties

Plaintiff researches and produces medical devices, including VHCs, to improve delivery of medicines for respiratory diseases, with a focus on infants and toddlers. *See* R. 56.1 at ¶ 3.

[1] A more complete statement is set forth in the accompanying Statement of Material Undisputed Facts and the accompanying declaration. References to that statement will be made to "R. 56.1 at ¶ __." References to exhibits attached to the Declaration of Matthew R. DiBlasi in Support of Defendant's Motion for Summary Judgment ("Def. Decl.") will be made to "Ex."

Plaintiff's management team is sophisticated and has decades of experience inventing and marketing VHCs. *See id.* at ¶ 4. Its CEO, Michael Amato, has been a leading figure in the VHC market since the mid-1980s. *See id.* at ¶ 7. Its Chief Medical Officer, Dr. Michael Newhouse, invented both InspiraChamber and the market leading VHC that was first launched in the mid-1980s, AeroChamber. *See id.* at ¶ 5. Plaintiff's marketing director, Michael Amato III, was member of Lupin's pediatric sales forces from 2013 to 2016. *See id.* at ¶ 6.

Lupin is a pharmaceutical company with commercial divisions for generics and branded pharmaceuticals. *See id.* at ¶ 9. Mr. Jay Liska, with nearly four decades of experience with DuPont, Bristol Myers Squibb, and Lupin, was Lupin's project leader for InspiraChamber. *See id.* at ¶¶ 10-11. By contrast to the extensive experience of Plaintiff's management team, Lupin's experience with VHCs was limited to supporting the company primarily responsible for promoting AeroChamber between 2008 and 2013. *See id.* at ¶ 12.

## II. The InspiraChamber and the VHC Market

VHCs were developed in the early 1980s. *See id.* at ¶ 13. VHCs are most often used with inhalers to deliver asthma medications. *See id.* at ¶ 14. VHCs are not as popular in the United States as other substitute products such as small volume nebulizers. *See id.* at ¶ 17. By 2015, the VHC retail market in the U.S. was a mature consumer market, consisting of only 2 million units with stagnant growth. *See id.* at ¶¶ 15-16. The market leader, AeroChamber, had the advantage of brand recognition. According to Plaintiff's Chief Medical Officer, AeroChamber was a "bit like Kleenex" to a lot of doctors because of its familiarity since the mid-1980s. *See id.* at ¶ 31.

## III. The December 2013 Agreement

The parties executed the Agreement in December 2013, and Plaintiff appointed Lupin and its affiliates to serve as the distributor of InspiraChamber products in the United States (excluding the hospital market). *See* R. 56.1 at ¶¶ 18-19; Ex. 1 at LUP0000173. Section 2.5 of the Agreement

required Lupin to make payments totaling $977,000 to Plaintiff in 2014. *See* Ex. 1 at LUP0000176. Section 4.1 of the Agreement required Lupin to pay Plaintiff a transfer price for the inventory that Lupin would then attempt to sell. *See id.* at LUP0000181. The basis of the parties' bargain was not a royalty agreement where both parties shared in future revenue. Rather, Plaintiff received upfront payments in 2014 and would receive future payments only when Lupin purchased more inventory from Plaintiff. Accordingly, Plaintiff negotiated for the right to terminate the Agreement at the conclusion of each contract year in which Lupin did not purchase the Annual Purchase Obligation. *See* R. 56.1 at ¶ 23; Ex. 1 at LUP0000179-80. (The Agreement included an annual purchase obligation for the first three years of the Agreement only. *See* Ex. 1 at LUP0000179 at § 3.11(a).) Plaintiff also had the right to terminate the Agreement for any uncured breach on 60 days' written notice. *See id.* at LUP0000180 at § 3.11(d). Similarly, Lupin bargained for the right to terminate the Agreement on 90 days' notice for convenience to mitigate the risk that the market would not be receptive to another premium model VHC. *See id.* at LUP0000193 at § 12.2(f).

For purposes of this motion, the other material terms include the definition of Commercially Reasonable Efforts (emphasis added):

> Commercially Reasonable Efforts means, with respect to the efforts to be expended by a Party with respect to any task or objective under this Agreement, reasonable, diligent, good-faith efforts to accomplish such task or objective as soon as practicable, which efforts shall not be less than the efforts that other similarly situated companies would normally use to accomplish a similar task or objective under similar circumstances exercising reasonable business judgment, with respect to a product owned by it or to which it has similar rights as the Products, which product is at a similar stage in its product life and is of similar market, commercial and profitability potential as the Product, taking into account efficacy, safety, approved labeling, the competitiveness of alternative products in the marketplace, the patent and other proprietary position of the product, and other relevant factors commonly considered in similar circumstances. *It is understood that the level of efforts required to meet the above standard may*

> *change over time* if there are changes in the status of the Products or of the above criteria applicable to the Products.

