Frank Morreale, Esq.
Matthew R. DiBlasi, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466
Facsimile: (904) 358-1872
E-mail: frank.morreale@hkalaw.com
matthew.diblasi@hklaw.com

*Attorneys for Defendant Lupin Atlantis Holdings SA*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INSPIRX, INC.,<br><br>Plaintiff,<br><br>- against -<br><br>LUPIN ATLANTIS HOLDINGS SA,<br><br>Defendant. | Case No. 1:20-cv-03214 (JPC) |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

Preliminary Statement ..... 1

Counter-Summary of Disputed Material Facts ..... 4

Argument ..... 7

I. THE AGREEMENT REQUIRED LUPIN TO MAKE COMMERCIALLY REASONABLE EFFORTS TO SELL INSPIRACHAMBERS, NOT TO USE THE “SAME” CAPABILITIES AND RESOURCES FOR EACH YEAR OF THE AGREEMENT’S TERM. ..... 7

II. NONE OF THE THREE BREACHES ALLEGED BY PLAINTIFF ARE MATERIAL BREACHES OF THE AGREEMENT. ..... 11

A. Restructuring The Pediatric Sales Force In 2017 Was Not A Material Breach Of The Agreement. ..... 12

B. Lupin’s Strategy For Presenting At Conferences In 2017 And 2019 Was Not A Material Breach Of The Agreement. ..... 15

C. Notifying Distributors That Lupin Did Not Have Saleable Product In September 2019 Was Required By Law, And Was Not A Breach Of The Agreement. ..... 18

III. PLAINTIFF HAS FAILED TO PROVE THE SECOND AND FOURTH ELEMENTS OF A CLAIM FOR BREACH OF CONTRACT. ..... 19

IV. PLAINTIFF HAS IGNORED LUPIN’S AFFIRMATIVE DEFENSES. ..... 20

V. PLAINTIFF’S MOTION IS BASED UPON DISPUTED FACTS. ..... 22

Conclusion ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bear, Stearns Funding, Inc. v. Interface Grp. – Nev., Inc.*,
361 F. Supp. 283 (S.D.N.Y. 2005) ....23

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*,
No. 03-cv-8259 (CSH), 2007 WL 1988150 (S.D.N.Y. July 10, 2007) ....11

*Colina v. One East River Place Realty Co.*,
No. 99-cv-5173(DC), 2000 WL 1171126 (S.D.N.Y. Aug. 17, 2000) ....19

*Curley v. Philo*,
No. 07-cv-370, 2009 WL 2152323 (N.D.N.Y. Jul. 14, 2009) ....10

*Emerson Elec. Co. v. Holmes*,
No. 16-cv-1390 (PKC) (SIL), 2020 WL 4592808 (E.D.N.Y. Aug. 11, 2020) ....21

*F.D.I.C. v. Great American Ins. Co.*,
607 F.3d 288 (2d Cir. 2010) ....20

*FDIC v. Giammettei*,
34 F.3d 51 (2d Cir. 1994) ....21

*Ford v. Deacon*,
No. 16-cv-01001, 2018 WL 5729352 (N.D.N.Y. Aug. 27, 2018) ....10

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992) ....9

*Holland Loader Company, LLC v. FLSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018), *aff'd*, 769 Fed. Appx. 40 (2d Cir. 2019) ....7, 8, 11

*Int'l Klafter Co. v. Cont'l Cas. Co.*,
869 F.2d 96 (2d Cir. 1989) ....9

*Kosakow v. New Rochelle Radiology Assocs.*,
274 F.3d 706 (2d Cir. 2001) ....22

*Matter of Lipper Holdings, LLC v. Trident Holdings, LLC*,
1 A.D.3d 170, 766 N.Y.S.2d 561 (1st Dep't 2003) ....10

*MBIA v. Patriarch Partners*,
950 F. Supp. 2d 568 ....11

*Network Enters. v. APBA Offshore Prods.*,
No. 01 Civ. 11765 (CSH), 2004 WL 1837349 (S.D.N.Y. Aug. 16, 2004)..............................23

*Planète Bleue Télévision, Inc. v. A&E Television Networks, LLC*,
No. 16-cv-9317 (PGG), 2018 WL 10579873 (S.D. N.Y. Sept. 19, 2018)...............................11

*Utica Mut. Ins. Co. v. Munich Reinsurance America, Inc.*,
2018 WL 173623 (N.D.N.Y. Mar. 20, 2018) ...........................................................................21

Defendant Lupin Atlantis Holdings SA ("Lupin"), by and through its undersigned counsel, respectfully submits this Memorandum of Law in Opposition to Plaintiff InspiRx, Inc.'s ("InspiRx" or "Plaintiff") Motion for Partial Summary Judgment (the "Motion") (Doc. Nos. 23-26).

**Preliminary Statement**

Plaintiff's motion is fatally flawed for two primary reasons. First, Plaintiff's argument conflicts with the plain language of the Agreement. Second, Plaintiff has failed to satisfy each of the four basic elements of a breach of contract claim or even address Lupin's affirmative defenses.

Plaintiff asks this Court to view the parties' contractual relationship in hindsight and to judge Lupin's actions based not (as the law requires) on the commercial reasonableness of those actions at the time, but rather on the fact that the market ultimately proved indifferent to Plaintiff's product, the InspiraChamber. In Plaintiff's overly simplistic view, Lupin's efforts were commercially unreasonable because they did not work as the parties hoped. But in so arguing, Plaintiff ignores New York law and its own words and actions that supported and advanced the very marketing strategies now alleged to be unreasonable. Plaintiff now seeks partial summary judgment based on a tortured reading of the Agreement. Plaintiff's efforts to rewrite the Agreement through litigation should be rejected.

