Frank Morreale, Esq.
Matthew R. DiBlasi, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466
Facsimile: (904) 358-1872
E-mail: frank.morreale@hklaw.com
matthew.diblasi@hklaw.com

*Attorneys for Defendant Lupin Atlantis Holdings SA*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INSPIRX, INC.,<br><br>Plaintiff,<br><br>- against -<br><br>LUPIN ATLANTIS HOLDINGS SA,<br><br>Defendant. | Case No. 1:20-cv-03214 (JPC) |

**REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

TABLE OF AUTHORITIES ........................................ ii

PRELIMINARY STATEMENT ........................................ 1

ARGUMENT ........................................ 2

I. PLAINTIFF HAS NOT MET ITS BURDEN OF PROVING DAMAGES WITH REASONABLE CERTAINTY AS REQUIRED BY NEW YORK LAW. ........................................ 2

II. PLAINTIFF HAS NOT MET ITS BURDEN OF COMING FORWARD WITH EVIDENCE THAT DEFENDANT BREACHED THE AGREEMENT. ........................................ 4

A. Plaintiff's Interpretation Of "Current Distribution Capabilities And Resources" In Section 2.1(b) Of The Agreement Is Illogical. ........................................ 4

B. The Alleged Breaches Are Unsupported By The Record Or Immaterial. ........................................ 5

III. PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT 2. ........................................ 9

IV. PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT 3. ........................................ 10

CONCLUSION ........................................ 10

# Table of Authorities

## Cases

*Ashland Mgmt. v. Janien*, 624 N.E. 2d 1007 (N.Y. 1993) .......... 3

*Colon v. Abbot Labs.*, 397 F. Supp. 2d 405 (S.D.N.Y. 2005) .......... 7

*Fishoff v. Coty Inc.*, 634 F.3d 647 (2d Cir. 2011) .......... 10

*Holland Loader Co., LLC v. FLSmidth A/S*, 313 F.Supp.3d 447 (S.D.N.Y. 2018) .......... 3, 5, 6

*Inficon, Inc. v. Verionix, Inc.*, 182 F. Supp. 3d 32 (S.D.N.Y. 2016) .......... 3

*Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96 (2d Cir. 1989) .......... 5

*Int'l Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82 (2d Cir. 1996) .......... 2

*Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, 2014 WL 28600 (S.D.N.Y. 2014) .......... 10

*Long Island Lighting Co. v. Transamerica Delavel*, 646 F. Supp. 1442 (S.D.N.Y. 1996) .......... 9

*MBIA Ins. Corp. v. Patriach Partners VIII, LLC*, 950 F. Supp. 2d 617 (S.D.N.Y. 2013) .......... 5

*McNally Wellman Co. v. N.Y. State Elec. & Gas Corp.*, 63 F.3d 1188 (2d Cir. 1995) .......... 9

*Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742 (S.D.N.Y. 2016) .......... 10

*SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*,
2000 WL 729110 (S.D.N.Y. June 6, 2000) .......... 5

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) .......... 8

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1 (S.D.N.Y. 2020) .......... 5

*Symquest Grp., Inc. v. Canon USA, Inc.*, 186 F. Supp. 3d 257 (E.D.N.Y. 2016) .......... 10

*Washington v. Kellwood Co.*, 714 F. App'x 35 (2d Cir. 2017) .......... 3

*Weldon v. United States*, 744 F. Supp. 408 (N.D.N.Y. 1990) .......... 7

**Preliminary Statement**

In its principal memorandum, Lupin demonstrated that each of Plaintiff's claims is barred by New York law, the terms of the Agreement, and the undisputed facts. Plaintiff's implied covenant claim (Count 3) is redundant of its breach of contract claim, and there is no evidence that Lupin sought to prevent performance. Count 2 fails because Section 3.11(d) of the Agreement does not allow Plaintiff to wait until April 2020 to demand damages for 2015-2017. Count 1 fails because Plaintiff has not met its burden to come forward with evidence of a material breach by Lupin or non-speculative damages for a new product, as is required by New York law.

In opposition, Plaintiff simply ignores the Agreement's definition of "Commercially Reasonable Efforts." Plaintiff's misdirection is not surprising, as the record is full of evidence that Lupin far exceeded the "lenient" standard under New York law. Plaintiff has failed to cite evidence of what any "similarly situated companies" have done "under similar circumstances" for a product "at a similar stage in its product life" in a "similar market." Plaintiff's avoidance of the Agreement's commercial reasonableness standard by which Lupin's efforts are to be judged makes a summary judgment decision simple: if the Court finds that Plaintiff must (as the Agreement mandates) prove that Lupin's actions were commercially unreasonable, then Plaintiff loses.

