UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                           :
INSPIRX, INC.,                                             :
                                                           :
                              Plaintiff,                   :
                                                           :
                                                           :                    20 Civ. 3214 (JPC)
              -v-                                          :
                                                           :                   OPINION AND ORDER
                                                           :
LUPIN ATLANTIS HOLDINGS SA,                               :
                                                           :
                              Defendant.                   :
                                                           :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

    In 2013, Plaintiff InspiRx, Inc. contracted with Defendant Lupin Atlantis Holdings SA

("Lupin") for Lupin to distribute InspiRx's new product, the InspiraChamber.  Sales of the

InspiraChamber proved disappointing, and in 2019, Lupin terminated the contract.  In 2020,

InspiRx filed this action, alleging that Lupin breached the contract and the implied covenant of

good faith and fair dealing.  Now before the Court are the parties' cross-motions for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth

below, the Court grants Lupin's motion and denies InspiRx's motion.

## I. Background

### A.  Facts[1]

    This case concerns the InspiraChamber, a type of valved holding chamber ("VHC") used

to deliver aerosolized asthma and allergy medicine.  InspiRx Counter-56.1 ¶¶ 3, 5.  VHCs, which

---

[1] The Court draws the facts from the parties' Local Civil Rule 56.1 Statements.  Dkt. 25
("InspiRx 56.1"); Dkt. 30 ("Lupin 56.1"); Dkt. 38 ("InspiRx Counter-56.1"); Dkt. 46 ("Lupin
Counter-56.1"); Dkt. 52, Exh. 2 ("Lupin Reply to InspiRx Counter-56.1"); Dkt. 57 ("InspiRx
Reply to Lupin Counter-56.1").  Unless otherwise noted, the Court cites to only one party's Rule
56.1 or Counter-56.1 Statement where the parties do not dispute the fact, the adverse party has

were developed in the early 1980s, are designed to improve delivery of medicines for diseases such as idiopathic pulmonary fibrosis.  *Id.* ¶¶ 3, 13.  The AeroChamber device was the leader in the VHC market from the early 1980s.  *Id.* ¶¶ 29, 30.

In the mid-2010s, InspiRx, a pharmaceutical and device company that researches and produces medical devices, sought to launch a new VHC product, the InspiraChamber.  *Id.* ¶ 3. Various InspiRx officers worked on the AeroChamber before joining InspiRx:  InspiRx's Chief Medical Officer, Dr. Michael Newhouse, invented the AeroChamber in the 1980s, *id.* ¶ 5, and InspiRx's Chief Executive Officer ("CEO"), Michael Amato, built AeroChamber into a global market leader between 1984 and 2011, *id.* ¶¶ 7, 8.  To launch the InspiraChamber, InspiRx partnered with Lupin, a pharmaceutical company that for several years had supported Forest Labs, a marketing company, to promote the AeroChamber.  *Id.* ¶¶ 9, 12.[2]

In December 2013, after Lupin's contract with Forest Labs ended, Lupin and InspiRx entered into the Exclusive Distribution and License Agreement.  *Id.* ¶ 18; Dkt. 29 ("DiBlasi Decl."), Exh. 1 ("Agreement").  Pursuant to the Agreement, Lupin accepted "the appointment as InspiRx's independent distributor with the sole and exclusive right to Distribute the Products" in

---

offered no admissible evidence to refute that fact, or the adverse party simply seeks to add its own "spin" on the fact or otherwise dispute the inferences from the stated fact.

In resolving the parties' motions, the Court has also considered InspiRx's memorandum of law in support of its motion, Dkt. 24 ("InspiRx Motion"), Lupin's opposition to InspiRx's motion, Dkt. 47 ("Lupin Opposition"), InspiRx's reply in further support of its motion, Dkt. 56 ("InspiRx Reply"), Lupin's memorandum of law in support of its motion, Dkt. 31 ("Lupin Motion"), InspiRx's opposition to Lupin's motion, Dkt. 37 ("InspiRx Opposition"), and Lupin's reply in further support of its motion, Dkt. 53 ("Lupin Reply"), as well as the declarations, exhibits, and affidavits filed in connection with the parties' submissions.

[2] The parties generally agree that Lupin served a supporting role with Forest Labs. However, Lupin states that it only made calls to promote the AeroChamber, whereas InspiRx contends that Lupin both marketed and distributed the AeroChamber.  *See* Lupin Reply to InspiRx Counter-56.1 ¶ 12.  Any dispute as to the exact nature of Lupin's role is not material to the disposition of these motions.

the United States, with the exception of the U.S. hospital market.  Agreement § 2.1; *see id.* § 1.1.

The "Products" governed by the Agreement included the InspiraChamber as well as the

InspiraMask and Soother Masks, two "mask[s] used in the administration of inhalable

medication."  *Id.* § 1.1.  InspiRx contracted with another entity, Salter Labs, for distribution in the

hospital market.  InspiRx Reply to Lupin Counter-56.1 ¶ 71.

The Agreement mandated that, "[s]ubject to the terms and conditions set forth in th[e]

Agreement, Lupin shall use Commercially Reasonable Efforts to Distribute the Products . . . using

its current distribution capabilities and resources."  Agreement § 2.1(b).  The Agreement defined

"Commercially Reasonable Efforts" as follows:

> "Commercially Reasonable Efforts" means, with respect to the efforts to be
> expended by a Party with respect to any task or objective under this Agreement,
> reasonable, diligent, good-faith efforts to accomplish such task or objective as soon
> as practicable, which efforts shall not be less than the efforts that other similarly
> situated companies would normally use to accomplish a similar task or objective
> under similar circumstances exercising reasonable business judgment, with respect
> to a product owned by it or to which it has similar rights as the Products, which
> product is at a similar stage in its product life and is of similar market, commercial
> and profitability potential as the Product, taking into account efficacy, safety,
> approved labeling, the competitiveness of alternative products in the marketplace,
> the patent and other proprietary position of the product, and other relevant factors
> commonly considered in similar circumstances. It is understood that the level of
> efforts required to meet the above standard may change over time if there are
> changes in the status of the Products or of the above criteria applicable to the
> Products.

*Id.* § 1.1.  In section 7.1(a), the Agreement provided that "Lupin shall have, in its sole discretion,

the authority to market and otherwise Distribute the Products . . . to the extent and in such manner

as it deems appropriate."  *Id*. § 7.1(a).  The Agreement also stated, however, that

"[n]otwithstanding Section 7.1(a), Lupin or its Affiliates shall use Commercially Reasonable

efforts to exhibit the Products at one or more major physician group meetings in the Territory

during each Contract Year."  *Id.* § 7.1(b).

The Agreement mandated that Lupin pay InspiRx, "[a]s full consideration for the grant by InspiRx of the exclusive Distribution rights and exclusive licenses hereunder," a total of ███████. *Id.* § 2.5.  The Agreement did not require InspiRx to pay Lupin for Lupin's efforts to market and sell the InspiraChamber, nor did it contain a royalty-sharing provision pursuant to which InspiRx would have been compensated for a portion of each sale.  *Id.*; InspiRx Counter-56.1 ¶ 26.

Finally, the Agreement required Lupin to purchase a certain number of InspiraChambers from InspiRx for the first three years of the contract (the "Annual Purchase Obligation").  *See* Agreement § 3.11(a) ("[D]uring each of the first, second and third Contract Years during the Term, Lupin agree[d] to a minimum annual purchase obligation with respect to units of the Products as set forth on Exhibit C attached hereto . . . .").  The Agreement provided that, in the event Lupin failed to purchase the minimum amount, "InspiRx's sole right and remedy with respect to such failure shall be to terminate th[e] Agreement on sixty (60) days prior written notice . . . and Lupin shall bear no other liability therefor."  *Id.* § 3.11(d).  It further stated that, "[i]n the event that InspiRx fails to deliver such written notice within such period, InspiRx shall be deemed to have irrevocably and unconditionally waived for all purposes Lupin's failure to meet the Annual Purchase Obligation for such Contract Year, and th[e] Agreement shall remain in full force and effect for the remainder of the Term."  *Id.*

At the time of the launch, the VHC market was a "mature" consumer market, as it had been around for close to four decades.  InspiRx Counter-56.1 ¶ 15; DiBlasi Decl., Exh. 2 ("Newhouse Depo. Tr.") at 28:5-29:18.  The VHC market faced several challenges, "including a lack of patient awareness as to the importance of VHCs, lack of physician awareness as to the importance of VHCs and prescribing practices, lack of pharmacy availability because prescriptions are filled based on the VHCs that are currently stocked on the shelf, and a lack of payor coverage."  Lupin

Reply to InspiRx Counter-56.1 ¶ 76.  In addition, in the United States, VHCs are not as popular as products such as small volume nebulizers to treat asthma.  InspiRx Counter-56.1 ¶ 17.