*See id.* at LUP0000170. According to § 2.1(a) of the Agreement, "Lupin shall use Commercially Reasonable Efforts to Distribute the Products in the Market within the Territory for use in the Field on or after the Launch Date using its current distribution capabilities and resources." *See id.* at LUP0000173. According to § 7.1(a) of the Agreement, Lupin had "sole discretion" to promote InspiraChamber "as it deems appropriate." *See id.* at LUP0000184.

## IV. The Launch (2014 through February 2015)

Lupin spent 2014 preparing for launch in February 2015. *See* R. 56.1 at ¶¶ 29, 32, 34. The parties positioned InspiraChamber to compete with AeroChamber at the top end of the VHC market. *See id.* at ¶ 29. Lupin, at its own cost, hired an external advertising agency, Brand Equity Rx, to help develop the InspiraChamber campaign. *See id.* at ¶ 32. Lupin's pediatric sales force was tasked with selling InspiraChambers, along with Lupin's other branded products, through personal promotion to pediatricians with a history of prescribing VHCs (mostly, AeroChambers). *See id.* at ¶ 36. Plaintiff's leadership described the InspiraChamber launch as "perfect" and "an extremely well-done introduction." *See id.* at ¶ 34. Plaintiff's Chief Medical Officer conceded, "I've never seen any program done any better than that for introducing a device." *See id.*

## V. Sales Were Disappointing in 2015 and 2016

For 2015 and 2016, Lupin's pediatric sales force promoted InspiraChamber directly to pediatricians and primary care physicians. *See id.* at ¶¶ 36-37. Lupin also attended medical conferences and exhibited InspiraChamber at eight conferences, often joined by Plaintiff's management team. *See id.* at ¶¶ 38-39. Despite Lupin's efforts, sales flat-lined by summer 2015, with a market share of approximately 2%. *See id.* at ¶¶ 44, 46.

InspiraChamber sales were also flat or non-existent in the other markets where Plaintiff engaged distributors other than Lupin. *See id.* at ¶¶ 46-49. By late 2016, Lupin had lost millions of dollars despite its efforts. *See id.* at ¶ 54. The parties' shared expectation that InspiraChamber would develop a significant market share within 12-18 months (*i.e.*, by fall 2016) did not come close to materializing. *See id.* at ¶¶ 56-57. At the same time, the other primary product sold by Lupin's pediatric sales force (Suprax) faced new, intense generic competition. *See id.* at ¶ 53. Lupin lost more than $10 million in 2015-16 marketing InspiraChamber using a salesforce; in the best year, InspiraChamber generated only $2 million in sales. Accordingly, Lupin made the commercially reasonable, and necessary, decision to recalibrate its strategy. *See id.* at ¶ 58.

## VI. The Alternate Strategy – February 2017

By early 2017, Lupin developed a three-pronged strategy to generate sales volume for InspiraChamber, and introduced it to Plaintiff's leadership at a February 16, 2017 meeting. *See* R. 56.1 at ¶¶ 59, 62; *see also* Ex. 21; Ex. 22. Plaintiff supported the plan during and after that meeting. *See* R. 56.1 at ¶ 62. A small sales force remained to promote InspiraChamber to certain doctors, but the alternative approach focused Lupin's efforts on trying to make large-volume sales. *See id.* at ¶ 61. The new strategy encompassed the entire VHC market, not solely pediatrics. Lupin directed its efforts toward large retail pharmacy chains and large allergy and asthma practice groups. *See id.* at ¶¶ 63, 72. Lupin also sought to analyze and present data to persuade managed care companies of the health benefits and potential cost savings of VHCs. *See id.* at ¶¶ 68-69. This part of the alternate strategy would not generate immediate revenue for Lupin, but offered potentially significant long-term benefits in the broader VHC market. *See id.* at ¶ 71. Plaintiff lauded the new strategy; after the meeting, Plaintiff's Marketing Director wrote to Lupin, "I believe the new strategy is not only going to be effective in moving units but is also going to make a huge

impact and make real changes on the standard of treatment in the United States …." *See id.* at ¶ 62.

Lupin reached out to many retailers, including Walmart, CVS, Publix, Albertsons, and HEB, but only reached a preferred agreement with one retailer (Albertsons). *See id.* at ¶¶ 63-67. Lupin invested in the relationships with managed care companies and large allergy groups without success. *See id.* at ¶¶ 68-73. Lupin even entered into a consulting agreement, at Plaintiff's request, with a non-profit organization to help with the large allergy group initiative. *See id.* at ¶ 72.