The Agreement at the heart of this dispute is a commercial contract negotiated by sophisticated parties. It required Lupin to exert "Commercially Reasonable Efforts," as that phrase is defined in the Agreement and under New York law, to market and sell InspiraChambers. Lupin did exactly that. Plaintiff's allegations that Lupin engaged in "bad faith" or conduct "unbeknownst" to Plaintiff contradict the evidence. Plaintiff had firsthand knowledge of, and in fact participated in, Lupin's efforts throughout the parties' six-year relationship. Plaintiff's sales and marketing director (the son of Plaintiff's CEO) was a member of Lupin's pediatric sales force

between 2014 and 2016 before joining Plaintiff in early 2017. He testified that Lupin informed him of the very strategy change Plaintiff now claims was unreasonable. He also conceded that Lupin kept him informed of Lupin's efforts to implement that strategy. Rather than object to the new strategy at the time, Plaintiff contemporaneously lauded the plan and encouraged Lupin's efforts right up until the very end of the relationship. Plaintiff partnered with Lupin for six years not because Plaintiff was duped, but because Lupin was the only company willing to sell InspiraChambers in the retail market. Plaintiff, well aware of this fact, declined to exercise its termination rights in 2017 after Lupin proposed the new strategy and despite the fact that Lupin had not met its minimum purchase requirements in prior years. In fact, it was Lupin that ultimately terminated the Agreement in 2019.

Now, in a last-ditch attempt to make money on a product the market has rejected, Plaintiff has sued Lupin, resorting to nitpicking the very same strategies and efforts it enthusiastically embraced through the years. But the very nature of Plaintiff's accusations renders Plaintiff's grievances legally immaterial and factually unsupported. Plaintiff has failed to satisfy the summary judgment standard for four reasons.

<u>First</u>, Plaintiff mischaracterizes Section 2.1(b) of the Agreement. Plaintiff essentially argues that Lupin was contractually obligated to utilize the "same" marketing "resources" for InspiraChamber throughout the course of the Agreement no matter how many years the Agreement remained in effect, the cost of the strategy, or even whether it succeeded or failed. This interpretation is frivolous. It is unfathomable that sophisticated parties would trap themselves in a money-losing strategy. The parties here did not. The Agreement's definition of "Commercially Reasonable Efforts" expressly provides that "the level of" Lupin's marketing efforts "may change

over time," and Section 7.1(a) of the Agreement grants Lupin the "sole discretion" to formulate a marketing strategy.

Second, not one of Plaintiff's three alleged breaches are "material," *i.e.*, so substantial that they defeat the purpose of the Agreement. The Agreement does not require a fixed or minimum number of sales representatives, or exhibitions at physician group meetings. Rather, the Agreement requires commercially reasonable efforts. Further, Plaintiff, not Lupin, was contractually obligated to manufacture product which complied with the government's new serialization requirement. Lupin's notice to distributors on September 30, 2019, that Lupin's remaining product was not saleable was not "premature" because federal law prohibited Lupin from selling InspiraChambers without serial number or barcodes after September 24, 2019.

Third, Plaintiff has completely ignored the second element (*i.e.*, Plaintiff performed its obligations under the Agreement) and fourth element (*i.e.*, Plaintiff suffered damages as a result of a material breach) of a claim for breach of contract. These omissions alone are fatal to Plaintiff's motion.

Fourth, Plaintiff failed to address Lupin's affirmative defenses, two of which foreclose summary judgment. Plaintiff ignores Affirmative Defense No. 7, which alleges that Plaintiff's prior material breaches of the Agreement excuse Lupin's alleged failure of performance. Plaintiff also ignores Affirmative Defense No. 8 (equitable estoppel). It is undisputed that Lupin changed the marketing strategy in February 2017 after two years of disappointing sales. It is also undisputed that Plaintiff was fully informed of, sent enthusiastic emails about, and participated in implementing the new strategy, causing Lupin to believe that Plaintiff supported and agreed with the plan. To its ultimate detriment, Lupin made the mistake of believing that Plaintiff, which now claims it actually harbored doubts about the new strategy all along, meant what it said.

For the foregoing reasons, and those set forth more fully below, Plaintiff's motion for partial summary judgment should be denied.

**Counter-Summary of Disputed Material Facts**[1]

This section only addresses six facts relied upon in Plaintiff's memorandum of law that lack evidentiary support, misstate the record, or are otherwise materially incomplete or misleading.

1. Plaintiff argues that "Lupin became the exclusive distributor of the Products in the United States" in December 2013. (*See* Motion at pg. 6 of 18.) The Agreement defines Lupin's exclusive "Market" to exclude a significant market segment, the United States hospital market: "**'Market'** means any and all customers and channels of distribution in the Territory, whatsoever, excluding the Hospital Market." (*See* Agreement at § 1.1.) Plaintiff retained Salter Labs to distribute InspiraChamber in the United States hospital market. (*See* Counter 56.1 at ¶ 71.) Plaintiff ultimately terminated Salter Labs in 2017 because Plaintiff was not satisfied with sales performance in the United States hospital market. (*See id.* at ¶ 72.)

2. Plaintiff contends that "Lupin's sales force of approximately 123 to 150 representatives was reduced to just nine," and that Lupin "fail[ed] to disclose this information." (*See* Motion at pg. 7 of 18.) Lupin's relevant sales force, the pediatric sales force, was not "123 to 150 representatives." Rather, the pediatric sales force was approximately 50 members until it was restructured in January 2017, with notice to Plaintiff when the alternate strategy was pursued in February 2017. (*See* Counter 56.1 at ¶ 31 (Liska Tr. at 181:7-16) ("Q. Okay. So at this point in time, there's around 50 sales reps assigned to InspiraChamber? A. It seems to indicate that, yes.").)