Plaintiff instead offers an illogical interpretation of part of Section 2.1(b), arguing that Lupin had to maintain the same "capabilities" throughout the Agreement. Plaintiff cannot reconcile its position that the level of marketing resources was predetermined in 2013 with the Agreement's statement, within the definition of commercially reasonable efforts, that "the level of efforts" may "change over time," or the section of the Agreement that gives Lupin sole marketing discretion. Plaintiff's interpretation would render meaningless large swaths of the Agreement.

It is Plaintiff's burden at the summary judgment stage to set forth specific facts demonstrating a genuine issue of material fact for trial. Plaintiff cannot do that and instead attempts to muddle the record. Plaintiff even denies facts its leadership conceded in depositions:

- Plaintiff's CEO testified that a sales force should have seen success, if at all, within 12-18 months. Lupin attempted that strategy for 23 months and lost millions of dollars. Sales flat-lined by mid-2015, more than a year before Lupin disbanded the pediatric sales force.
- Plaintiff's CEO and its Marketing Director participated in an "in-depth discussion" with Lupin in February 2017 about Lupin disbanding the pediatric sales force and the change to an alternative marketing strategy that emphasized non-personal promotion. Plaintiff emailed Lupin after the meeting to express support for the new strategy.
- As part of the agreed alternate strategy, Lupin negotiated with "most large, if not all box stores . . . from a pricing stand point."
- The alternative marketing strategy starting in 2017 allowed Lupin to eke out a small profit.
- Lupin's promotion of a different product in a different market beginning in March 2018 did not divert resources because the pediatric sales force was disbanded in January 2017.
- Lupin exhibited at 8 conferences and trade shows in 5 ½ years; sales were unaffected.
- Lupin had no "bad faith" motive to "table" its efforts because Lupin could only make money through sales; Plaintiff did not pay Lupin for its efforts.

These facts cannot be disputed. Lupin is entitled to summary judgment.

## Argument

### I. PLAINTIFF HAS NOT MET ITS BURDEN OF PROVING DAMAGES WITH REASONABLE CERTAINTY AS REQUIRED BY NEW YORK LAW.

Plaintiff concedes that courts applying New York law "employ a 'higher level of scrutiny'" when considering damages for a new product. (Dkt. 37 at 26) (*citing Int'l Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 86 (2d Cir. 1996) ("We are also aware that there are no reported decisions since the Court of Appeals' decision in [1918] that have affirmed the award of lost profits to a new business."). Plaintiff also concedes that its "lost profit damages" (Dkt. 37 at 9) are based entirely on one preliminary forecast created 11 months before launch for the purpose of an "initial production order." (Dkt. 42-23). These concessions are fatal to Plaintiff's damages claim.

Plaintiff attempts to justify its reliance on a single forecast by citing *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F.Supp.3d 447 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019), in which the court awarded *no damages* upon finding that the defendant's internal forecasts could not support a claim for lost profits. The court refused to award damages despite defendant's breach, explaining that "Plaintiff's evidence of damages [based on the defendant's internal forecasts] is nothing more than speculative." *Id.* at 481. Plaintiff makes the same mistake here. New York law rejects Plaintiff's approach. *See, e.g., Inficon, Inc. v. Verionix, Inc.*, 182 F. Supp. 3d 32, 37 (S.D.N.Y. 2016) ("A defendant's own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history.").[1]

Plaintiff attempts to circumvent New York law's heightened scrutiny of new products by arguing that InspiraChamber, which had never before been sold, was not a "new product" because other VHCs were on the market. (Dkt. 37 at 26-28). No case law supports that argument. A new product need not be the very first of its kind for New York law to foreclose the use of one forecast to prove lost profits. In *Washington v. Kellwood Co.*, 714 F. App'x 35 (2d Cir. 2017), the Second Circuit considered a defendant's failure to market a startup company's athletic compression wear products that were similar to brand name products in an existing market. The Court applied the "greater scrutiny" standard for new products and held that the expert's damages model was "so unfounded that it failed to establish any legal basis for awarding lost-profits damages." *Id.* at 40. That holding applies equally here. InspiraChamber was a new product with no sales history, launched into a mature market. Plaintiff cannot rely solely upon a forecast prepared 11 months

[1] The only other case relied upon by Plaintiff, *Ashland Mgmt. v. Janien*, 624 N.E. 2d 1007 (N.Y. 1993), is likewise unhelpful. In *Ashland*, the contract itself contained "realistic estimates of future assets to be managed" which allowed for the "easy" computation of damages. *Id.* at 1012.

before the first product was sold. Under New York law, damages cannot be awarded based upon an untested forecast without considering actual sales or performing a meaningful market analysis.