The parties were nonetheless initially optimistic that the InspiraChamber would be successful.  In March 2014, Lupin provided InspiRx with a preliminary forecast predicting the following market share by year: (1) ███ in 2015, (2) ███ in 2016, (3) ███ in 2017, (4) ███ in 2018, and (5) ███ in 2019.  Lupin Counter 56.1 ¶ 30; Dkt. 26 ("Miller Decl."), Exh. M.  Lupin budgeted $1,543,511 for marketing of the Products for fiscal year 2015, and proposed an increased budget of $2,380,175 for fiscal year 2016.  Lupin Counter-56.1 ¶ 32.  At the time of the Agreement, Lupin had a total sales force of approximately 123 to 150 representatives, *id.* ¶ 41, which was responsible for selling the company's entire brand portfolio, including Lupin's historic anchor brand, Suprax, InspiRx Counter-56.1 ¶ 36.[3]  A subset of this 123- to 150-person sales force, the pediatric sales force, focused on products like the InspiraChamber.  Lupin Counter-56.1 ¶ 41.

The parties launched the InspiraChamber in February 2015.  InspiRx Couter-56.1 ¶ 34. InspiRx was satisfied with the launch, with its CEO, Amato, calling it "perfect."  *Id.*  Lupin met the Annual Purchase Obligation in 2015.  *Id.* ¶ 45.  Throughout 2015 and 2016, Lupin engaged in journal advertising and attended numerous meetings to exhibit the Products.  *Id.* ¶¶ 38, 41.

Nonetheless, sales during this period proved disappointing and "flat-lined" by summer 2015.  *Id.* ¶ 44.  Results were unsatisfactory across other markets as well:  InspiRx's European

---

[3] At different points throughout its briefing, InspiRx states that Lupin had both a "pediatric sales force" and a total "sales force" of 123 to 150.  *See, e.g.*, InspiRx 56.1 ¶ 41; InspiRx Counter-56.1 ¶¶ 25, 61.  Lupin insists that the *entire* sales force was between 123 to 150 representatives. Lupin Counter-56.1 ¶ 41.  And all of the evidence that InspiRx cites refers to Lupin's entire sales force.  InspiRx Counter-56.1 ¶ 25; *see* Miller Decl., Exh. C at 168:2-169:2; *id.*, Exh. J at LUP0036222; *id.*, Exh. I ("Lupin's RFA Responses") at 2 (admitting that at the time Lupin entered into the Agreement, it employed more than 100 "sales representatives"); *see also* Lupin's RFA Responses at 2 (InspiRx distinguishing between sales representatives and pediatric sales representatives).

distributor faced similarly disappointing sales following the launch of the InspiraChamber in that region, *id.* ¶ 47, and, as InspiRx admits, the opportunities in certain Asian markets that InspiRx had considered expanding into "did not materialize," *id.* ¶ 48.  InspiRx's distributor for the U.S. hospital market, Salter Labs, did not order any new InspiraChamber product in 2016 and returned a significant number of unsold products.  *Id.* ¶¶ 49-50.[4]  Salter Labs and InspiRx ultimately terminated their contract for distribution in the U.S. hospital market.  InspiRx Reply to Lupin Counter-56.1 ¶ 72.

In late 2016, Lupin decided to change its marketing strategy, restructure its pediatric sales force, and reduce the budget for the InspiraChamber.  InspiRx Counter-56.1 ¶¶ 53, 54, 58, 59, 60.  Lupin created a three-pronged marketing strategy to generate sales through large retail pharmacy chains, selected large allergy group practices, and managed care companies.  *Id.* ¶¶ 57, 63, 68, 72.  It reduced its pediatric sales force to nine employees, *id.* ¶ 61, before ultimately disbanding the pediatric sales force completely in Spring 2018, Lupin Counter-56.1 ¶ 45.  Lupin admits that this was done, in part, because Suprax, one of Lupin's most successful brands, became genericized in April 2015.  Dkt. 45, Exh. 1 ("Liska Depo. Tr.") at 247:15-25; InspiRx Counter-56.1 ¶¶ 53, 60.

On February 16, 2017, InspiRx and Lupin met to discuss the new strategy.  InspiRx Counter-56.1 ¶ 62.  Amato, InspiRx's CEO, testified it "was appropriate for Lupin to change their strategy, change . . . their marketing focus."  DiBlasi Decl., Exh. 5 ("First Amato Depo. Tr.") at 162:7-15.  Both he and Michael Amato III—InspiRx's marketing director and Amato's son, *see id.* at 51:19-52:14, who had been a member of Lupin's pediatric sales force from 2013 to 2016— reacted positively to this changed strategy.  *See id.* 137:22-138:18; DiBlasi Decl., Exh. 21 (email

---

[4] InspiRx's objections regarding Lupin's financial losses are discussed in further detail in Section III(A)(2)(ii).

from Amato III stating, "I believe the new strategy is not only going to be effective in moving units, but is also going to make a huge impact, and make real changes on the standard of treatment in the United States . . . . Thank you all for the time, passion and continued effort."); First Amato III Depo. Tr. at 72:1-3 ("I would say we supported the new strategy, with offering our help to help them increase their sales."); *id.* at 72:18-23 (testifying that he believed the new strategy would be effective in increasing sales and that he was on board with the strategy). Around this time, but after the meeting, Lupin informed InspiRx that it was disbanding its pediatric sales force. *See* Dkt. 59 ¶¶ 2, 3 (declaration from Amato III that he was not notified until after the meeting); InspiRx Counter-56.1 ¶ 57; *see also* Dkt. 45, Exh. 10 ("Second Amato III Depo. Tr.") at 60:21-24 (testifying that, about a month after a January 12, 2017 email, Lupin advised Amato III that it was disbanding its pediatric sales force).

After changing its strategy, Lupin made some efforts to contract with large retailers, but was not particularly successful. InspiRx Counter-56.1 ¶ 63. Lupin did secure a contract with Albertsons, a national grocery and pharmacy chain, in 2017 and "improved" the contract a year later, which led to some increased sales. *Id.* ¶¶ 65-66. Lupin also attempted to implement the managed care initiative. *Id.* ¶ 68. Additionally, in the spring of 2017, Lupin sponsored a non-profit organization recommended by InspiRx, the Allergy & Asthma Network, to assist with its large allergy group initiative. *Id.* ¶ 72. But this sponsorship did not increase sales to a meaningful degree. *Id.* ¶ 73. Lupin did not meet its Annual Purchase Obligations in either 2016 or 2017. *See* Lupin Counter-56.1 ¶ 49; Miller Decl., Exh. I at 3, 4.

During this time, Lupin continued to promote other brands as well. A Lupin affiliate acquired another company, Symbiomix, in October 2017. InspiRx Counter-56.1 ¶ 79. Lupin created a sales force to promote a Symbiomix product, Solosec, in March 2018. *Id.*

Then, on August 7, 2019, Lupin notified InspiRx that it was terminating the Agreement. *Id.* ¶ 82; Lupin Counter-56.1 ¶ 69.  As stipulated by the Agreement, termination would not be effective for 90 days from service of that notice, *i.e.*, November 6, 2019.  Lupin Counter-56.1 ¶ 69. However, pursuant to a regulation passed by the Food and Drug Administration ("FDA"), the Products were required to have a "unique device identifier" beginning in September 2019.  InspiRx Counter-56.1 ¶ 81.  Because the InspiraChambers in Lupin's possession did not have these required serial numbers, Lupin could no longer sell them as of September 2019.  *Id.*  On September 30, 2019, Lupin sent its authorized distributors a notice stating that, as of that day, it would no longer offer the InspiraChamber.  Lupin Counter-56.1 ¶ 70.