The new strategy achieved slightly lower sales than the original strategy that relied on Lupin's pediatric sales force, at a much more reasonable cost. *See id.* at ¶ 78. Lupin was able to eke out a small profit instead of losing millions. *See* Ex. 11 at "P&L with 2015-2020" tab.

**VII. The Termination – August 2019**

In mid-2019, Lupin evaluated the history of disappointing InspiraChamber sales. Lupin also recognized it held 134,000 units of InspiraChamber products in inventory (which amounted to 2-3 years of inventory) that could not be sold after September 2019 as a result of new FDA regulations. *See* R. 56.1 at ¶ 81. Despite now alleging that Lupin's efforts we commercially unreasonable all along, Plaintiff never exercised its contractual right to terminate the Agreement. Rather, Lupin exercised its right terminate the Agreement because it no longer made commercial sense to continue attempting to sell InspiraChambers. Plaintiff has not replaced Lupin for marketing and selling InspiraChambers in the United States retail market, *see id.* at ¶¶ 84, 86, presumably because no other company is willing to make the effort that Lupin made. In fact, Plaintiff is not even promoting InspiraChamber in the United States retail market. *See id.* at ¶¶ 84-86. Plaintiff has instead decided to invest in litigation. In February 2020, Plaintiff first provided written notice of alleged breaches. *See id.* at ¶ 83. In April 2020, Plaintiff commenced this action.

## **Argument**

### I. THE IMPLIED COVENANT CLAIM (COUNT 3) IS DUPLICATIVE OF THE BREACH OF CONTRACT CLAIM (COUNT 1), AND THERE IS NO EVIDENCE OF BAD FAITH OR OTHER MISCONDUCT.

Plaintiff's tag-along claim for breach of the implied covenant of good faith and fair dealing fails for two reasons. First, the implied covenant claim is based on the same set of allegations as the breach of contract claim, and seeks the same damages. A redundant implied covenant claim is not recognized under New York law. Second, there is no evidence that Lupin sought to prevent performance of the Agreement or withhold benefits from Plaintiff, as required by New York law to support an implied covenant claim.

#### A. Plaintiff's Implied Covenant Claim (Count 3) Is Redundant Of Its Breach Of Contract Claim (Count 1).

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (internal quotation omitted). "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Id. (internal quotations omitted) (alteration in original). When a complaint alleges both a breach of contract and a breach of implied covenant of good faith and fair dealing on the same facts, the court should dismiss the implied covenant claim as redundant. *Id.*; *Boart Longyear Ltd. v. Alliance Indus., Inc.*, 869. F.Supp.2d 407, 419-20 (S.D.N.Y. 2012) (noting that "recent Second Circuit case law indicates that dismissal for redundancy is the appropriate outcome here"); *Zarour v. Pacific Indem. Co.*, 113 F. Supp. 3d 711, 716-17 (S.D.N.Y. 2015) (granting summary judgment and noting that "plaintiff's subjective feeling of offense is insufficient to raise a genuine issue of material fact as to whether defendant acted in bad faith"). "When the alleged breach of the implied covenant of

good faith and fair dealing is intrinsically tied to the damages allegedly resulting from the breach of the insurance contract, those claims are redundant." *Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, (S.D.N.Y. 2014) (internal quotations omitted), *aff'd*, 581 Fed.Appx. 49 (2d Cir. 2014).

Plaintiff's implied covenant claim merely restates its breach of contract claim. The crux of both Counts 1 and 3 is that Lupin did not sell enough InspiraChambers. Compare Compl. ¶ 60 ("As a result of Defendant's failure to use commercially reasonable efforts, Defendant purchased fewer products from Plaintiff and NTLLC than it otherwise would have had it complied with the Agreement."), *with id.* at ¶ 85 ("As a result of Defendant's bad faith conduct, Defendant continued to purchase fewer products from Plaintiff and NTLLC than it otherwise would have had it complied with the Agreement."). Because Plaintiff's claim is based upon the same facts and predicated on the same contractual terms as the breach of contract claim, it must be dismissed as duplicative. So, too, Plaintiff seeks the same exact damages in Counts 1 and 3. Compare Compl. ¶¶ 64-65 *with id.* at ¶¶ 90-91 (damages allegations for both counts are substantively identical).