[1] The disputed facts, and additional material facts are set forth in Lupin's accompanying Counterstatement of Material Undisputed Facts and the corresponding declaration. References to that statement will be made to "Counter 56.1 at ¶ __." References to exhibits attached to the Declaration of Frank Morreale in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. Decl.") will be made to "Ex. __."

Nine members of the pediatric sales force remained and were incorporated into the existing general pharmacy sales force. They continued to promote InspiraChamber in 2017. (*See id.* at ¶ 44 (Liska Tr. at 227:14-21) ("Even when we disbanded the pediatric sales force, we kept a few, I guess nine, of the pediatric sales reps on. They assumed responsibility for promoting the primary care products as well. So they would promote the [pediatric] products, which was InspiraChamber and Suprax I think at this time.").) Lupin informed Plaintiff of the restructuring of the sales force during a 60-day window when Plaintiff had an unfettered right to terminate the Agreement. Plaintiff instead chose to proceed with the alternate strategy. (*See id.* at ¶¶ 57-58.)

3. Plaintiff contends that "during the launch," Lupin forecast a [redacted] market share in 2016 and a [redacted] market share in 2019. Plaintiff relies upon a preliminary forecast that was prepared for the purpose of making an initial production order 11 months before launch. (*See id.* at ¶ 30 (Collins Tr. at 30:13-15) (explaining that variables "would be subject to change as the model is iterated."); Ex. 23 (March 11, 2014 cover email conveying the forecast cited by Plaintiff, asking recipients to "put some time on the books this week to discuss any concerns before we finalize it for the initial production order").) Plaintiff ignores later iterations of forecasts based on additional market research and actual sales. Even though Plaintiff's purported undisputed fact refers to February 2015 (*i.e.*, "during the launch"), the forecast relied upon is attached to a much earlier email dated March 11, 2014.

4. Plaintiff contends that it "later learned that Lupin had dismantled its sales force because its most successful brand product, Suprax, became genericized." (*See* Motion at pg. 7 of 18.) Lupin restructured its sales force for multiple, commercially reasonable reasons: "The decision to disband the pediatric sales force was a function of the fact that InspiraChamber sales were flat to declining; Suprax was getting generic competition, and we were not able to get any

other business development deals to support that sales force." (*See* Counter 56.1 at ¶ 42.) Supporting the pediatric sales force was costing Lupin more than the revenue generated by InspiraChamber. (*See id.* at ¶ 49 (Liska Tr. at 231:7-20) ("[W]e lost money on InspiraChamber every year. We spent a million and a half the year before we launched it, two and a half million the year we launched it, 1.6 or something. We never sold more than a million and a half dollars a year of InspiraChamber. Most Marketing/Sales organizations will budget five to eight percent of sales as their expense budget, so you can do the math: five to eight percent of one and a half million is a small number.").)

5. Plaintiff contends that Lupin's "bad faith" conduct included an October 2017 acquisition of the rights to distribute an adult women's drug (Solosec), and the hiring of sales representatives in March 2018 to promote Solosec. (*See* Motion at pg. 8 of 18.) Every witness questioned about the acquisition explained that it had nothing to do with Lupin's marketing strategies for InspiraChamber. (*See* Counter 56.1 at ¶ 63.)

6. Plaintiff contends that Lupin breached the Agreement through "its delay in complying with the Unique Device Identifier ("UDI") requirements by the United States Food and Drug Administration, which had a deadline of September 24, 2019." (*See* Motion at pg. 8 of 18 n.5.) Plaintiff had the obligation pursuant to Sections 2.3 and 3.8 of the Agreement to "at its sole expense, obtain and maintain in its own name all necessary governmental approvals to Distribute the Products in the Market within the Territory" and "at its sole expense, . . . package all Products . . . in conformance with standard industry practice and Applicable Laws[.]" (*See* Agreement at §§ 2.3, 3.8.) Plaintiff conceded it was, at least in part, Plaintiff's responsibility. (*See* Counter 56.1 at ¶ 53 (Toddywala Tr. at 41:2-5) ("From my perspective, it was a dual responsibility. Because

anything that Lupin or Salter does, we have to implement anyway, in – using our manufacturers.").)

## Argument

### I. THE AGREEMENT REQUIRED LUPIN TO MAKE COMMERCIALLY REASONABLE EFFORTS TO SELL INSPIRACHAMBERS, NOT TO USE THE "SAME" CAPABILITIES AND RESOURCES FOR EACH YEAR OF THE AGREEMENT'S TERM.

The lynchpin of Plaintiff's motion is the untenable presumption that the Agreement required Lupin to use the "same" company-wide capabilities and resources that existed in 2013 throughout the entire term. (*See* Motion at pp. 13 of 18.) In other words, Plaintiff argues that Lupin contracted to freeze its "capabilities" in time, so long as the Agreement remained in effect, to the exclusion of any other consideration. Plaintiff's interpretation simply cannot be reconciled with the Agreement, New York law, or common sense.

The Agreement defines "Commercially Reasonable Efforts" in objective terms, consistent with governing New York law. *See Holland Loader Company, LLC v. FLSmidth A/S*, 313 F.Supp.3d 447, 473 (S.D.N.Y. 2018), *aff'd*, 769 Fed. Appx. 40 (2d Cir. 2019) ("A contracting party's efforts are judged objectively in light of proven standards"). That is, the Agreement defines "Commercially Reasonable Efforts" as:

> reasonable, diligent, good-faith efforts to accomplish such task or objective as soon as practicable, which efforts shall not be less than the efforts that other similarly situated companies would normally use to accomplish a similar task or objective under similar circumstances exercising reasonable business judgment, with respect to a product owned by it or to which it has similar rights as the Products, which product is at a similar stage in its product life and is of similar market, commercial and profitability potential as the Product, taking into account efficacy, safety, approved labeling, the competitiveness of alternative products in the marketplace, the patent and other proprietary position of the product, and other relevant factors commonly considered in similar circumstances. It is understood that the level of efforts required to meet the above

> standard may change over time if there are changes in the status of the Products or of the above criteria applicable to the Products.