## II. PLAINTIFF HAS NOT MET ITS BURDEN OF COMING FORWARD WITH EVIDENCE THAT DEFENDANT BREACHED THE AGREEMENT.

Plaintiff's retreat from the Agreement's definition of "Commercially Reasonable Efforts" is complete; it is not addressed in Plaintiff's lengthy opposition. Unable to meet its burden of proving that Lupin's efforts did not meet that "fairly lenient" standard under New York law, Plaintiff cites to no evidence of what "similarly situated companies" have done "under similar circumstances" for a product "at a similar stage in its product life" in a "similar market." (Dkt. 29-1 at 4). Plaintiff instead employs two tactics. First, Plaintiff offers an illogical interpretation of Section 2.1(b) of the Agreement that would render meaningless much of the Agreement. Second, Plaintiff mischaracterizes the record. Neither tactic creates a triable issue of fact.

### A. <u>Plaintiff's Interpretation Of "Current Distribution Capabilities And Resources" In Section 2.1(b) Of The Agreement Is Illogical.</u>

The gravamen of Plaintiff's argument is that Lupin breached the Agreement because it [redacted] (*See* Dkt. 37 at 5; *see also id.* at 7, 8, 17, 21). Plaintiff's argument is founded on the remarkable contention that Lupin had to use the "same" company-wide capabilities and resources that existed in 2013 throughout the entire term of the Agreement regardless of the market considerations embedded in the definition of "Commercially Reasonable Efforts." As shown in Lupin's principal memorandum, Plaintiff's interpretation contradicts the Agreement's definition of "Commercially Reasonable Efforts," which states, "[i]t is understood that the level of efforts required to meet the above standard *may change over time* if there are changes in the status of the Products or the above criteria applicable to the Products." (Dkt. 29-1 at 4) (emphasis added). Plaintiff's argument likewise cannot be reconciled with the sole marketing discretion granted to

Lupin under Section 7.1(a) of the Agreement, or New York law, which instructs that a contract must be read as a cohesive whole. *See Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (interpretation of one paragraph was "illogical" because it would "eviscerate" a different paragraph). Plaintiff does not explain what such terms mean, or why they exist at all.

Plaintiff's argument [redacted], (Dkt. 37 at 13, 22), also contradicts New York law. *MBIA Ins. Corp. v. Patriach Partners VIII, LLC*, 950 F. Supp. 2d 617, 618 (S.D.N.Y. 2013) (commercially reasonable efforts "do[] not require a party to act against its own business interests."); *see also Holland Loader*, 313 F. Supp. 3d at 472 (commercially reasonable efforts require "something less than a degree of efforts that jeopardizes one's business interests.").

The two other cases Plaintiff references regarding commercially reasonable efforts either support Lupin's position or are inapposite. (*See* Dkt. 37 at 18). In *SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*, 2000 WL 729110, at *20 (S.D.N.Y. June 6, 2000), the plaintiff failed to identify "any evidence of specific efforts undertaken to satisfy its marketing obligations." Here, by contrast, there is ample evidence of Lupin's efforts. (Dkt. 30 at ¶¶ 29-78). In *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020) (Rakoff, J.), the court dismissed a claim alleging failure to use commercially reasonable efforts and noted that "the standard for satisfying commercial reasonability under New York law is a fairly lenient one." New York law forecloses Plaintiff's attempt to rely on "a hindsight comparison of the party's actual conduct to that which could have been undertaken to produce a better result." *Id.*

**B. <u>The Alleged Breaches Are Unsupported By The Record Or Immaterial.</u>**

In lieu of material factual disputes, Plaintiff labels undisputed facts as products of "bad faith," although none of Plaintiff's examples would be bad faith even if true. This tactic fails to

raise a genuine issue of material fact. That Plaintiff chose to misrepresent the record in the following ways confirms that the record does not support Plaintiff's claims:

1. [redacted] (*Id.* at 12).

Plaintiff's CEO and its Marketing Director *testified* that they had an "in-depth" discussion with Lupin in February 2017 about Lupin's disbanding of the pediatric sales force, and that Plaintiff supported the new strategy. (*See* Ex. 1 to the Supp. DiBlasi Decl. at 134:19-22 ("Q. Was there an in-depth discussion with Lupin when they told you they were disbanding the pediatric sales force? A. There was a -- yes, there was."); Dkt. 46 at ¶¶ 57, 59 (Plaintiff's marketing director: "I would say we supported the new strategy…")). Plaintiff's attempt to deny that it "approved of Lupin's efforts," (Dkt. 37 at 7), contradicts the record.[2]

2. [redacted] (Dkt. 37 at 7).