InspiRx did not find a replacement to distribute the InspiraChamber before the Agreement was terminated, InspiRx Counter-56.1 ¶ 86, nor has it done so since, *id.* ¶ 84.

## B.  Procedural History

InspiRx initially filed suit on April 23, 2020.  Dkt. 1.  InspiRx filed its Amended Complaint on May 19, 2020, alleging three counts: (1) breach of contract based on Lupin's failure to use commercially reasonable efforts, Dkt. 14 ("Amended Compl.") ¶¶ 56-65; (2) breach of contract based on Lupin's failure to meet the Annual Purchase Obligations for 2015, 2016, and 2017, *id.* ¶¶ 66-77; and (3) breach of the covenant of good faith and fair dealing, *id.* ¶¶ 78-91.  InspiRx seeks $9,940,000 plus interest, attorneys' fees, and costs.  *Id.* at 16.

On October 3, 2020, InspiRx moved for partial summary judgment, *see* InspiRx Motion, and on October 5, 2020, Lupin moved for summary judgment on all counts, *see* Lupin Motion. InspiRx moves for summary judgment on Count One, failure to use commercially reasonable efforts.  InspiRx Motion at 1, 13.  InspiRx argues that Lupin breached the Agreement by: (1) "failing to use its then 'current distribution capabilities and resources,'" which InspiRx argues is *not* a question of commercially reasonable efforts, *id.* at 8, 9 n.10; (2) "failing to 'exhibit the

Products at one or more major physician group meetings in the Territory during each Contract Year,'" *id.* at 8; and (3) "prematurely discontinuing distribution of the Products prior to the expiration of the Agreement," *id.* InspiRx does not address any other claims, and argues that damages should be decided at trial. *Id.* at 8 & n.8. Lupin has moved for summary judgment on all Counts, arguing that (1) Lupin did not breach the Agreement because its efforts were commercially reasonable and there is no reliable evidence of damages; (2) InspiRx's claim based on the Annual Purchase Obligation must fail because InspiRx waived any right to sue under that provision; and (3) InspiRx's implied covenant claim must be dismissed because it is duplicative of its breach of contract claim and because there is no evidence of Lupin's bad faith. Lupin Motion at 3-6.

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).

"To defeat a motion for summary judgment, the non-movant 'must come forward with "specific facts showing that there is a genuine issue for trial."'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

### III. Discussion

### A. InspiRx's Express Breach of Contract Claims

The Court begins with InspiRx's claim that Lupin breached the Agreement by failing to use commercially reasonable efforts, Amended Compl. ¶¶ 56-65, and by failing to meet its Annual Purchase Obligations, *id.* ¶¶ 66-77. There are four elements to a breach of contract claim under New York law: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).[5]

### 1. Current Distribution Capabilities and Resources

InspiRx's principal argument—which forms both the basis of its summary judgment motion and pervades much of its response to Lupin's motion for summary judgment—is that Lupin

---

[5] New York law applies in this case under the terms of the Agreement. *See* Agreement § 13.10(b) ("This Agreement shall be construed and enforced in accordance with the laws of the

breached the contract because it "fail[ed] to use its distribution capabilities and resources that were in place at the time of executi[on]." InspiRx Opposition at 1. This argument hinges on the language in the Agreement that referred to Lupin's obligation to use commercially reasonable efforts to distribute the Products based on its "current distribution capabilities and resources." Agreement § 2.1(b).

"Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide.'" *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996)). A court must first determine if a contractual provision is ambiguous. *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001). "An ambiguity exists where the terms of [a contract] could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)). "No ambiguity exists, however, when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Planète Bleue Télévision, Inc. v. A&E Television Networks,*

---

State of New York, excluding its conflict of laws provisions and excluding any applicable provisions of the United Nations Convention for the International Sale of Goods."). Both parties also apply New York law in their briefs. *See, e.g.*, *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) ("The parties' briefs assume that New York law controls this dispute, and such implied consent . . . is sufficient to establish choice of law." (alteration in original) (internal quotation marks and citation omitted)).

*LLC*, No. 16 Civ. 9317 (PGG), 2018 WL 10579873, at *8 (S.D.N.Y. Sept. 19, 2018) (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)).

"Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citing *Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 56 (1979)); *see also Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) ("[E]xtrinsic evidence is inadmissible to alter or add a provision to a written agreement."). In interpreting a contract, a court must consider "the provisions of the contract as a whole," and cannot "view sentences or clauses in isolation." *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989). "[T]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency," *Terwilliger*, 206 F.3d at 245, and to avoid "adopting an interpretation that would render any individual provision superfluous,'" *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Insurance Co.*, 309 F.3d 76, 86 (2d Cir. 2002)).

The Agreement required Lupin, "[s]ubject to the terms and conditions set forth in th[e] Agreement," to "use Commercially Reasonable Efforts to Distribute the Products . . . using its current distribution capabilities and resources." Agreement § 2.1(b). InspiRx homes in on the word "current," arguing that the Agreement required Lupin to use the distribution capabilities that it had either when it negotiated the Agreement or when it entered into the Agreement in December 2013. InspiRx Motion at 2, 4, 8-10; InspiRx Opposition at 3-4, 9, 13-14, 17, 18. In its motion for partial summary judgment, InspiRx argues that Lupin breached this language of the Agreement by disbanding its pediatric sales force. InspiRx Motion at 9-10. And in response to Lupin's motion for summary judgment, InspiRx relies on this provision to suggest that Lupin's budgetary cuts

were a *per se* breach of the agreement, as Lupin "was not entitled to recalibrate its efforts by shifting resources away from the Products and disbanding its sales force."  InspiRx Opposition at 9.  Notwithstanding the fact that InspiRx claims it is moving for summary judgment on Count 1, failure to use commercially reasonable efforts, *see* InspiRx Motion at 13, these arguments are primarily based on a theory of express breach of the "current distribution capabilities and resources" provision, separate and apart from any breach of the "commercially reasonable efforts" requirements, *see id.* at 9 n.10 ("It is unnecessary for the Court to assess whether Lupin used Commercially Reasonable Efforts in this context because this contractual provision requires and includes the independent and separate obligation for Lupin to use its 'current distribution capabilities and resources,' which Lupin did not do.").

The Court declines to adopt InspiRx's reading of "current distribution capability and resources," as it would lead to illogical results and is in conflict with the remainder of the Agreement.  InspiRx asks the Court to adopt one definition of "current" from *Merriam-Webster's Online Dictionary*: "occurring in or existing at the present time."  *Current*, Merriam-Webster, https://www.merriam-webster.com/dictionary/current (last visited July 22, 2021); InspiRx Motion at 9.  But even InspiRx's preferred source, *Merriam-Webster's Online Dictionary*, provides multiple other definitions of "current," such as "presently elapsing," "most recent," and "generally accepted, used practice, or prevalent at the moment."  *Current*, Merriam-Webster, https://www.merriam-webster.com/dictionary/current (last visited July 22, 2021).

Adopting InspiRx's preferred definition—and interpreting "present time" to be the time when the Agreement was either negotiated or signed, rather than any particular "present time" over the course of the Agreement—would lead to unreasonable results.  Lupin provides a helpful example:  If the Agreement "required notices to be delivered to Lupin's 'current' General Counsel," it would be difficult to argue that "notices should be provided to the attorney who held

the title of General Counsel in December 2013 even if that attorney no longer worked for Lupin when the notice was actually delivered." Lupin Opposition at 10 n.3. That is precisely what would occur under InspiRx's interpretation of "current" capabilities and resources.