It is not a sufficient distinction for Plaintiff to allege that Lupin breached the Agreement in bad faith. In *Symquest Group, Inc. v. Canon USA, Inc.*, 186 F. Supp. 3d 257, 265-66 (E.D.N.Y. 2016), the court granted a motion to dismiss an implied covenant claim over the plaintiff's argument that the claim was "not duplicative of its breach of contract claim because it has alleged bad faith on [defendant's] part." The court explained that the plaintiff's claim must be based on allegations different from those underlying the accompanying breach of contract claim and further that "bad faith in connection with a breach of contract claim does not provide an independent basis for recovery." *Id.* at 266. Accordingly, the implied covenant claim (Count 3) must be dismissed as redundant of Plaintiff's breach of contract claim (Count 1).

**B. <u>There Is No Evidence Of "Bad Faith" Conduct Or Intentional Wrongdoing By Lupin.</u>**

There is an additional basis to dismiss the implied covenant claim. Even if Plaintiff's implied covenant claim were not duplicative of its breach of contract claim, there is no genuine issue of material fact regarding Lupin's good faith or intentions. To prevail on an implied covenant claim, the plaintiff must demonstrate "that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *See Aventine Inv. Mgt. Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (2d Dep't 1999) (reversing order and dismissing implied covenant claim).

Here, there is no evidence that Lupin sought to prevent performance of the Agreement or withhold benefits from Plaintiff. This is not surprising because the only way for Lupin to generate revenue was to perform by selling InspiraChambers. There is, of course, no evidence that Lupin reduced its efforts in order to sell a competing product or a substitute product. Rather, Lupin executed a "perfect" launch in 2015, followed a salesforce-based strategy for 22 months (a period which Plaintiff admits was sufficient to achieve success, if any was coming), and then created an alternate strategy (with Plaintiff's support) after the original strategy did not meet expectations. Plaintiff may argue that Lupin acted in bad faith in recalibrating its efforts in early 2017. But it is not bad faith for Lupin to exercise its contractual right pursuant to § 7.1(a) to market InspiraChamber products in the "manner as it deems appropriate" after both parties recognized that the original strategy was not achieving the anticipated market share within the expected 12-18 month time period. *See Roberts v. Weight Watchers Int'l, Inc.*, 217 F.Supp.3d 742, 751-52 (S.D.N.Y. 2016) (implied covenant does not include any term inconsistent with the terms of the contractual relationship). When Lupin exercised its discretion to change the strategy after two years of disappointing sales and informed Plaintiff of the alternate strategy, Plaintiff fully

supported the strategy. Lupin then executed the strategy. Efforts are not made in bad faith simply because sales did not increase as the parties planned. Nor was Lupin required, by the implied covenant or otherwise, to ignore its own interest solely to satisfy Plaintiff. *See Roberts*, 217 F.Supp.3d at 752 (covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract") (citation omitted).

Plaintiff's only purported evidence of bad faith is that (1) Lupin's project leader (Mr. Liska) maintained a positive attitude and (2) sales did not meet pre-launch forecasts. These arguments are easily overcome. Generally supportive or encouraging statements are legally insufficient to constitute bad faith, *cf. JoLyssa Educ. Dev., LLC v. Banco Popular N. Am., Inc.*, No. 11-cv-1503-WWE, 2013 WL 2047572 (D. Conn. May 14, 2013) (dismissing implied covenant claim for failure to adequately allege bad faith where plaintiff alleged that defendant did not recognize that projections were unrealistically optimistic). This is particularly so where, as here, Plaintiff's CEO is recognized as a leading expert in the VHC market and had contractual remedies to challenge Lupin's strategy and efforts. Disappointment with sales results is not evidence supporting an implied covenant claim. *See Zarour*, 113 F. Supp. 3d at 716-17 ("plaintiff's subjective feeling of offense is insufficient to raise a genuine issue of material fact as to whether defendant acted in bad faith"). "Bad faith" in no way describes Lupin's collaboration with Plaintiff; it is a term much better suited to Plaintiff's attempt to extract a ransom in 2020 through this Court by criticizing efforts Plaintiff supported between 2014 and 2019.

## II. INSPIRX'S CLAIM REGARDING THE ANNUAL PURCHASE OBLIGATION (COUNT 2) REQUIRES THIS COURT TO REWRITE THE AGREEMENT.

Through Count 2, Plaintiff asks this Court to rewrite or ignore the express terms of the Agreement to allow Plaintiff to obtain "damages" for the three-year period between 2015 and