*See* Agreement at § 1.1 (emphasis added).[2]

Plaintiff's Motion does not attack the commercial reasonableness of Lupin's decision to change marketing strategies in early 2017, but rather Lupin's discretion to change strategies in the first place. Plaintiff, however, only reaches this conclusion by ignoring several indispensable sentences from the Agreement's definition of "Commercially Reasonable Efforts." Most importantly, the definition provides that "the level of efforts required to meet the above standard may change over time if there are changes in the status of the Products . . ." (*Id.* at § 1.1.) Plaintiff likewise fails to address that this definition unambiguously gave Lupin authority to market InspiraChamber so long as its efforts were not "less than the efforts that other similarly situated companies would normally use . . . under similar circumstances exercising reasonable business judgment." *Id.* Plaintiff's interpretation also runs contrary to Section 7.1(a) of the Agreement ("Lupin Marketing Authority"), which states, in relevant part:

> "Lupin shall have, in its sole discretion, the authority to market and otherwise Distribute the Products in the Market within the Territory for use in the Field to the extent and in such manner as it deems appropriate."

*Id.* at § 7.1. Read together, as New York law requires, these agreed contract terms gave Lupin discretion to exercise reasonable business judgment to determine the marketing strategy for the Products, recognizing that this strategy could change over time to remain commercially reasonable. Plaintiff has no answer for these contract terms. If, as Plaintiff contends, Lupin's capabilities and resources were fixed in December 2013, Lupin would have no authority to market

[2] The definition of commercially reasonable efforts is used throughout the Agreement to explain Lupin's obligations, (*see, e.g.,* Agreement at §§ 2.1(b), 7.1(b)), as well as Plaintiff's obligations. (*Id.* at § 3.1.)

InspiraChamber "as it deems appropriate." To the contrary, in Plaintiff's view, the level of Lupin's capabilities and resources that were also used to sell other products and drugs would be dictated by the level set during the InspiraChamber launch. This cannot be, as it is unfathomable that any company would agree to such a harsh and commercially unreasonable restriction, particularly for a product with no sales history.

Plaintiff's argument that Section 2.1(b) prohibits Lupin from using reasonable business judgment to recalibrate its efforts periodically based on market conditions also contravenes the law. New York law prohibits reading a contract term to the exclusion of all other terms. Section 2.1(b)'s introductory phrase makes it clear that the Agreement must be read as a whole: "Subject to the terms and conditions set forth in this Agreement . . . ." *Id.* at § 2.1(b). Courts applying New York law consider "the provisions of the contract as a whole," and do not "view sentences or clauses in isolation." *See Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (affirming summary judgment for defendant and rejecting Plaintiff's contract interpretation as "illogical" because reading a requirement into one paragraph of agreement would "eviscerate" a different paragraph). Nor should a contract be interpreted to render any terms or clauses "superfluous or meaningless." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992). Viewing sentences or clauses in isolation is precisely what Plaintiff attempts here to avoid having the Agreement read "as a whole."

Plaintiff also improperly defines the word "current." While the term can have multiple meanings, "most recent" is the only definition in the resource identified by Plaintiff (*i.e.*, the on-line version of the *Merriam-Webster* dictionary) that makes sense because it is consistent with the last sentence of the definition of Commercially Reasonable Efforts, which states:

> "It is understood that the level of efforts required to meet the above standard *may change over time* if there are changes in the status of

> the Products or the above criteria applicable to the Products." (emphasis added.)

*See* Agreement at § 1.1.

Presumably Plaintiff omits this definition from its argument because acknowledging such would torpedo its motion.[3] Courts that have applied the term "current" in other circumstances understood it to mean changing over time. *See, e.g.*, *Ford v. Deacon*, No. 16-cv-01001 (MAD/TWD), 2018 WL 5729352, at *13 (N.D.N.Y. Aug. 27, 2018) ("[R]eviews must take into account prison conditions and inmate behavior as they change over time; those *changes may modify the calculus of* whether the inmate presents a *current* threat to the safety of the facility.") (citation omitted) (emphasis added); *Curley v. Philo*, No. 07-cv-370 (GLS-DRH), 2009 WL 2152323, at *3 n.1 (N.D.N.Y. Jul. 14, 2009) ("The character of a forum is defined by its uses and the uses to which it is put change over time. Therefore, the character of the forum must be based on a factual inquiry into the forum's current uses, not those of a decade ago.") (alterations and citations omitted).

Plaintiff's refusal to read the Agreement as a harmonious whole, as New York law requires, ultimately leads Plaintiff to argue that this Court should ignore the Agreement's definition of "Commercially Reasonable Efforts" altogether: "[i]t is unnecessary for the Court to assess whether Lupin used Commercially Reasonable Efforts in this context because this contractual

[3] The error of Plaintiff's position is exemplified by example. If the Agreement required notices to be delivered to Lupin's "current" General Counsel, no one would argue that notices should be provided to the attorney who held the title of General Counsel in December 2013 even if that attorney no longer worked for Lupin when the notice was actually delivered. Yet, that is the position Plaintiff has argued. New York law does not allow for such a result. *See Matter of Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (internal citations omitted).

provision requires and includes the independent and separate obligation for Lupin to use its 'current distribution capabilities and resources,' which Lupin did not do." (*See* Motion at pg. 13 of 18 n.10.) Indeed, the best reading of the "current distribution capabilities and resources" language is that it was meant to ensure that Lupin was not required to develop new capabilities to launch the Products. It was always the parties' intention, as manifested in the unambiguous language of the Agreement, that strategy and efforts could and should respond to market conditions. Plaintiff's unreasonable and restrictive interpretation should not be permitted.