This argument is untrue and immaterial. First, InspiraChamber sales flat-lined by summer 2015, a year before the alleged deprioritization. (*See* Dkt. 30 at ¶ 44 ("sales were flat … as soon as May, after the launch in February"); *see also* Dkt. 43 at ¶ 54 (marketing expenses exceeded sales revenue for 2015 and 2016)). Second, even if Lupin "deprioritized" InspiraChamber (which it did not), the Agreement did not require Lupin to "prioritize" it over other products. Lastly, Lupin was not obligated to engage in money-losing strategies solely to benefit Plaintiff. New York law recognizes a defendant's right to protect its business interests, "including the right to prioritize its product lines based on financial reasons." *Holland Loader*, 313 F. Supp. 3d at 477.

[2] While immaterial to this motion, Plaintiff concedes that Lupin retained nine sales representatives for 2017. (*See* Dkt. 37 at 18; *see also* Dkt. 43 at ¶¶ 41-44).

3. [redacted] (Dkt. 37 at 8, 16-17, 19, 21, 23).

Lupin used strategies with "most large, if not all box stores . . . from a pricing stand point." (Dkt. 46 at ¶¶ 51-52; Dkt. 30 at ¶ 63). Plaintiff tacks "bad faith" onto this allegation without regard for what the term means under New York law, *i.e.*, acting purposely to deprive a counterparty of contract benefits. (Dkt. 31 at 18). There is no evidence that Lupin purposely priced InspiraChambers to avoid sales. Likewise, there is no evidence that lowering the price to some undisclosed level would have mattered. (*E.g.*, Dkt. 46 at ¶ 51). Bald speculation by an "expert" (*see* Dkt. 37 at 23) cannot be considered. *See Colon v. Abbot Labs.*, 397 F. Supp. 2d 405, 413-14 (S.D.N.Y. 2005) (granting summary judgment where expert's opinion was speculative); *Weldon v. United States*, 744 F. Supp. 408, 412 (N.D.N.Y. 1990) ("Summary judgment is appropriate when the facts submitted in opposition are only an expert's theoretical speculations.") (citation omitted).

4. [redacted]. (Dkt. 37 at 11-12).

Plaintiff relies upon excerpts of emails that suggest Lupin's focus was on other products, but such statements are taken out of context and contradicted by other evidence. For example, Plaintiff relies on a January 16, 2019 email from Mr. Liska to Mr. Turner stating, "I know this is a low-priority project for you." (Dkt. 37 at 12). Both Mr. Liska and Mr. Turner testified that selling to Wal-Mart was not a low priority. (*See* Dkt. No. 43 at ¶ 52) ("I've continued to tell you all day long that all products are just as important as one another, and my responsibility was to maintain and ensure their distribution on a day-to-day basis."). Moreover, the relevant inquiry at this stage should be Lupin's specific efforts to promote InspiraChamber; mere characterizations are irrelevant. There is no genuine dispute as to what Lupin did to sell InspiraChambers.

5. [redacted] (Dkt. 37 at 11).

The sales force Lupin hired to promote Solosec (a drug that treated bacterial vaginosis) in a different market (physicians who treat adult females) at a different time (beginning in March 2018) could not promote InspiraChamber, a pediatric medical device. (Dkt. 30 at ¶ 79; Dkt. 43 at ¶ 63). Moreover, the fact that one product's potential justifies the expense of a sales force does not mean that a wholly different product with a weak sales history warrants the same treatment. Plaintiff speculates that rehiring a sales force in March 2018 to sell InspiraChambers would have achieved better sales results than Lupin obtained in 2015-16. Speculation is not sufficient at the summary judgment stage. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("[N]on-moving party may not rely on … unsubstantiated speculation.").

6. [redacted] (Dkt. 37 at 13).

There is no evidence that Plaintiff rested on its laurels based on anything Lupin said, or that any non-parties were willing to market InspiraChamber.[3] In fact, Plaintiff sought other distributors for the United States retail market during the term of the Agreement; none were interested in selling InspiraChambers. (Dkt. 30 at ¶ 86). Plaintiff even considered selling InspiraChamber itself, but chose not to do so. (*Id.* at ¶ 85). Today, a year after Lupin terminated the Agreement, Plaintiff does not sell in the United States retail market. (*Id.* at ¶ 84).