More importantly, InspiRx's interpretation would vitiate other provisions of the Agreement. The Agreement explicitly provided that the commercially reasonable efforts Lupin was required to take were "[s]ubject to the terms and conditions set forth in t[he] Agreement." Agreement § 2.1(b). This includes conditions like the one in section 7.1(a), which gave Lupin the "sole discretion" to "market and otherwise Distribute the Products . . . to the extent and in such manner as it deems appropriate." *Id* § 7.1(a). Indeed, InspiRx's reading would read out the very definition of the "Commercially Reasonable Efforts," which recognized that "the level of efforts required to meet the [Commercially Reasonable Efforts] standard *may change over time*." *Id.* § 1.1 (emphasis added). Reading the word "current" as tying Lupin to its initial capacities and resources would deprive these other provisions of importance and drain Lupin of the discretion the parties explicitly contracted to give it. This would thus be in conflict with well-established law that a court must "read the integrated contract 'as a whole to ensure that undue emphasis is not placed upon particular words and phrases,' and 'to safeguard against adopting an interpretation that would render any individual provision superfluous.'" *L. Debenture Tr. Co. of N.Y.*, 595 F.3d at 468 (quoting *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) and *Int'l Multifoods Corp.*, 309 F.3d at 86).

As such, the only reasonable way to read "current" is to give it a more dynamic meaning as referring to Lupin's capabilities and resources during the performance of the contract—not as mandating that Lupin maintain a certain level of initial capabilities and resources, lest it breach the contract. Accordingly, it cannot be said that Lupin necessarily breached the contract when it

reduced its sales force. Instead, the Court must examine whether that decision—and Lupin's other actions—were commercially reasonable.

### 2. Commercially Reasonable Efforts

Under the Agreement's definition of "Commercially Reasonable Efforts," Lupin was required to make "reasonable, diligent, good-faith efforts" to accomplish the Agreement's objectives. Agreement § 1.1. Lupin's efforts could "not be less than the efforts that other similarly situated companies would normally use to accomplish a similar task or objective under similar circumstances exercising reasonable business judgment, with respect to a product owned by it or to which it has similar rights as the Products, which product is at a similar stage in its product life and is of similar market, commercial and profitability potential as the Product." *Id.* The definition of commercially reasonable efforts under the Agreement further allowed Lupin to "tak[e] into account efficacy, safety, approved labeling, the competitiveness of alternative products in the marketplace, the patent and other proprietary position of the product, and other relevant factors commonly considered in similar circumstances." *Id.* Finally, the definition specifically noted that "[i]t is understood that the level of efforts required to meet the above standard may change over time if there are changes in the status of the Products or of the above criteria applicable to the Products." *Id.*

And even when a "commercially reasonable efforts" clause is not defined in a contract, courts generally hold that "[t]he standard for satisfying commercial reasonability under New York law is a fairly lenient one." *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020). A "commercially reasonable efforts" clause "requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests." *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019).

### i. Lupin's Efforts Prior to February 2017

InspiRx does not dispute that Lupin exerted commercially reasonable efforts at the time of the February 2015 launch.  *See* InspiRx Opposition at 15.  In fact, InspiRx's expert, Christianna Vance, opined that "Lupin's efforts to distribute the Products at the time of the launch, *i.e.*, in or around February 2015, were commercially reasonable and demonstrated reasonable, diligent and good-faith efforts to position the business to increase market share over the course of several years." DiBlasi Decl., Exh. 10 at 2.  Amato similarly testified he was happy with the efforts leading up to the launch and that the launch was "perfect."  First Amato Depo. Tr. at 107:4-25.

Between the launch and February 2017, Lupin marketed the Products via its pediatric sales force, with a focus on personal promotion at conferences, and advertised the Products in journals. InspiRx Counter-56.1 ¶¶ 38, 41.  InspiRx's Chief Medical Officer, Dr. Newhouse, acknowledged that Lupin's exhibitions at physician conferences in 2015 and 2016 were "well done."  *Id.* ¶ 39. Amato affirmed that he did not "have any complaints about the effort Lupin was making in 2015 and 2016 when they had the pediatric sales force."  First Amato Depo. Tr. at 162:16-19.[6]

InspiRx now contends that Lupin did not exhibit commercially reasonable efforts during this period because "[t]he evidence demonstrates that when it became apparent after the launch that Lupin was not gaining traction in the market, Lupin began to cut its marketing resources and deprioritize the Products."  InspiRx Opposition at 15 (citing InspiRx 56.1 ¶¶ 34-53).  This, without more, is unpersuasive:  The Agreement simply did not require Lupin to "prioritize" the Products over all others and did not tie Lupin to maintaining its initial resources to distribute the Products,

---

[6] While InspiRx contends this quote is "taken out of context," InspiRx does not explain how this is the case, nor does InspiRx actually controvert this statement.  Lupin Reply to InspiRx Counter-56.1 ¶ 43.

as explained above.  And Lupin's "perfect" and "well done" efforts at the launch did not set a baseline for "commercially reasonable efforts" to which Lupin was tied.

InspiRx also contends that Lupin's purported de-prioritization "caused sales to decline." *Id.* at 3.  But this is not supported by the record.  What the record does reflect is that sales "flat-lined" by summer 2015, only a few months after what InspiRx admits was a commercially reasonable launch.  InspiRx Counter-56.1 ¶ 44.  The only evidence that InspiRx cites in support of its argument are the InspiraChamber's low market share and low sales, and "complain[ts]" it had about Lupin's performance during this time.  InspiRx Opposition at 15-16.  But weak sales that cannot be attributed to any unreasonable efforts on Lupin's part and InspiRx's apparent dissatisfaction with the results of Lupin's efforts are decidedly insufficient to allow a reasonable factfinder to conclude that Lupin's actions were commercially unreasonable.

### ii.  Lupin's Efforts After February 2017

As such, the Court focuses on the efforts beginning in February 2017, when Lupin implemented its new marketing strategy.  Lupin Motion at 20.  There is little doubt from the record that InspiRx executives generally supported a change in strategy.  Indeed, Amato testified that it "was appropriate for Lupin to change their strategy."  First Amato Depo. Tr. at 162:7-15; *see also id.* at 137:22-138:18; First Amato III Depo. Tr. at 70:8-72:7.  Pursuant to this new strategy, Lupin successfully contracted with Albertsons and unsuccessfully attempted to contract with four other retailers.  InspiRx Counter-56.1 ¶¶ 65-67.  Amato testified that the Albertsons contract was a "positive development" and confirmed that it was something that "Lupin made the effort to do on its own."  First Amato Depo. Tr. at 144:23-145:7.  Lupin also sponsored an allergy non-profit and initiated a managed care initiative.  InspiRx Counter-56.1 ¶¶ 68-72.

Nonetheless, in opposition to Lupin's motion and in its own motion for partial summary judgment, InspiRx argues that Lupin's actions were not commercially reasonable.  Specifically,

InspiRx takes issue with Lupin's (1) decision to disband its sales force and cut its marketing budget, (2) choice not to exhibit the Products at physician meetings, (3) refusal to lower the price of the Products, and (4) decision to discontinue the InspiraChamber before the end of the 90-day termination period.  The Court addresses each argument in turn.

First, InspiRx contends that Lupin breached the Agreement by "disbanding its sales force and substantially cutting its marketing budget for the [Products]."  InspiRx Opposition at 18.  But the Agreement did not require Lupin to keep its pediatric sales force, and InspiRx has not set forth any evidence showing that the pediatric sales force was a necessary condition of the Agreement. Indeed, had InspiRx found a pediatric sales force necessary, it could have insisted on including the use of one in the Agreement when negotiating that contract.