2017. Section 3.11 of the Agreement bars this claim. Section 3.11(d) provided Plaintiff with a powerful and sole remedy if Lupin did not purchase a certain amount of product each year. Plaintiff failed to exercise its sole remedy, and instead waived it. "A court will not rewrite the contract for the parties or relieve a sophisticated contracting party from terms that it later deems disadvantageous." *Nat'l Grid Corp. Servs., LLC v. Brand Energy Servs., LLC*, No. 13-cv-1275(DRH)(ARL), 2017 WL 1194499, at *7 (E.D.N.Y. Mar. 30, 2017) (interpreting New York law) (quotation marks and citation omitted). "Absent some indicia of fraud or other circumstances warranting equitable intervention, it is the duty of a court to enforce rather than reform the bargain struck." *Grace v. Nappa*, 46 N.Y.2d 560, 565 (N.Y. 1979); *Siegel v. Lewis*, 40 N.Y.2d 687, 691 (N.Y. 1976) ("[T]he courts of this State will not rewrite the contract for the parties.") (citation omitted); *see also, e.g., Schmidt v. Magnetic Head Corp.*, 468 N.Y.S. 2d 649, 654 (2d Dep't 1983) ("It is fundamental that courts enforce contracts and do not rewrite them."). Courts construing contracts under New York law enforce those contracts as written. *See Constellation Power Source, Inc. v. Select Energy, Inc.*, 467 F. Supp. 2d 187, 203 (D. Conn. 2006) (applying New York law).

Exhibit C of the Agreement sets the annual purchase obligations for the first three years. *See* Ex. 1 at LUP0000202. The amounts increase each year, at a potential cost of approximately $1 million in the first year and $3 million in the third year. *Id.* at LUP0000203. Section 3.11(d) of the Agreement provides Plaintiff with a sole remedy in the event that Lupin did not meet the annual purchase obligation:

> In the event that Lupin fails to meet the Annual Purchase Obligation in any Contract Year . . . , InspiRx's *sole right and remedy* with respect to such failure shall be to terminate this Agreement on sixty (60) days prior written notice delivered within sixty (60) days after the end of such Contract Year, and *Lupin shall bear no other liability* therefore . . . .

Ex. 1 at LUP0000180 (emphasis added); *see also* R. 56.1 at ¶ 23. The Agreement left no doubt for a sophisticated party like Plaintiff that it would waive its right to that remedy if it did not act timely and instead permitted Lupin to continue to perform under the Agreement:

> In the event that InspiRx fails to deliver such written notice within such period, InspiRx shall be deemed to have irrevocably and unconditionally waived for all purposes Lupin's failure to meet the Annual Purchase Obligation for such Contract Year[.]

Ex. 1 at LUP0000180. Plaintiff did not exercise its "sole right and remedy." Plaintiff never provided Lupin the required written notice within 60 days after the end of any contract year. *See* R. 56.1 at ¶ 83. Plaintiff, therefore, waived the claim it now seeks to assert.

Plaintiff offers no reason why this Court should rewrite the contract. The Agreement was "concededly arrived at freely by both parties," *Siegel*, 358 N.E. 2d at 486, and Plaintiff is a sophisticated party with far more experience with VHCs than Lupin. New York law requires enforcing the Agreement as written and rejecting Plaintiff's attempt to recover purported damages it long ago waived. Moreover, it would be unjust to rewrite the Agreement in Plaintiff's favor. Lupin paid Plaintiff $977,000 upfront in 2014 (*see* R. 56.1 at ¶ 22), bought inventory, and invested substantially in hope of future profit. Lupin received no payment from Plaintiff and no profit for its efforts. Plaintiff avoided the risk of investing the resources to launch a new product into a mature market. If anything, Lupin bore the greater risk that the market would not accept InspiraChamber as an alternative to AeroChamber (which is what happened). That is the bargain the parties struck. There is simply no justification to rewrite Section 3.11 of the Agreement.

## III. PLAINTIFF HAS NOT AND CANNOT COME FORWARD WITH EVIDENCE THAT DEFENDANT BREACHED THE AGREEMENT OR THAT PLAINTIFF HAS INCURRED DAMAGES.

To prove a claim for breach of contract, the plaintiff must come forward with evidence of four elements: (1) the existence of an agreement, (2) adequate performance of the contract by the

plaintiff, (3) material breach of contract by the defendant, and (4) damages. *See Colina v. One East River Place Realty Co.*, No. 99-CV-5173(DC), 2000 WL 1171126, at *8 (S.D.N.Y. Aug. 17, 2000). Plaintiff's first count fails because there is no evidence supporting the third or fourth elements. Lupin did not materially breach any of its obligations under the Agreement. So, too, Plaintiff has not come forward with evidence of lost profit damages to the level of certainty required for a new product. *See generally Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).