## II. NONE OF THE THREE BREACHES ALLEGED BY PLAINTIFF ARE MATERIAL BREACHES OF THE AGREEMENT.

Over the course of a nearly six-year relationship, Plaintiff identifies just three actions Lupin took in 2017 and 2019 as breaches, none of which caused any damages. Not a single one of these alleged breaches is "material" as required for Plaintiff to recover for an alleged breach of contract concerning a commercial reasonableness requirement.

A material breach is "one which is so substantial that it defeats the purpose of the contract." *See Planète Bleue Télévision, Inc. v. A&E Television Networks, LLC*, No. 16-cv-9317 (PGG), 2018 WL 10579873, at *13-14 (S.D. N.Y. Sept. 19, 2018) (payment delay was immaterial where plaintiff "has not alleged any prejudice that it suffered as a result of this delay"). A claim for a material breach of a commercially reasonable efforts provision "cannot be established simply by observing, in hindsight, that [the party] could have done something differently that would have produced a better result." *See Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03-cv-8259 (CSH), 2007 WL 1988150, at *22 (S.D.N.Y. July 10, 2007) (granting summary judgment dismissing counterclaims). An agreement to use commercially reasonable efforts "does not require a party to act against its own business interests." *See MBIA v. Patriarch Partners*, 950 F.Supp. 2d at 618; *see also Holland Loader Company, LLC*, 313 F.Supp.3d at 472 ("commercially reasonable

efforts" require "something less than a degree of efforts that jeopardizes one's business interests"). Notably, the Motion includes no complaints about Lupin's efforts in 2014, 2015 and 2016.

### A. <u>Restructuring The Pediatric Sales Force In 2017 Was Not A Material Breach Of The Agreement.</u>

The first alleged breach—"disband[ing] the sales force"—is not a breach. The Agreement does not require that Lupin maintain a minimum number of sales representatives. Rather, as demonstrated in Section I, *supra*, Section 2.1(b) of the Agreement requires Lupin to use "commercially reasonable efforts," and Section 7.1(a) gives Lupin the authority to market InspiraChamber in its "sole discretion" and "in such manner as it deems appropriate." The definition of "commercially reasonable efforts" provided that Lupin's efforts would be measured based on an objective standard that considers what "other similarly situated companies would normally use" in the exercise of "reasonable business judgment."

Plaintiff ignores all of these provisions in the Agreement in arguing that a pediatric sales force was not only contractually required, but necessary to sell InspiraChambers. Plaintiff's claim is not supported by the record. For one thing, Plaintiff ignores the requirement under the definition of "Commercially Reasonable Efforts" that Lupin utilize "reasonable business judgment." In two years (2015-16), the sales force incurred nothing but losses without developing market share above [redacted]. If anything, continuing to use the same sales force approach would not have been commercially reasonable or in accordance with Lupin's "reasonable business judgment." Moreover, Plaintiff sidesteps Lupin's obligation under the same definition to maintain a level of effort commensurate with similarly situated companies selling like products. Plaintiff identifies no such company and, according to Mr. Liska, there is no evidence of other companies marketing through a pediatric sales force, much less one of a certain minimum size. "[W]e were in fact one of, if not the only, pediatric sales force in the market. Most other companies had abandoned, you

know, the pediatrics as a promotional focus." *See* Counter 56.1 at ¶ 28 (Liska Tr. at 134:24-135:17). Nor can Plaintiff explain how Lupin could possibly maintain efforts commensurate with similarly situated companies when those companies are free to adapt and change with market conditions, while Lupin (at least according to Plaintiff) was frozen in time.

Plaintiff was well aware that Lupin's efforts to market InspiraChamber, in fact, far outpaced similarly situated companies. Plaintiff tried (without Lupin's knowledge) both before and during the Agreement to find other potential marketing partners, only to identify no other company willing to market and sell the Products with a salesforce or otherwise. *See* Counter 56.1 at ¶ 62 (Amato, III Tr. at 94:22-25) ("Q. What was the end result of your efforts to work with Teva? A. Well, since we're not in business with them now, I don't believe that avenue worked out."); *id.* (Amato, III Tr. at 96:3-9) ("I believe she spoke Teva and GSK. AstraZeneca, I believe was also on a proposed list to look into. Q. But ultimately, InspiRx didn't end up doing business with any of those companies. Is that correct? A. That's correct."). There simply was no interest, beyond Lupin, in undertaking the effort to market InspiraChambers. Unable to demonstrate that "similarly situated companies" were incurring the cost of a pediatric sales force to market similar, competing products, Plaintiff simply ignores the definition of Commercially Reasonable Efforts as well as the high cost/low benefit of a pediatric sales force. Plaintiff does not have that option on its motion or at trial.

Plaintiff's argument concerning its CEO's view on the sales force is completely irrelevant to this breach of contract dispute. (*See* Motion at pg. 8 of 18.) If Mr. Amato thought a sales force was necessary, Plaintiff could have negotiated for its inclusion when the Agreement was negotiated. Plaintiff did not. If he thought the continued use of a sales force was necessary to lift the disappointing sales trend in early 2017, Plaintiff could have insisted on it. He did not. If he

thought a sales force was necessary at any point in 2017, 2018, or 2019, Plaintiff could have terminated the Agreement with Lupin. Plaintiff did not. To the contrary, he supported and encouraged Lupin's efforts. Plaintiff is not permitted to re-write the Agreement or ignore the facts.