7. [redacted] (Dkt. 37 at 14).

This is Plaintiff's opinion, not a fact. Lupin made every effort to sell the Products and was financially incentivized to do so. (Dkt. 46 at ¶ 55) ("[W]e just worked harder . . . all of those

---

[3] [redacted] (Dkt. 40 at ¶ 3). But sales in a different market under extraordinary circumstances (*i.e.*, during a pandemic when respiratory medical devices are in high demand) are irrelevant.

people showed up every other week for 18 months, to not only talk about, but to implement the plan we agreed with InspiRx in February of 2017."). Lupin attempted to contract with large retailers. (*See* Dkt. 30 at ¶ 63). Lupin, not Plaintiff, paid for the data necessary to implement the managed care initiative. (*Id.* at ¶ 69). There is no evidence of a hidden intention and no explanation for why Lupin would have remained in the Agreement from 2017 to 2019 with no intention to "turn things around," when Lupin could have simply terminated on 90 days' notice.

8. [redacted] (Dkt. 37 at 20).

Lupin exhibited at 8 conferences and trade shows and attended 15 in 5 ½ years. (*See* Dkt. 30 at ¶ 38; Dkt. 29-11 at pp. 3-4). Plaintiff's CEO could not identify any missed opportunities related to conference attendance. (*See* Dkt. 43 at ¶ 73).

## III. PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT 2.

Plaintiff argues that Section 3.11(d)'s limitation of remedies is unenforceable based upon two cases. Neither case, which interpret UCC 2-719(3) (exclusions of incidental or consequential damages), is persuasive. In *Long Island Lighting Co. v. Transamerica Delavel*, 646 F. Supp. 1442 (S.D.N.Y. 1996), a claim for breach of warranty to repair or replace defective parts survived a motion to dismiss because allegations of fraudulent concealment and the repudiation of the repair remedy meant the exclusive remedy failed of its essential purpose. This case is not at the pleadings stage. There is no evidence of fraudulent concealment. Moreover, Plaintiff had a contractual remedy that it chose not to pursue. Plaintiff cannot turn to this Court for a different remedy.

In *McNally Wellman Co. v. N.Y. State Elec. & Gas Corp.*, 63 F.3d 1188, 1195 (2d Cir. 1995), the Second Circuit affirmed summary judgment, stating "[i]t is axiomatic that parties to a contract must remain free to allocate risks and shield themselves from liability." Here, the parties contractually allocated risk. Lupin accepted the risk that its efforts to sell InspiraChamber would not succeed, but shielded itself from stale claims that it should have purchased more in 2015-2017.

## IV. PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT 3.

Plaintiff fails to address law that forecloses its implied covenant claim. *See Symquest Grp., Inc. v. Canon USA, Inc.*, 186 F. Supp. 3d 257, 266 (E.D.N.Y. 2016) (rejecting argument that implied covenant claim was not duplicative on the grounds that "plaintiff has alleged bad faith"); *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016) (covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract") (citation omitted); *Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, 2014 WL 28600, at *10 (S.D.N.Y. 2014), *aff'd*, 581 F. App'x. 49 (2d Cir. 2014) (claim "intrinsically tied" to breach of contract damages is redundant).

Instead, Plaintiff relies on two inapposite cases. In *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011), the Second Circuit affirmed judgment in favor of the plaintiff where his former employer retroactively valued stock to diminish the value of plaintiff's options. There is no similar misconduct here. In *Jaffe v. Paramount Comm. Inc.*, 644 N.Y.S. 2d 43, 47 (1st Dep't 1996), the court affirmed dismissal of an implied covenant claim, explaining the claim was "without merit."

Even if Plaintiff had presented evidence that Lupin was not fully "committed to growing the business" despite stating as much to Plaintiff, Plaintiff cites to no cases holding that general assurances can amount to "bad faith." [redacted] (Dkt. 37 at 16). But Lupin had the contractual right to change strategies; Mr. Liska explained that doing so was a reasonable business decision. (Dkt. 30 at ¶ 53). There is no evidence of a sinister motive.

**<u>Conclusion</u>**

For the foregoing reasons and the reasons stated in Lupin's opening brief, Lupin respectfully submits that summary judgment should be granted in its favor.

Dated: New York, New York
October 26, 2020

**HOLLAND & KNIGHT LLP**

By: /s/ Frank Morreale
Frank Morreale
Matthew R. DiBlasi
31 West 52nd Street
New York, New York 10019
Telephone: (904) 798-5466

*Attorneys for Defendant*