The Agreement, of course, recognized that "the level of efforts required to meet the [Commercially Reasonable Efforts] standard *may change over time* if there are changes in the status of the Products or the above criteria applicable to the Products."  Agreement § 1.1 (emphasis added).  A commercially reasonable efforts clause is not a "hell or high water" clause tying the signatory to use all efforts possible, no matter the cost.  *See Wells Fargo Bank Nw. v. TACA Int'l Airlines*, 247 F. Supp. 2d 352, 355-56, 361 (S.D.N.Y. 2002) (holding that "absolute and unconditional" obligations, "commonly known as a 'hell or high water' clause," are enforceable). And it is well-settled that a commercially reasonable efforts clause does not require the signatory to act against its own interest.  *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 618 (S.D.N.Y. 2013) ("A contractual requirement to act in a commercially reasonable manner does not require a party to act against its own business interests, 'which it has a legal privilege to protect.'" (quoting *Citri–Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 924 (E.D. Cal. 2010)).  This is particularly true here, where the Agreement gave Lupin the power to make "reasonable" decisions commensurate with the efforts of other similarly situated companies.

18

Agreement § 1.1.  The Agreement thus endowed Lupin with significant discretion—indeed the "sole discretion"—to distribute the Products as it saw fit.  *Id.* § 7.1(a).

In support of its argument otherwise, InspiRx cites to its expert's view that "it is not reasonable to abandon a marketing plan and shift resources away from a product merely because it does not meet sales and/or profitability expectations in the short term."  InspiRx Opposition at 18-19 (citing Dkt. 58, Exh. B at 9-10).  But the record demonstrates that Lupin did not shift its resources "merely" because the Products "d[id] not meet sales and/or profitability expectations in the short term."  Prior to changing its strategy, Lupin spent—and lost—millions of dollars on InspiraChamber in the first few years after the launch.  Specifically, according to Lupin's Profit & Loss Statement, Lupin lost $17.112 million on InspiraChamber between April 2014 and March 2017.  InspiRx Counter-56.1 ¶ 55; DiBlasi Decl., Exh. 11 at p. 17.

InspiRx, without any real explanation, asserts that the Profit & Loss Statement, which Lupin provided InspiRx in response to InspiRx's interrogatories, "lacks proper authentication."  InspiRx Counter-56.1 ¶ 55.  But, under Rule 56(c), the Court can consider, among other things, depositions, interrogatory answers, and admissions in deciding a summary judgment motion.  Fed. R. Civ. P. 56(c).  And under Rule 901 of the Federal Rules of Evidence, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  This can include testimony of a witness with knowledge, *id.* 901(b)(1), or through "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," *id.* 901(b)(4).  "The requirement under Rule 901 is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'"  *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (quoting *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991)).  "Authentication under this rule

'does not erect a particularly high hurdle.'"  *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 344 (2d Cir. 2004) (quoting *Dhinsa*, 243 F.3d at 658).

Here, the Profit & Loss Statement, on its face, is a graphic reflecting Lupin's profits and losses.  Lupin represented that it created this data compilation "in the course of a regularly conducted business activity" and that it "has been the regular practice of Defendant to make this type of data compilation."  DiBlasi Decl., Exh. 11 at 6.  Both Lupin's Vice President of Market Access and Trade Relations and a Senior Financial Analyst represented, on behalf of Lupin, that they reviewed Lupin's response to this interrogatory, including the Profit & Loss Statement, and attested that the responses were, "to [their] knowledge and information, true and correct."  *Id.* at 6, 8-9.  Both individuals certified that they "underst[ood]" they would be "subject to punishment if any of [their] answers [were] willfully false."  *Id.* at 8-9.  Matthew DiBlasi, Lupin's counsel, has further attested, based on personal knowledge, that these documents, including the Profit & Loss Statement, are in fact the interrogatory responses that Lupin gave InspiRx.  DiBlasi Decl. ¶ 11.

The Profit & Loss Statement thus appears authentic and reliable, and the Court sees no reason to conclude otherwise.  Notably, InspiRx does not object to the *authenticity* of the Profit & Loss Statement, but just whether it was *authenticated*.  *See Com. Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 59 (S.D.N.Y. 2003) (finding that certain documents challenged as not properly authenticated met the requirements for authenticity to be considered at the summary judgment stage); *Bieda v. JCPenney Commc'ns, Inc.*, No. 92 Civ 5910 (JFK), 1995 WL 437689, at *1 n.2 (S.D.N.Y. July 25, 1995) (same); *see also Villalba v. Robo-Breaking Co.*, No. 11 Civ. 1030 (WFK), 2014 WL 4829280, at *8 & n.11 (E.D.N.Y. Sept. 29, 2014) (finding at the summary judgment stage a photograph to have been sufficiently authenticated by the plaintiff and a fellow worker and "find[ing] it notable that [the defendant] contests the Plaintiff's ability to authenticate

the picture, but never directly questions the authenticity of the photograph itself").  Nor has InspiRx moved to strike this document from the record.

Furthermore, the Profit & Loss Statement is not the only evidence in the record that reflects that Lupin lost millions of dollars on the InspiraChamber.  For instance, Jay Liska, Lupin's former Senior Director of Marketing, testified, "[W]e lost money on InspiraChamber every year.  We spent a million and a half the year before we launched it, two and a half million the year we launched it, 1.6 or something.  We never sold more than a million and a half dollars a year of InspiraChamber."  Liska Depo. Tr. at 231:7-12.  InspiRx takes issue with Lupin's characterization of testimony like this, arguing that Lupin's factual statements are not supported by the deposition testimony, quarreling over the inferences one can take from certain statements, and arguing that any "hypothetical" losses did not excuse performance.  *See, e.g.*, InspiRx Counter-56.1 ¶ 54.  But at this stage, InspiRx "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  InspiRx has not raised any factual dispute on this issue, nor introduced any evidence controverting Lupin's evidence that it lost millions of dollars on its InspiraChamber business.

Nor has InspiRx provided any evidence that would allow a reasonable factfinder to conclude that, when faced with these mounting losses, it was not commercially reasonable for Lupin to reduce its budget and pediatric sales force.  Instead, InspiRx asserts that Lupin should have continued executing its strategy because Lupin itself "viewed the Products as superior compared to its competitors and believed it had a superior sales force with experience marketing one of the Products' primary competitors, AeroChamber."  InspiRx Opposition at 19.  But Lupin's belief in itself and the Products simply does not guarantee results.

Indeed, there is no actual evidence to support that it *would have been* commercially reasonable to have maintained the same efforts in light of these losses.  As Liska testified,

"typically in the first 12 to 18 months of any brand launch, you get the prescribers you're going to get." DiBlasi Decl., Exh. 6 at 161:22-162:13.  And as Amato testified, InspiRx expected that "within 12 to 18 months [of the launch] [it] could capture ███████ of the retail market."  First Amato Depo. Tr. at 46:13-18.  This prediction did not pan out:  Sales flat-lined by May 2015, only a few months after the launch, and InspiraChamber's market share never rose above ███████.  InspiRx Counter-56.1 ¶ 44; InspiRx 56.1 ¶ 34.

The record is devoid of any evidence of efforts that other similarly situated companies would have taken in these circumstances.  *See* Agreement § 1.1 (requiring Lupin to use "efforts . . . not . . . less than the efforts that other similarly situated companies would normally use to accomplish a similar task or objective under similar circumstances exercising reasonable business judgment").  In fact, there is no evidence that any company other than Lupin was interested in promoting the InspiraChamber before the parties signed the Agreement.  Lupin Reply to InspiRx Counter-56.1 ¶ 28.[7]  Lupin was "one of, if not the only, pediatric sales force in the market," as "[m]ost other companies had abandoned . . . pediatrics as a promotional focus."  Liska Depo. Tr. at 135:3-11.  Liska testified that while Lupin spent millions on launching the product and "never sold more than a million and a half dollars a year of InspiraChamber," "[m]ost Marketing/Sales organizations will budget five to eight percent of sales as their expense budget."  *Id.* at 231:7-20.  As Liska put it:  "[Y]ou can do the math:  Five to eight percent of one and a half million is a small

---

[7] Although InspiRx admits that it contacted GSK, Teva, and Lupin, and GSK and Teva "were not interested in pursuing a deal with InspiRx in connection with the Products at that time," it argues that "this does not establish that no company other than Lupin was interested in promoting InspiraChamber prior to [when] the parties entered into the Agreement."  InspiRx Counter-56.1 ¶ 28.  But it is on an opposing party to come forward with admissible evidence to controvert a material fact in the opposing party's statement.  A party cannot simply make an unsupported denial.  *Omnipoint Commc'ns, Inc. v. City of White Plains*, 175 F. Supp. 2d 697, 700 (S.D.N.Y. 2001), *rev'd on other grounds*, 430 F.3d 529 (2d Cir. 2005).

number" in comparison to what Lupin did spend.  *Id.*  The complete absence of any evidence suggesting that a similarly situated company would not have cut costs here is telling.