**A. Plaintiff Cannot Identify A Material Breach By Lupin**

A material breach is "one which is so substantial that it defeats the purpose of the contract." *See Planète Bleue Télévision, Inc. v. A&E Television Networks, LLC*, No. 16-cv-9317 (PGG), 2018 WL 10579873, at *13-14 (S.D. N.Y. Sept. 19, 2018) (payment delay was immaterial where plaintiff "has not alleged any prejudice that it suffered as a result of this delay"). Here, Plaintiff has alleged that Lupin's efforts were not commercially reasonable. It is a plaintiff's duty to define the standard of commercial reasonableness where "the complained-of conduct took place in an industry that is outside the fact-finder's ordinary experience." *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F.Supp. 2d 568, 617 (S.D.N.Y. 2013). A claim for a material breach of a commercially reasonable efforts provision "cannot be established simply by observing, in hindsight, that [the party] could have done something differently that would have produced a better result." *See Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03-cv-8259 (CSH), 2007 WL 1988150, at *22 (S.D.N.Y. July 10, 2007) (granting summary judgment dismissing counterclaims). An agreement to use commercially reasonable efforts "does not require a party to act against its own business interests." *See MBIA v. Patriarch Partners*, 950 F.Supp. 2d at 618; *see also Holland Loader Company, LLC v. FLSmidth A/S*, 313 F.Supp.3d 447, 472 (S.D.N.Y. 2018), aff'd, 769 Fed. Appx. 40 (2d Cir. 2019) ("commercially reasonable efforts" require "something less than a degree of efforts that jeopardizes one's business interests").

1. Lupin Did Not Breach The Agreement Prior to February 2017.

The evidence about Lupin's efforts for the first three years after the Agreement was signed in December 2013 is one-sided: Lupin performed at a high level. Plaintiff's CEO has conceded that Lupin's launch was far more than commercially reasonable; it was "perfect":

> Q: Do you agree that Lupin successfully launched InspiraChamber in February 2015?
>
> A: Yes.
>
> …
>
> Q: Was the launch event well done?
>
> A: I believe the launch was perfect.

Ex. 5 at 107:7-9, 107:24-25; *see also* Def. R. 56.1 at ¶ 34. Plaintiff's damages expert has conceded that Lupin "met the minimum purchase requirement in 2015 …." *See* Def. R. 56.1 at ¶ 45; Ex. 14 at ¶ 56. Section 3.11(e) of the Agreement provides that Defendant's "satisfaction of the Annual Purchase Obligation in any Contract Year … shall be deemed to satisfy … any requirement to use any degree of efforts concerning such distribution." Ex. 1 at LUP0000180. Thus, the Agreement, when coupled with Plaintiff's admissions, forecloses any claim that Lupin's efforts through 2015 were not commercially reasonable.

In addition to utilizing a salesforce, Lupin attended 11 medical conferences and trade conferences and supported exhibition booths at 8 conferences. *See* Ex. 11 at Answer to Interrogatory No. 4. InspiraChamber was a top priority for Lupin in 2014, 2015, and 2016. *See* R. 56.1 at ¶ 37. Plaintiff has conceded that Lupin's marketing efforts in 2015-16 were reasonable. Plaintiff's Chief Medical Officer has conceded that Lupin's exhibitions at physician conferences in 2015 and 2016 were "well done." *See id.* at ¶ 39. Plaintiff's CEO conceded that Lupin's efforts were perfectly fine before 2017. *See* R. 56.1 at ¶ 43 ("Q. And so do you have any complaints

about the effort Lupin was making in 2015 and 2016 when they had the pediatric sales force? A. No, I don't.").

2. Lupin Did Not Breach The Agreement After February 2017.

Plaintiff's claim that the alternate strategy implemented in February 2017 fell short of commercial reasonableness is belied by the record. There is no dispute that Lupin implemented the alternative strategy with Plaintiff's knowledge and assistance, and in response to disappointing sales. *See* R. 56.1 at ¶¶ 58-60, 62. While ultimately not successful, there is no dispute the strategy resulted in Lupin successfully contracting with one national pharmacy chain (Albertsons), but unsuccessfully with four others (Walmart, CVS, Publix, and HEB). *See id.* at ¶¶ 65-67. Had one or more of those other large retailers contracted with Lupin, Plaintiff would have no complaint about sales results. But whether Lupin entered contracts is immaterial because commercially reasonable efforts are not measured by ultimate sales results.

Lupin initiated the managed care initiative, devoting financial and human resources that culminated in a poster presentation at a medical conference in November 2018. *See id.* at ¶¶ 68-70. So, too, Lupin sought to interest two large allergy and asthma practices in the InspiraChamber, even incurring the cost, at Plaintiff's recommendation, of sponsoring a non-profit organization with deep industry ties. *See id.* at ¶ 72.