Likewise, Plaintiff's reliance on the fact that Lupin hired a sales force for a different product, Solosec, in March 2018 is also misplaced. (*See* Motion at pg. 17 of 18.) Lupin did not hire sales representatives to market Solosec instead of InspiraChamber. Efforts to sell InspiraChamber through a pediatric sales force had already produced disappointing sales results by the end of 2016 due to the retail market's tepid response to InspiraChamber, and both parties mutually agreed to a new strategy starting in February 2017. There was no "bad faith" in those decisions made well before Lupin began promoting Solosec; personal promotion of InspiraChamber through an expensive pediatric sales force was simply not working. As Mr. Liska explained, "[t]he product did not seem to be promotionally responsive." (*See* Counter 56.1 at ¶ 63 (Liska Tr. at 176:10-11).) And "after the pediatric sales force was disbanded, the sales roughly maintained the same level." (*Id.* (Liska Tr. at 176:19-21).) Every Lupin witness who testified on this matter agreed that Lupin's efforts to sell Solosec—a different product, in a different market (women's health), sold through a different sales force, at a different time (*i.e.*, beginning in March 2018)—are unrelated and irrelevant to Lupin's efforts to sell InspiraChambers. (*See* Counter 56.1 at ¶¶ 63-65.) The parties did not contemplate, or even discuss, the use of a new sales force to sell InspiraChamber after January 2017. It is a theory concocted by Plaintiff for this lawsuit that finds no support in the record. It would have been commercially unreasonable for Lupin to continue losing millions annually through personal promotion efforts that were simply not driving sales.

### B. Lupin's Strategy For Presenting At Conferences In 2017 And 2019 Was Not A Material Breach Of The Agreement.

Plaintiff next alleges that Lupin breached the Agreement by not exhibiting InspiraChambers at "physician group meetings" in 2017 and 2019. But once again, Plaintiff ignores the record as well as the Agreement on its way to reaching the wrong conclusion. Not attending physician group meetings, even if true, would neither be material nor a breach. The Agreement does not require exhibitions at physician group meetings. Rather, Section 7.1(b) of the Agreement requires that "Lupin or its Affiliates shall use Commercially Reasonable Efforts to exhibit Products at one or more major physician group meetings in the Territory during each Contract Year." (Emphasis added.) Plaintiff recites this standard, but does not apply it, instead spinning the provision as zero-sum: attending conferences is commercially reasonable, while not attending is unreasonable. No reasonable business judgment, no objective comparison to similarly situated companies, and no further analysis required. Unfortunately for Plaintiff, that is not the contract it negotiated. The Agreement explicitly incorporates a commercial reasonableness standard into Section 7.1(b). Lupin therefore was entitled, indeed *contractually required,* to exercise its "reasonable business judgment" in determining whether dedicating resources to conferences in certain years made commercial sense.

Plaintiff suggests Lupin should have attended additional conferences, but does not identify any or analyze how they allegedly would have driven sales. Plaintiff also insinuates that not attending some unspecified conferences meant Lupin exhibited no "conscious exertion" to comply with the Agreement. But here, too, the Motion is bereft of discussion of what Lupin did or considered or any other evidence bearing on commercial reasonableness. Plaintiff does not address the fact that Lupin attended more than twice as many conferences (15 in 5 ½ years) as was required by Plaintiff's interpretation of the Agreement. Those conferences were the American

Academy of Allergy, Asthma & Immunology conference in Fiscal Years 2015, 2016, and 2017, the ECRM conference in Fiscal Years 2015 and 2018, the American Academy of Pediatrics national conference in Fiscal Years 2016 and 2017, the American College of Allergy, Asthma & Immunology conference in Fiscal Years 2016, 2017, and 2019, the American Academy of Respiratory Care conference in Fiscal Year 2017, the National Association of Chain Drug Stores in Fiscal Years 2017, 2018 and 2019, and the Atlanta Allergy Group in Fiscal Year 2019. (*See* Counter 56.1 at ¶ 40.)[4] Plaintiff, of course, does not dispute that Lupin's extraordinary efforts in 2015 and 2016 were commercially reasonable.

Plaintiff does not raise any concerns about specific conferences Lupin attended. To the extent Plaintiff attempts to differentiate between "physician conferences" and "trade" conferences, then its nitpicking has truly descended into immaterial distinctions. As demonstrated in Lupin's motion for summary judgment (*see* D.E. 31 at pg. 13-14), the parties engaged in two marketing strategies during the course of the Agreement: (1) personal promotion to pediatricians through a sales force in 2015-16; and (2) a three-pronged, strategic approach principally targeting large trade customers (*e.g.*, national pharmacy chains) in 2017-19. Lupin promoted at conferences aimed at physicians in 2015 and 2016, and attended more trade conferences (plus some physician conferences) thereafter. Lupin, in other words, in its "reasonable business judgment," made the "commercially reasonable" decision to attend conferences geared to its target market. As with its rigid and mistaken interpretation of "current capabilities," Plaintiff's hyper-focus on a single word ("physicians") ignores common sense.

---

[4] As for 2019, Lupin terminated the Agreement in August, six months before the end of the contract year in February 2020. Accordingly, any alleged breach by not attending a conference that year could not have accrued.

Regardless, this claim fails because Plaintiff again offers no evidence of damages as required to prove breach of contract under New York law. It is undisputed that attending conferences came at a substantial cost to Lupin and did nothing to boost interest in, or sales of, InspiraChambers. Plaintiff's CEO admitted that no opportunities arose from conference attendance:

> Q. Okay. Can you identify any conference that you consider a missed opportunity?
>
> A. Any conference that wasn't exhibited at.
>
> Q. Are there any particulars, meaning there was someone who said to you, Where were you? I had a buyer there. They were very interested, or anything of that nature?
>
> A. Yes. Quite a few of them. Several ATS meetings during the course. Several pediatric -- American Academy of Pediatrics meetings, which was certainly what I thought Lupin should absolutely be at.
>
> Q. And did you pass those leads on to Lupin?
>
> A. I didn't have any leads. I attended just to listen to the science.