Second, in both its own motion and in opposition to Lupin's motion, InspiRx argues that Lupin's failure to exhibit the InspiraChamber at "physician group meetings" in 2017 and 2019 was commercially unreasonable.  InspiRx Motion at 10-12; InspiRx Opposition at 17.  The Agreement provided that, "Lupin or its Affiliates shall use Commercially Reasonable efforts to exhibit the Products at one or more major physician group meetings in the Territory during each Contract Year."  Agreement § 7.1(b).  InspiRx asks the Court to "set[] th[e] definition [of Commercially Reasonable Efforts in the Agreement] aside," and find that "Lupin could not have used Commercially Reasonable Efforts to exhibit the Products (at major physician group meetings in Contract Years 2017 and 2019) if Lupin did not exhibit the Products at all," because it did not give any "conscious exertion" in this respect.  InspiRx Motion at 11 (quoting *Shane Campbell Gallery*, 441 F. Supp. 3d at 4).

But the Court cannot simply set the Agreement—or the record—aside.  The record reflects that Lupin *did* undertake efforts to exhibit the Products as various conferences—fifteen total— over the course of five and a half years.  Lupin Opposition at 15-16; Lupin Counter-56.1 ¶ 40.  This was thus not a case where Lupin made no efforts at all in this regard.  *See, e.g.*, *SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*, No. 98 Civ. 9095 (DLC), 2000 WL 729110, at *17 (S.D.N.Y. June 6, 2000) (noting that the plaintiff failed to "'use all commercially reasonable and good faith efforts' to obtain gateway permits 'promptly,'" as required by the contract, where it "offered no evidence of any efforts to obtain permits").  The conferences Lupin did attend came at a high cost yet resulted in little benefit.  *See* Lupin Reply to InspiRx Counter 56.1 ¶ 40.  For instance, the record reflects that Lupin exhibited the Products at several conferences between January 2015 and December 2016, InspiRx Counter-56.1 ¶¶ 38-39, but that those were not

successful in driving sales, *id.* ¶ 40.   Some of these conferences were "trade" conferences, not "physician" conferences.   *See* Lupin Opposition at 16.   But InspiRx does not point to anything in the record that shows Lupin's decision to market at a more specific type of conference was material or that attending additional physician conferences would have been commercially reasonable.

And even if Lupin did breach the technical terms of this provision, there is nothing that suggests that any breach was material.   "For a breach to be material, it must 'go to the root of the agreement between the parties.'"   *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016) (quoting *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)).   InspiRx provides only a circuitous explanation of materiality:   "If this was not an important part of marketing the Products, why did Lupin exert such efforts?   Lupin did so because Section 7.1(b) was material."   InspiRx Reply at 7.   But Lupin's conclusion that in-person marketing was, at one time, commercially reasonable, says nothing about whether it would be commercially reasonable to keep doing so in light of the high cost and low return.   And while InspiRx also suggests it was material because "a key assumption in Lupin's pre-launch forecast was that Lupin reps will have a high degree of success in switching existing prescribers of AeroChamber to InspiraChamber due to their longstanding relationships," *id.* at 7 (internal quotation marks omitted), this assumption did not materialize.   Again, InspiRx was not required to keep pursuing a losing strategy against its interests.

Third, InspiRx argues that "Lupin failed to secure additional contracts with retailers because of its bad faith refusal to make price concessions."   InspiRx Opposition at 17.   But InspiRx does not point to anything in the record that reflects this was done in "bad faith," *i.e.*, in a way *intended* to harm sales.   InspiRx contractually gave Lupin the "sole discretion" to "market and otherwise Distribute the Products . . . to the extent and in such manner as it deems appropriate."   Agreement § 7.1(a).   InspiRx does not even suggest a theory, let alone provide any evidence, as to

why it would make sense for Lupin to engage in a bad faith refusal to lower prices, when Lupin only sought to gain from selling the Products.

The only thing that InspiRx does cite in support is its expert's view that Lupin might have been able to achieve the forecasted market share if it had reduced the price. *See* InspiRx Opposition 17-18, 19; *see, e.g.*, Dkt. 39, Exh. B at 12 ("[E]ven if Lupin faced challenges from retail pharmacies after launch, by reducing the price, it is reasonably likely that Lupin would have achieved the market share targets that it originally forecasted . . . [and] [i]t was unreasonable and improper for Lupin to have significantly cut the promotion of the Products, and then continue to sell at a premium price."). But this speculative testimony alone is insufficient for a jury to find that Lupin's actions were not commercially reasonable, particularly given the long history of low sales and weak results. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation."); *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 219 (S.D.N.Y. 2009) (finding an expert's testimony that certain sales "could have" happened if the defendants had taken certain actions to be insufficient where "there [was] evidence in the record explaining why such sales did not occur"), *aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher*, 412 F. App'x 337 (2d Cir. 2011).

Moreover, Lupin was required to take "commercially reasonable" actions, not perfect actions that achieved maximum returns. A claim for a material breach of a commercially reasonable efforts provision "cannot be established simply by observing, in hindsight, that [the party] could have done something differently that would have produced a better result." *Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, No. 03 Civ. 8259 (CSH), 2007 WL 1988150, at *22 (S.D.N.Y. July 10, 2007) (citation omitted). And that is exactly what InspiRx seeks to do here.

Fourth, and finally, InspiRx argues that Lupin breached the contract by failing to use commercially reasonable efforts after September 30, 2019, when it alerted retailers that it was discontinuing the InspiraChamber before the end of the 90-day termination period and therefore ceased *all* efforts to sell the Products.  But the parties agree that as of September 30, 2019, Lupin was no longer legally able to sell the InspiraChambers that it had because they lacked certain serial numbers mandated by the FDA.  The Agreement provides that InspiRx "shall at its sole expense, obtain and maintain in its own name all necessary governmental approvals to Distribute the Products in the Market within the Territory," Agreement § 2.3, and "shall, at its sole cost and expense . . . package all products . . . in conformance with standard industry practice and Applicable Laws," *id.* § 3.8.  And InspiRx's own expert testified that InspiRx was responsible for the appropriate labeling, not Lupin.  Dkt. 45, Exh. 17 at 294:14-295:20.  Nonetheless, InspiRx blames its failure to comply with the FDA's serial number requirement on Lupin, which needed to generate certain codes before InspiRx could apply the serial numbers.  InspiRx Reply to Lupin Counter-56.1 ¶ 74; InspiRx Reply at 8.  In addition, InspiRx points to section 9.2 of the Agreement, wherein "Lupin represented and warranted in the Agreement that '[a]ll necessary consents, approvals and authorizations of all governmental entities . . . required to be obtained by [Lupin] in connection with its performance of this Agreement have been obtained.'"  InspiRx Reply at 9 (alterations in original) (quoting Agreement § 9.2(c)).  InspiRx argues that Lupin breached *that provision* by failing to timely obtain these numbers.  *Id.*

InspiRx's arguments are unavailing.  First, section 9.2 does little for InspiRx.  On its face, section 9.2 referred to approvals needed when entering into the Agreement.  The Agreement clearly provided that it was InspiRx's responsibility to comply with governmental approvals on an ongoing basis.  InspiRx failed to do so.  Second, while InspiRx contends that it was Lupin's fault that InspiRx was unable to apply the serial numbers, InspiRx does not argue that Lupin breached

the implied covenant of good faith and fair dealing by failing to provide the initial codes.  InspiRx has thus failed to raise any question of material fact regarding the reasonableness of Lupin's efforts by alerting retailers it would no longer sell a product it was legally prohibited from selling.