Lupin's budget was reduced in 2017 consistent with a standard, post-launch sales strategy. *See id.* at ¶¶ 57, 60. It is also commercially reasonable to reduce marketing expenses to align with sales. As Lupin's project leader testified, "the aggregate marketing budget was obviously reduced, commensurate with flat-to-declining sales." *See* Ex. 6 at 220:21-23. It would have been unreasonable for Lupin to continue to incur multimillion-dollar annual losses without trying something different. As Lupin's project leader explained:

> Q: When you say "commercially reasonable efforts," what do you consider to be commercially reasonable efforts?
>
> A: That we get some type of return on our investment; strategically sound and financially prudent. I think the strategy was sound, the execution was good, the results were poor, leading us to a situation where we lost a substantial amount of money every year, and that's just not a sustainable proposition. I think to our credit, we tried to pivot, two years into the agreement, to propose, you know, a different approach, a more strategic approach to be successful. And, as you know, shared that with InspiRx management, and they agreed and supported it. So, you know, I have no apologies to make for, you know, our investment, our efforts, you know, with InspiraChamber. I'm just disappointed, as everybody is, with the results.

*Id.* at 231:21-232:14. Plaintiff's generalized allegation that Lupin "deprioritized" InspiraChamber after January 2017 is a distraction and irrelevant. The parties did not contract to make InspiraChamber Lupin's highest priority. Seven years later, Plaintiff cannot convert the Agreement's "commercially reasonable efforts" standard into a "hell or high water" standard that was never agreed. *Cf. Wells Fargo Bank Northwest v. TACA Int'l Airlines*, 247 F. Supp. 2d 352, 355-56 & 361 (S.D.N.Y. 2003) ("absolute and unconditional" obligations "commonly known as 'hell or high water' clauses" are enforceable). Here, the record is clear that Plaintiff received what it bargained for: commercially reasonable efforts, not guaranteed sales results.

Plaintiff may also argue that Lupin's acquisition of another company (Symbiomix) in October 2017 diverted resources from InspiraChamber. Plaintiff is wrong. That speculative theory has been addressed and dismissed by every Lupin witness questioned about the acquisition. *See* R. 56.1 at ¶ 79. Lupin implemented the alternative InspiraChamber strategy in February 2017, eight months before Lupin acquired Symbiomix, and more than a year before the Symbiomix product (Solosec) was launched into an entirely different market (women's healthcare) with entirely different physician prescribers. The Symbiomix acquisition was simply unrelated to

Lupin's decisions regarding InspiraChamber. In addition, Lupin actually increased its resources company-wide to accommodate the new product. *See id.* at ¶ 79.

It is pure speculation that if Lupin retained the pediatric sales force for some additional years, sales would have spiked. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation."). Both parties, including Plaintiff's CEO, shared the view that if personal promotion was to be successful, InspiraChamber would have obtained a greater market share within 12-18 months. *See* R. 56.1 at ¶ 56. Lupin gave InspiraChamber that much time and more. Moreover, sales did not change dramatically with the new strategy starting in 2017. *See id.* at ¶ 78. And, even if Lupin continued to incur the cost of a pediatric sales force (more than $3 million annually, *see id.* at ¶ 53), there is no evidence that sales would have increased enough to justify the cost of that sales force, deplete Lupin's inventory, or require additional purchases from Plaintiff. The Agreement governs. Lupin agreed to act reasonably, not to promote InspiraChamber at all costs or to Lupin's detriment.

### B. Plaintiff Is Relying Solely On Speculation And Conjecture To Identify Alleged Damages Arising From A Material Breach.

Even if Plaintiff could establish the first three elements of a breach of contract claim, summary judgment should still be granted to Lupin because Plaintiff has no admissible evidence of damages. Where a plaintiff fails to produce admissible evidence of damages on a breach of contract claim, summary judgment is appropriate. *See, e.g.*, *Cramer v. Spada*, 610 N.Y.S.2d 662, 664 (3d Dep't 1994) ("The failure to prove damages is also fatal to plaintiff's breach of contract cause of action"); *Kobrand Corp. v. Abadia Retuerta, S.A.*, No. 12-cv-154 (KBF), 2012 WL 5851139, at *9 (S.D.N.Y. Nov. 19, 2012) (granting summary judgment motion dismissing breach of contract counterclaim where counterclaimant "points to no facts in its summary judgment papers that would permit a jury to find that it suffered damages as a result of any of these breaches").

"New York law does not countenance damage awards based on speculation or conjecture." *See Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991) (reversing damages award where court erroneously relied on party's "best estimate") (internal quotations and citation omitted). The burden of proving damages is even more difficult when the claim involves a new product because courts give those damages models heightened scrutiny. *See Schonfeld*, 218 F.3d at 172 ("cheerful prognostications" for a new business venture are insufficient); *see also Washington v. Kellwood Co.*, 714 Fed. Appx. 35 (2d Cir. 2017) (affirming order granting motion of judgment as a matter of law following jury trial).