(*See* Counter 56.1 at ¶ 73 (Amato Tr. at 179:18-180:19).) Any claim that exhibiting at a particular conference was material—*i.e.*, the exhibition would have boosted sales—is pure speculation. It is telling that Plaintiff fails to cite a single shred of supporting evidence. As discussed above, it had become commercially unreasonable by 2017 to direct resources toward physician group meetings that were not effective, particularly when Lupin (with Plaintiff's knowledge and assistance) had largely moved from personal promotion to physicians to a focus on large, nationwide retailers. Lupin instead participated in trade shows that actually supported the agreed alternative marketing strategy. (*See* Counter 56.1 at ¶ 51 (Shirkey Tr. at 27:22-28-8) ("And then we also met every retailer in the country at ECRM and had brief conversations about the product to see if there was interest. So that included every retailer in the country.").) If Plaintiff truly believed that medical

conferences drove sales, it had the right pursuant to Section 7.1(b) of the Agreement to attend conferences with or without Lupin "at [Plaintiff's] own expense." Plaintiff's inaction speaks volumes about what it actually believed the value of conferences to be.

### C. Notifying Distributors That Lupin Did Not Have Saleable Product In September 2019 Was Required By Law, And Was Not A Breach Of The Agreement.

The third alleged breach—prematurely notifying distributors on September 30, 2019 that Lupin did not have saleable product—is also not a breach, or material. There was nothing premature about Lupin's notice. It is undisputed that federal law required serial numbers or bar codes on medical devices like InspiraChamber after September 24, 2019. It is also undisputed that Plaintiff had not provided Lupin with any InspiraChambers with serial numbers or bar codes, as was Plaintiff's responsibility under the Agreement:

> "**2.3. Product Governmental Approvals.** During the Term, InspiRx shall. at its sole expense, obtain and maintain in its own name all necessary governmental approvals to Distribute the Products in the market within the Territory (including any required 510(k) Clearances for the Products)." (emphasis added.)
>
> "**3.8. Packaging of Products.** InspiRx shall. at its sole cost and expense, handle, sterilize, preserve and package all Products so as to protect the Products from loss or damage, and in conformance with standard industry practice and Applicable Laws (including the Act." (emphasis added.)

(*See* Ex. 3 (Agreement) at §§ 2.3 and 3.8.) As Plaintiff's Chief Technology Officer conceded, "[a]fter (September 24, 2019), the whole product was junk." (*See* Counter 56.1 at ¶ 74.)

Equally important, there is no evidence that Lupin's notice to the distributors in late September 2019 caused any loss in sales. This was not a royalty-based Agreement wherein Plaintiff received compensation for each sale (or should receive damages for a "missed" sale). There is no evidence in the record that any pharmacies were unable to fill InspiraChamber

prescriptions in either October or November of 2019 from existing inventory. Accordingly, this alleged breach at the very end of the contractual relationship is nothing but pure speculation.

## III. PLAINTIFF HAS FAILED TO PROVE THE SECOND AND FOURTH ELEMENTS OF A CLAIM FOR BREACH OF CONTRACT.

Plaintiff cannot prevail on breach-of-contract claims when it does not even address two of the four elements of such a claim under New York law. Both parties agree that to prove a claim for breach of contract, the plaintiff must come forward with evidence of four elements: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) material breach of contract by the defendant, and (4) damages. *See Colina v. One East River Place Realty Co.*, No. 99-cv-5173(DC), 2000 WL 1171126, at *8 (S.D.N.Y. Aug. 17, 2000); *see also* Motion at p. 11. But Plaintiff wholly ignores the second element (evidence of Plaintiff's performance) and concedes it has insufficient evidence to prove the fourth element (damages). *See* Motion at pg. 8 n.8.[5]

Plaintiff has failed to perform its contractual obligations in at least two ways.

First, as set forth in Section II C, *supra*, Plaintiff failed to meet its contractual obligations pursuant to Section 2.3 and 3.8 of the Agreement, which required Plaintiff, not Lupin, to comply with the UDI requirement. Section 2.3 of the Agreement ("Product Government Approvals") requires that Plaintiff "shall at its sole expense, obtain and maintain in its own name all necessary governmental approvals to Distribute the Products in the Market within the Territory …." Section 3.8 ("Packing of Products") states that Plaintiff "shall, at its sole cost and expense … package all products … in conformance with standard industry practice and applicable laws …." Plaintiff failed to do so. Lupin's Rule 30(b)(6) witness, Ms. DeTore, explained that Plaintiff was not

[5] Lupin's motion for summary judgment demonstrates that Plaintiff cannot prove damages at any stage. *See* D.E. 31 at pp. 26-28 (Plaintiff's alleged damages are speculative and not related to any alleged breach).

diligent in addressing its contractual obligation: "[W]e had reached out to InspiRx to get guidance because, obviously, you know, they're the makers and experts in this space. And there seemed to be confusion on that end as well, which is why we went to outside counsel to get better guidance." (*See* Counter 56.1 at ¶ 68.) Plaintiff omitted this testimony from the record and fills that gap by blaming Lupin, a fact which was expressly contradicted by Plaintiff's expert. (*See* Counter 56.1 at ¶ 53 [redacted].)