In light of the above, the Court concludes that Lupin has demonstrated an absence of material fact as to the reasonableness of its efforts.  Simply put, this case is quite unlike other cases in which courts have found a party failed to engage in commercially reasonable efforts.  *See, e.g.*, *Holland Loader Co.*, 313 F. Supp. 3d at 475-80 (finding that the defendant failed to use commercially reasonable efforts where "[t]here [was] no evidence of a clear marketing plan, and even when [the defendant] proposed an action plan partway through the earnout period, [the defendant] made no apparent effort to implement that plan," and where the defendant "table[d]" the plaintiff's products but "introduced no evidence that compliance with its contractual obligations would have crippled it or otherwise caused the company financial hardship").  The Agreement required Lupin to exert commercially reasonable efforts.  It did not guarantee success.

### 3. Damages

Lupin provides an alternative argument in favor of summary judgment on the breach of contract claim based on its alleged failure to use commercially reasonable efforts:  InspiRx cannot show any non-speculative damages.  *See* Lupin Motion at 22-25.  Under New York law, "a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty."  *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).  Although damages "need not be proven with 'mathematical precision,'" they must nevertheless be "capable of measurement based upon known reliable factors without undue speculation."  *Id.* (quoting *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993)).  In other words, "damages

may not be merely speculative, possible or imaginary." *Kenford Co. v. Cnty. of Erie* (*Kenford I*), 67 N.Y.2d 257, 261 (1986).

As such "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld*, 218 F.3d at 172 (citing *Kenford I*, 67 N.Y.2d at 261); *see Kenford I*, 67 N.Y.2d at 261 ("If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." (citation omitted)). Although a court is not prohibited from awarding damages to a new business, *see Int'l Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 86 (2d Cir. 1996), New York's requirement that damages be "capable of proof with reasonable certainty" is a "stringent" one, *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993) (citation omitted).

InspiRx launched a new product into a mature market. InspiRx seeks damages based on a model from its damages expert, Graham D. Rogers. *See* Dkt. 39, Exh D ("Rogers Report"). Rogers's damages model recommends that the Court compensate InspiRx for lost profits based on Lupin's initial forecasts. *Id.* ¶¶ 31, 32.[8] Courts are hesitant to rely on limited periods of historical data to project future earnings for new products. *See, e.g.*, *Trademark Rsch. Corp.*, 995 F.2d at 333 (concluding that the plaintiff could not "extrapolate seven years of lost profits from four months" of sales of a new product); *Int'l Telecom, Inc. v. Generadora Electrica del Oriente*, No. 00 Civ. 8695 (WHP), 2004 WL 784941, at *4 (S.D.N.Y. Apr.13, 2004) (denying lost profits where the plaintiff "[sought] to project eight years of lost profits based on only two months revenues in

---

[8] Rogers alternatively provides a calculation of damages based on the Annual Purchase Obligation. Rogers Report ¶¶ 31, 33, 52-62. As the Court explains below, InspiRx does not have a cause of action for damages based on that provision. *See* Section III(A)(4).

a new business venture"); *Ciraolo v. Miller*, 525 N.Y.S.2d 861, 862 (App. Div. 1988) (concluding that a one-month profit history was an unduly speculative basis for award of twelve months' lost profits).  Here, InspiRx had no sales history at all, meaning the damages model is based only on speculative projections.  *See Schonfeld*, 218 F.3d at 172-73 (holding that damages for a new proposed television channel were overly speculative in part because "there [was] no historic record of operations from which lost profits could be projected").  These forecasts are particularly questionable given that they are from mid-2014, almost a year before the Products launched.  And once the Products launched, sales quickly failed to live up to expectations.

InspiRx makes two main arguments in an effort to overcome New York's stringent damages requirement for new businesses.  First, it argues that "the Products were *not* a new business when launched by Lupin," as both companies had extensive experience in the VHC market.  InspiRx Opposition at 22.  InspiRx analogizes this case to *Ashland Management*, where the New York Court of Appeals held that a developer could recover from his former employer, an investment management firm, for improperly using the developer's mathematical model for guiding the firm's investment strategy.  82 N.Y.2d 395.  First, the court noted that the contract to use the model explicitly provided for "realistic estimates of future assets to be managed by the use of" the model, and incorporated a mathematical formula for allotting revenues to the developer, allowing the developer's loss to be "easily computed."  *Id.* at 406.  Second, the court noted that "while the parties were launching a new investment strategy, they were not entering a new or unfamiliar business," as the introduction of the model was viewed as an "enhancement" to the employer's already-successful strategy.  *Id.*  Third, the court noted the employer "had a ready reservoir of customers" for the model and that although the model "had never been used in a commercial setting, it had been extensively back-tested over a number of years."  *Id.*

*Ashland* is distinguishable from the case at hand. The InspiraChamber was simply not a new "strategy" for either company. It was a new product with no sales history or back-testing. The parties' experience with a competing VHC product does not make damages concerning *this* product any less speculative. *See, e.g.*, *Schonfeld*, 218 F.3d at 172-73 (rejecting the plaintiff's argument on appeal that the channel was not a "new business," on the basis that the defendants "were experienced cable channel operators and [their other] news programming has been distributed around the world for many years"); *Upper Deck Co. v. Breakey Int'l, BV*, 390 F. Supp. 2d 355, 360 (S.D.N.Y. 2005) ("While Upper Deck may be, as BreaKey argues, 'an experienced player in the collectible toy market,' this is a new entertainment product that has never before been sold in thirty-five of the thirty-seven countries for which Stewart projects sales.").

Second, InspiRx argues that the damages are not speculative because they are based on Lupin's own projections. *See* InspiRx Opposition at 20 ("InspiRx's lost profit damage calculation is not speculative as it is based on data Lupin considered reliable for its own economic assessment of the business."). But these projections were from mid-2014, long before the product was launched. Regardless, courts regularly hold that "[a] defendant's own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history." *Holland Loader Co.*, 313 F. Supp. 3d at 481 (quoting *Inficon, Inc. v. Verionix, Inc.*, 182 F. Supp. 3d 32, 37 (S.D.N.Y. 2016)).

Accordingly, the Court concludes that the speculative nature of damages alone provides an alternative basis for granting summary judgment in favor of Lupin on InspiRx's breach of contract claim based on Lupin's alleged failure to use commercially reasonable efforts to distribute the Products.

### 4. InspiRx's Minimum Purchases Claim

Lupin seeks summary judgment on InspiRx's minimum purchases claim.  The Agreement required Lupin to make certain minimum purchases for each of the first three years of the Agreement, *i.e.*, 2015, 2016, and 2017.  *See* Agreement § 3.11. The amounts increased each year, from approximately two hundred thousand units to over five hundred thousand in the third year. *Id.* at C-1.  It also provided that "there shall be no Annual Purchase Obligation after the third Contract Year."  *Id.* § 3.11(a).  Lupin does not dispute that it did not meet the Annual Purchase Obligations in both 2016 and 2017.  *See* Lupin Counter-56.1 ¶ 49; Miller Decl., Exh. I at 3-4.

The Agreement outlined InspiRx's remedies in the event Lupin breached that provision: "In the event that Lupin fails to meet the Annual Purchase Obligation in any Contract Year . . . , InspiRx's *sole right and remedy* with respect to such failure shall be to terminate this Agreement on sixty (60) days prior written notice delivered within sixty (60) days after the end of such Contract Year, and *Lupin shall bear no other liability* therefore."  Agreement § 3.11(d) (emphasis added).  The Agreement further provided that, "[i]n the event that InspiRx fails to deliver such written notice within such period, InspiRx shall be deemed to have irrevocably and unconditionally waived for all purposes Lupin's failure to meet the Annual Purchase Obligation for such Contract Year."  *Id.*

The parties do not dispute that InspiRx did not exercise this remedy under the Agreement, *see* InspiRx Counter-56.1 ¶ 83, and Amato testified that "nothing" prevented InspiRx from doing so, First Amato Depo. Tr. at 161:5-8.  However, InspiRx contends that Lupin is estopped from enforcing section 3.11's limitation on InspiRx's rights in the event of breach "due to [Lupin's] bad faith non-performance" of the Agreement.  InspiRx Opposition at 11-13.  In support, InspiRx cites two cases: *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442 (S.D.N.Y.