*Washington v. Kellwood* is instructive. In that case, the defendant was the exclusive manufacturer and promoter of the plaintiff's athletic compression wear products. *Id.* at 37. Liability was a foregone conclusion because the defendant conceded that "no marketing efforts were conducted." *Id.* at 38. The trial court reversed a jury award of $4.35 million and awarded nominal damages of $1. *Id.* at 37. The Second Circuit determined that the district court properly excluded, as speculative, the plaintiff's expert's "market forecast" methodology based solely on one contemporaneous projection. *Id.* at 39. The Second Circuit further explained that expert testimony that reasonable marketing efforts would have allowed the plaintiff to earn revenues half of the market leader was purely hypothetical because an "established business" was not a reasonable comparator to a "start-up, producing a product similar to brand-name companies, but with no record of notable sales." *Id.* at 40.

Here, Plaintiff is attempting to hold Lupin liable for the difference between actual sales of a new product between 2015 and 2019 and a preliminary sales forecast made in mid-2014. Absent unusual circumstances not present here, a defendant's own projections cannot justify the requisite level of certainty in situations involving a new product with relatively little sales history. *See*

*Upper Deck Co. LLC v. BreaKey Int'l, BV*, 390 F. Supp.2d 355, 361 n.1 (S.D.N.Y. 2005). Here, there was no actual sales history and Plaintiff relies on only a preliminary pre-launch forecast.

Plaintiff steadfastly refuses to acknowledge that there is risk launching a new product into a mature consumer market with an entrenched market leader and secondary competition. Plaintiff also ignores actual InspiraChamber sales for the period that Lupin's efforts, by Plaintiff's experts' admissions, were commercially reasonable (2015 and 2016). But New York law does not allow a plaintiff the luxury of ignoring actual sales. Damages must be proved with reasonable certainty. Lost profit models for new products, such as InspiraChamber, are subject to heightened scrutiny.

Moreover, even the breaches alleged are not tied to its alleged damages. *See Bear Stearns*, at *21, *28 (plaintiff must present evidence that a purported breach caused damage to sustain a valid breach of contract claim). Plaintiff has failed to present evidence of damages caused by Lupin's reduced spending on medical conference and advertising. Moreover, the Agreement does not require any level of spending on medical conferences or advertising. The Agreement does not even require attendance at a medical conference. Rather, Section 7.1(b) of the Agreement only requires that Defendant "shall use Commercially Reasonable efforts to exhibit the Products at one or more major physician group meetings … during each Contract Year." Ex. 1 at LUP0000184; *see also* R. 56.1 at ¶ 25. Lupin attended, and set up exhibit booths, at multiple major conferences between January 2015 and December 2016. *See* R. 56.1 at ¶¶ 38-39; Ex. 11 at Answer to No. 4. Those conferences were expensive, but were not driving sales. *See* R. 56.1 at ¶ 40; Ex. 6 at 176:10-11 ("The product did not seem to be promotionally responsive"). After early 2017, when Lupin had moved away from personal promotion directed to prescribing physicians as the primary type of promotion and toward a more strategic targeting of larger-volume buyers, staffing and attending medical conferences to meet pediatricians would have been commercially unreasonable.

Likewise, it was reasonable to reduce the amount spent on advertising. *See* R. 56.1 at ¶ 42. ("Typically, you know, once you've created your awareness, you know, and usually that's a six-month blitz, you know, and there's a place for remainder advertising, but, you know, advertising is expensive, particularly print advertising. So we typically tapered off after six months.").

Moreover, Plaintiff's speculation about increased sales is not a fair measure of damages because when Lupin terminated the Agreement, Lupin held 134,000 units in inventory. *See* R. 56.1 at ¶ 81. Plaintiff would not have received a penny until after Lupin sold all of that inventory and ordered more InspiraChambers. To add context, Lupin never sold more than 54,000 units in a fiscal year. *See* Ex. 11 at "Units & Revenue" tab. After 14 fact depositions and hundreds of thousands of pages of documents exchanged, Plaintiff is left speculating that if Lupin had only remained committed to the original strategy for some additional amount of time, the same strategy that failed for two years suddenly would have worked and caused sales to match a preliminary forecast. That is not enough to avoid summary judgment.

## Conclusion

For the foregoing reasons, Defendant Lupin respectfully submits that summary judgment should be granted in its favor.

Dated: New York, New York
October 5, 2020

**HOLLAND & KNIGHT LLP**

By: /s/ Matthew R. DiBlasi
Frank Morreale
Matthew R. DiBlasi
31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466

*Attorneys for Defendant*