Second, Plaintiff made and breached representations, warranties, and covenants memorialized in section 9.1 of the Agreement. Pursuant to Section 9.1(c) of the Agreement, Plaintiff agreed to provide Lupin "written notice immediately" of any alleged breach of the Ontario/Respibaby Agreement."[6] (*See* Ex. 3 (Agreement) at § 9.1(c).) Plaintiff began receiving allegations of breaches of the Ontario/RespiBaby Agreement no later than early 2016, (*see* Counter 56.1 at ¶ 75), and was sued for those alleged breaches in 2017 and again in 2018. (*See* Counter 56.1 at ¶ 76.) Plaintiff never provided notice, written or oral, to Lupin. (*See* Counter 56.1 at ¶ 77.) Without notice, Lupin was deprived of its opportunity to even consider whether Lupin should exercise its right to terminate the Agreement as a result of Plaintiff's failure and refusal to pay royalties to the co-inventors.

## IV. PLAINTIFF HAS IGNORED LUPIN'S AFFIRMATIVE DEFENSES.

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *See F.D.I.C. v. Great American Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (affirming summary judgment in favor of defendant). A plaintiff moving for summary judgment

---

[6] The "Ontario/Respibaby Agreement was an agreement to pay royalties to the co-inventors of the InspiraChamber. *See* Agreement at § 9.1(c).

must make a *prima facie* showing on each of the elements essential to its case and the absence of genuine issue of material fact as to the affirmative defenses. *See FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) ("Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense . . . a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case.") (quotation marks, brackets, and citation omitted); *Emerson Elec. Co. v. Holmes*, No. 16-cv-1390 (PKC) (SIL), 2020 WL 4592808, at *6 (E.D.N.Y. Aug. 11, 2020) (citing same). Plaintiff has ignored Lupin's affirmative defenses.

Plaintiff ignores Affirmative Defense No. 7, which alleges that Plaintiff's prior material breaches of the Agreement excuse Lupin's alleged failure of performance. As set forth more fully in Section III, *supra*, Plaintiff has breached the Agreement in at least two ways. First, Plaintiff breached the representations, warranties, and covenants memorialized in section 9.1 of the Agreement by failing to provide Lupin "written notice immediately" of any alleged breach by Plaintiff of the Ontario/Respibaby Agreement. Second, Plaintiff breached its obligations under Section 2.3 of the Agreement ("Product Government Approvals") to obtain all necessary governmental approvals, and Section 3.8 ("Packing of Products") to "package all products . . . in conformance with standard industry practice and applicable laws . . . ." *See* Ex. 3 (Agreement) at §§ 2.3, 3.8.)

So, too, Plaintiff ignores Affirmative Defense No. 8 (estoppel). A party may be equitably estopped from pursuing a claim where it makes a misrepresentation to the other party with reason to believe that the other party will rely on it, and the other party relies on it to its detriment. *See Utica Mut. Ins. Co. v. Munich Reinsurance America, Inc.*, 2018 WL 173623, at *27 (N.D.N.Y. Mar. 20, 2018) (denying motion for summary judgment because of issues of fact raised by

equitable estoppel defense). Whether equitable estoppel applies in a given case is ultimately a question of fact. *See Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001) (vacating judgment and finding fact issue).

It is undisputed that Lupin changed the marketing strategy in February 2017 after two years of disappointing sales. (*See* Counter 56.1 at ¶ 43.) It is also undisputed that Plaintiff was fully informed of the strategy and caused Lupin to believe Plaintiff agreed with the strategy. (*Id.* at ¶ 57.) It is further undisputed that Plaintiff had the right to terminate the Agreement for an uncured breach or product purchases beneath the annual minimums in 2016 and 2017, but chose to allow Lupin to implement the alternate strategy. (*Id.* at ¶¶ 49, 62.) It is also undisputed that Lupin executed the alternative strategy for more than two years. (*Id.* at ¶¶ 41, 70.)

Plaintiff now contends that despite its outward support, it inwardly rejected the alternate strategy and that Lupin acted in "bad faith" when it pivoted from a sales force after two years of disappointing results. (*Id.* at ¶ 57) (Plaintiff's CEO claimed he supported the alternate strategy only "as long as it was an addition" to the original strategy; however, Plaintiff's marketing director explained that he supported the alternate strategy.) Setting aside that Lupin reasonably took its business partner at its word, Plaintiff ignores the fact that Lupin had a contractual right to terminate the Agreement on 90 days' notice. (*See* Agreement at § 12.2(f).) Because Plaintiff did not oppose or even question the alternate strategy in February 2017, Lupin lost the opportunity to terminate the Agreement in February 2017, to Lupin's detriment. At the very least, genuine issues of material fact preclude partial summary judgment for Plaintiff on this affirmative defense.

## V. PLAINTIFF'S MOTION IS BASED UPON DISPUTED FACTS.

As set forth more fully in the Summary of Disputed Material Facts, *supra*, and in the accompanying Counterstatement, the material facts alleged supporting Plaintiff's motion are

disputed. For that reason alone, Plaintiff's motion should be denied. *See Bear, Stearns Funding, Inc. v. Interface Grp. – Nev., Inc.*, 361 F. Supp. 283, 289-97 (S.D.N.Y. 2005) ("If there is 'any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party,' then summary judgment should be denied.") (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)); *Network Enters. v. APBA Offshore Prods.*, No. 01 Civ. 11765 (CSH), 2004 WL 1837349, at *2-3 (S.D.N.Y. Aug. 16, 2004) (denying plaintiff's motion for summary judgment on its breach of contract claim where there remained an issue of material fact).] These disputes issues are genuine and prevent granting Plaintiff's motion.

## Conclusion

For the foregoing reasons, Defendant respectfully submits that Plaintiff's motion for partial summary judgment should be denied.

Dated: New York, New York
October 19, 2020

**HOLLAND & KNIGHT LLP**

By: /s/ Matthew R. DiBlasi
Frank Morreale
Matthew R. DiBlasi
31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466

*Attorneys for Defendant*