1986), and *McNally Wellman Co., v. New York State Electric & Gas Corp.*, 63 F.3d 1188 (2d Cir. 1995). *See* InspiRx Opposition at 11.

But those cases address section 2-719(3) of the Uniform Commercial Code, which provides that consequential damages "may be limited or excluded unless the limitation or exclusion is unconscionable." N.Y. U.C.C. Law § 2-719(3); *see Long Island Lighting Co.*, 646 F. Supp. at 1458 ("The Uniform Commercial Code permits the parties to a sales contract to provide specific remedies and to limit or exclude consequential damages 'unless the limitation or exclusion is unconscionable.' . . . A defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith." (citing N.Y. U.C.C. Law § 2-719(1), (3))); *McNally Wellman Co.*, 63 F.3d at 1198 n.9 (concluding that "[t]here is some support for [the defendant's] contention that bad faith is an exception to the enforceability of a consequential damages exclusion under section 2–719(3)," but declining to "resolve the source or viability of the bad faith exception" because the defendant had failed to raise a genuine issue of material fact as to plaintiff's bad faith "under any theory").

These cases simply do not support the proposition that Lupin can be estopped from enforcing the contractual provision limiting InspiRx's remedies for breach. "Absent some indicia of fraud or other circumstances warranting equitable intervention, it is the duty of a court to enforce rather than reform the bargain struck." *Grace v. Nappa*, 46 N.Y.2d 560, 565 (1979). "A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Terwilliger*, 206 F.3d at 245 (citations omitted). The parties agreed to limit InspiRx's remedy if Lupin failed to meet the minimum purchase requirements, and InspiRx did not exercise that remedy. It has waived its right to do so now.

Accordingly, the Court grants summary judgment in favor of Lupin on InspiRx's second

cause of action, breach of contract based on Lupin's failure to meet the Annual Purchase Obligations.

## B. InspiRx's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

Finally, Lupin moves for summary judgment on InspiRx's claim for breach of the implied covenant of good faith and fair dealing. Under New York law, every contract "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (citation and internal quotation marks omitted). The implied covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Fishoff v. Coty Inc.,* 634 F.3d 647, 653 (2d Cir. 2011) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). However, "the implied covenant of good faith and fair dealing cannot be used to impose an obligation that is inconsistent with express contractual terms." *In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 102 (2d Cir. 2015); *accord LJL 33rd St. Assoc., LLC v. Pitcairn Props., Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) ("[T]he implied covenant of good faith cannot create duties that negate explicit rights under a contract.").

"A breach of the duty of good faith and fair dealing is considered a breach of contract." *Fishoff*, 634 F.3d at 653 (citation omitted). Therefore, a complaint that pleads both breach of contract and breach of the implied covenant based on same the facts "is redundant." *Jordan v. Verizon Corp.*, No. 08 Civ. 6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008); *see also Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (noting that New York law "does not recognize a separate cause of action for a breach of the implied covenant of

good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled"). "An exception to this general rule exists when a plaintiff alleges 'an implied duty that is consistent with the express contractual terms, but base[s] its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims.'" *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 220 (E.D.N.Y. 2018) (alteration in original) (quoting *JPMorgan Chase Bank, N.A. v. IDW Grp.*, No. 08 Civ. 9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009)).

InspiRx contends that Lupin breached the implied covenant because, in essence, Lupin told InspiRx it was devoted to improving sales while "behind the scenes, it was deprioritizing the Products and cutting its marketing resources and capabilities." InspiRx Opposition at 6; *see* Amended Compl. ¶¶ 78-91. InspiRx's breach of contract and implied covenant claims plainly concern the same underlying facts: Lupin's alleged failure to engage in commercially reasonable efforts. InspiRx's argument that Lupin did so in bad faith do not give rise to a cause of action distinct from a breach of contract action. *See Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 266 (E.D.N.Y. 2016) ("[B]ad faith in connection with a breach of contract claim does not provide an independent basis for recovery." (citation omitted)).

But even if the implied covenant claim was not duplicative, the Court would still grant summary judgment on this claim because there is no genuine issue of material fact regarding Lupin's good faith. "The implied covenant does not undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (internal quotation marks omitted). "The covenant will be breached only in a narrow range of cases." *Id.* "A plaintiff must show substantially more than evidence that the defendant's actions were negligent or inept[,] . . . . such as that the defendant 'act[ed] arbitrarily or irrationally in exercising [the] discretion' afforded

to it under the contract."  *Id.* at 817-18 (second and third alterations in original) (quoting *Dalton*, 87 N.Y.2d at 389).

There is simply nothing in the record reflecting that Lupin acted to prevent performance of the contract or exercised its discretion arbitrarily.  For instance, InspiRx suggests that the fact Lupin hired 120 sales representatives to promote Solosec "instead of the Products" reflected bad faith.  InspiRx Opposition at 7.  But Solosec is a different drug marketed towards physicians who treat adult females, and was launched at a later time, March 2018.  Lupin Reply at 8; Lupin Counter 56.1 ¶ 63.  InspiRx does not point to any evidence to reflect that the sales force for Solosec was hired at the expense of the Products, or why this drug would merit the same treatment as the Products, which had shown a record of poor sales.

InspiRx also asserts that Lupin engaged in bad faith by failing to disclose that it had reduced its marketing budget, disbanded its pediatric sales force, and "had no intention of utilizing personal promotion efforts for the Products going forward."  InspiRx Opposition at 6-7.  But again, these were commercially reasonable actions that did not constitute a breach of the Agreement, as outlined above.  Moreover, the record reflects that Lupin *did* disclose that it disbanded the sales force around February 2017.  *See* Second Amato III Depo. Tr. at 60:21-24 (testifying that about a month after a January 12, 2017 email was sent, Lupin told Amato III that it was disbanding its pediatric sales force).   Although InspiRx makes much of this being *after* the February 2017 meeting, *see, e.g.*, Dkt. 59 ¶¶ 2, 3 (declaration from Amato III that he was not notified until after the meeting), at most that might temper the inferences a factfinder could take from InspiRx's positive reactions to that meeting.  It does not show bad faith.

At bottom, InspiRx argues that Lupin convinced InspiRx that Lupin was "going to turn things around, all the while Lupin had no real intention of doing so," which "induced" InspiRx not to terminate the Agreement.  InspiRx Opposition at 8, 10.  But InspiRx did search for other

distributors.  InspiRx Counter-56.1 ¶ 86.  None were interested.  *Id.* ¶¶ 84, 86.  Even putting that aside, there is nothing in the record that would allow a reasonable factfinder to conclude that Lupin did not intend to go forward with its new strategy.  InspiRx does not point to any evidence that Lupin had an ulterior motive, nor has it set forth any facts that would explain why Lupin remained in the Agreement for two more years with no intent to "turn things around."  To do so would make little sense:  Lupin only benefited from the Agreement by actually selling the Products.

In sum, InspiRx's speculation that Lupin acted in bad faith, against Lupin's own interests, is belied by the record.

## IV. Conclusion

For the foregoing reasons, the Court grants Lupin's motion for summary judgment and denies InspiRx's motion for partial summary judgment.  The Clerk of the Court is respectfully directed to terminate all pending motions and close this case.  This Opinion and Order shall initially be filed under seal.  The parties shall have until August 23, 2021 to file any proposed redactions to this Opinion and Order, as well as a letter justifying why these redactions are justified under *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  The parties shall submit a single set of proposed redactions, but may explain any disagreements in their joint letter.

SO ORDERED.

Dated: July 23, 2021
New York, New York

JOHN P. CRONAN
United States District Judge